**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| In Re:<br><br>Law Enforcement Officers Security Union,<br><br>Debtor. | Case No. 24-70277-JAD |
| The International Union, Security, Police and Fire Professionals of America,<br><br>Objecting Party,<br>v.<br><br>Eric E. Bononi, Trustee,<br><br>Respondent. | Chapter 7 |

**<u>THE SPFPA'S OBJECTION
TO THE MOTION TO APPROVE SETTLEMENT</u>**

The International Union, Security, Police and Fire Professionals of America (the "<u>SPFPA</u>"), by and through its undersigned counsel, hereby submits this objection to the above-captioned trustee's (the "<u>Trustee</u>") *Motion to Approve Settlement* [Docket No. 92] (the "<u>9019 Motion</u>") by and between the Trustee, the above-captioned debtor ("<u>Debtor LEOSU</u>"), the Law Enforcement Officers Security & Police Benevolent Association LEOS-PBA ("<u>LEOS-PBA</u>"), and the United

Federation LEOS-PBA (the "Federation"). In support of this objection, the SPFPA respectfully states as follows:

## PRELIMINARY STATEMENT

1. Steve Maritas ("Debtor Maritas")[1] and his union, Debtor LEOSU are blatantly abusing the bankruptcy system. Their Chapter 7 Cases were strategically filed to flee an imminent multi-million dollar judgment resulting from Debtor Maritas' and Debtor LEOSU's willful and unlawful prepetition conduct, including the willful and intentional defamation of SPFPA and its officers and their equally willful and intentional destruction of evidence to hide those undisputable facts from a judge and jury. Now, the Debtors pushed for a settlement that impermissibly seeks to release the Debtors and their insiders arguably from all claims, particularly fraudulent transfer and preference claims amounting to $1.8 million, in exchange for a mere $140,000. If this settlement was approved, the Debtors' strategic use of the bankruptcy court to put the empty shells into bankruptcy and keep the full shells out will have come to a very successful conclusion indeed. Moreover, this is grossly insufficient consideration for the Debtors' victims (*i.e.* non-settling parties) whose rights are ultimately prejudiced by this proposed settlement. These creditors will receive pennies, while their abusers' alter ego unions will have successfully hidden

---

[1] The Chapter 7 Case for Debtor Maritas proceeds under Case Number 24-70275(JAD).

away millions of dollars in would-be recovery. These Debtors and their non-debtor affiliates are engaged in a long-running and classic shell-game.

2. The Trustee provides *no evidence* in the 9019 Motion to support the settlement. Furthermore, the 9019 Motion and the settlement attached thereto (the "9019 Settlement") are riddled with inconsistencies. As mandated by the Supreme Court in *TMT Trailer Ferry*, the 9019 Motion must be denied because the Court has no ability to make an informed, independent judgment on the reasonableness of the 9019 Settlement.[2] This Court has similarly disapproved a settlement for the lack of evidentiary support. See *In re Zambrano Corp.*, No. ADV 09-02045-JAD, 2014 WL 585305 (Bankr. W.D. Pa. Feb. 13, 2014). Even if the Trustee were to provide evidence, the facts that would be put before the Court would weigh heavily against approval of the 9019 Motion, as explained in more detail below.

3. Accordingly, SPFPA requests this Court: deny the 9019 Motion and grant such other relief as is just and proper.

[2] *Protective Comm. for Indep. S'holders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 88 S. Ct. 1157, 20 L. Ed. 2d 1 (1968) (remanding to the district court to hold a proper evidentiary hearing relating to the debtor's valuation that was integral to the proposed settlement because the court lacked information sufficient to make an informed, independent judgment on the compromise).

## BACKGROUND

### I. PRE-BANKRUPTCY LAWSUITS

4. Debtor Maritas titles himself as an "executive director" or "organizer" of multiple labor unions that he created, including Debtor LEOSU. In these roles, Debtor Maritas engaged in a decade-long campaign of obscene defamation against SPFPA, which, in one instance, escalated to Debtor Maritas assaulting one of the SPFPA's officers. These actions are but a sliver of the many claims at issue in the SPFPA's lawsuits against the Debtors.[3] In the aggregate, SPFPA possesses unliquidated claims against the Debtors in the amount of at least $2.4 million.[4][5]

5. Debtor Maritas and Debtor LEOSU know that the chances of successfully defending the multiple lawsuits against them is slim to none, so they are willing to take whatever actions necessary to avoid collection. Directly relevant

---

[3] The currently pending lawsuits during these chapter 7 cases are: First Circuit Court State of Hawaii, Case No. 1CCV-24-0000593, and Eastern District of Michigan, Case No. 19-cv-10743 (the "Federal Lawsuit," and collectively, the "Lawsuits"). As this Court will recall, on September 27, 2024 the Court lifted the stay for the Lawsuits upon entry of the *Order Granting Movants' Request for Relief from Automatic Stay and Denying Without Prejudice the Movants' Request for Abstention* [Docket No. 39].

[4] This amount does not include punitive damages, attorney's fees, costs and pre- and post- judgment interest, which are specifically recoverable pursuant to the aforementioned claims. The SPFPA currently estimate that these latter categories of claims amount to at least $1,000,000 in additional damages.

[5] The SPFPA filed a general unsecured claim against Debtor LEOSU in the amount of at least $3,658,337.67 [Claim No. 3].

to the matter before the Federal Court in Michigan, Debtor Maritas' criminal history and his association with (and in fact control of) Debtor LEOSU were the subject of detailed findings by a Federal Judge. Among many other findings, the Court ruled that: (a) "…Maritas, who is the organizing director of LEOSU, has a criminal record and a history of crime," (b) "…Maritas served time in connection with a crime of which he was guilty…," (c)"…Maritas threatened to stalk and kill his girlfriend and their daughter…," and (d) "[t]he suggestion that LEOSU was "criminal run" was also not false because there is not dispute that Mr. Maritas ran the organization." [**Ex. A**, Opinion and Order, PageID.2432, 2423, 2421 and 2431].

6. To avoid even more damning findings against them, Debtors Maritas and LEOSU first willfully deleted responsive evidence during active litigation that prejudiced SPFPA, as detailed by the Special Master in the Federal Lawsuit. [**Ex. B**, Report and Recommendation, dated June 17, 2024] and [**Ex. C**, Report and Recommendation, dated September 22, 2022]. When faced with an imminent jury trial and pending sanctions—including Rule 11 show-cause proceedings for demonstrable bad-faith litigation tactics—the Debtors then sought refuge in bankruptcy, filing petitions on July 8, 2024 (the "Petition Date"), just one week before trial, in a transparent effort to halt adjudication and avoid accountability in the Federal Lawsuit.

7. These are not the only actions the Debtors have taken to avoid collection. Far from it. Debtor LEOSU, at the direction of Debtor Maritas, has been funneling millions of dollars of membership dues to non-debtor LEOS-PBA and potentially other shell entities (*e.g.* the Federation) for years, as discussed further below.

## II. THE FRAUDULENT TRANSFERS

8. Since as early as December 2018, there has been a sustained pattern of fraudulent transfers orchestrated by Debtor Maritas to siphon union membership dues away from Debtor LEOSU and into other unions he formed and controls. After the filing of the Federal Lawsuit, dues checks payable to Debtor LEOSU were deposited into non-debtor LEOS-PBA's accounts, which reported receipts exceeding $2 million, while Debtor LEOSU reported *none*. Debtor Maritas later merged Debtor LEOSU and non-debtor LEOS-PBA into another union called the Federation and, thereafter, LEOS-PBA disclosed a $900,000 "per capita" transfer to an undisclosed union, believed to be the Federation. These movements, coupled with missing LM Reports (discussed below), reflect deliberate concealment and diversion of assets to LEOS-PBA, the Federation, and related unions to shield millions of dollars from creditor collection.

9. It began on March 6, 2018. As required by federal law, Debtor LEOSU filed a report evidencing its formation (the "Formation Report"), whereby it

disclosed that Debtor LEOSU expected to receive annual union membership dues of between $10,000 and $199,999. [**Ex. D**, Formation Report].

10. In December 2018, approximately nine months after the Formation Report's filing, SPFPA filed the Federal Lawsuit. The Debtors were on notice that they faced a multi-million-dollar claim. It was at this time that Debtor LEOSU backtracked on its Formation Report statement that it would receive annual membership dues. Rather, Maritas immediately began, by his own admission, funneling dues paid to Debtor LEOSU to other unions controlled by Debtor Maritas and the same group of cronies. At this moment, the Debtors and non-debtor affiliates began effectuating their shell game of fraudulent transfers.

11. In March of 2019, Debtor LEOSU filed its first annual report as required by the Department of Labor (the "LM Reports"). Those LM Reports revealed that Debtor LEOSU had 217 and 557 union members in years 2017 and 2018, respectively, but somehow received zero dollars in membership dues. [**Ex. E**, LM Report, dated March 29, 2019]; *see, also* [**Ex. F**, LM Report, dated March 31, 2019 at p.2]. A footnote in the LM Reports states that Debtor LEOSU does not maintain any cash and, instead, all funds are kept by the "International Union." [**Ex. F**, LM Report, dated March 31, 2019 at p.3]. In deposition testimony, Debtor Maritas confirmed that the "International Union" is actually non-debtor LEOS-PBA,

another union entity that Debtor Maritas created. [**Ex. G**, Maritas Dep. at 25:19-26:1].

12. Debtor LEOSU's subsequent LM Reports for years 2019 through 2022 continue this trend. The 2019 LM Report showed that Debtor LEOSU's membership rose to 655 members, yet Debtor LEOSU still received zero dollars in membership dues. The 2020 LM Report showed a further increase to 1,724 members, yet Debtor LEOSU still received zero dollars in membership dues. [**Ex. H**, LM Report, dated June 26, 2021 at p.2]. Debtor LEOSU filed a substantially identical LM form for years 2021 and 2022, showing flat membership of the same 1,724 union members and still not a dollar of funds in union dues. [**Ex. I**, LM Report, dated July 25, 2022]. Notably, every LM Report filed by Debtor LEOSU has the same footnote stating that all of Debtor LEOSU's membership dues are kept by LEOS-PBA.

13. Non-debtor LEOS-PBA's filed LM Reports verify this shell game. LEOS-PBA's LM Reports show the *exact same* union memberships that Debtor LEOSU reported for each and every year, yet further reported receiving total receipts *of over $2 million dollars* during the relevant period. Clearly, Debtor LEOSU simply deposited these funds in non-debtor LEOS-PBA's bank account to hide assets from Debtor LEOSU's creditors. In fact, Debtor Maritas confirmed in deposition testimony that union members wrote dues checks to Debtor LEOSU *and Debtor Maritas himself simply deposited those checks into LEOS-PBA's bank account*. [**Ex.**

**G**, Maritas Dep at 26:23-27:4]. Debtor Maritas plainly decided, after the filing of the Federal Lawsuit, to transfer these funds to LEOS-PBA and to treat these unions as one-in-the-same – and, tellingly, ultimately decided to file Debtor LEOSU for Chapter 7 but to keep LEOS-PBA out. An all-too-typical shell-game to defraud creditors that is worthy of a substantive consolidation.

14. As the Lawsuits continued, Debtor Maritas needed to try and bury the money even deeper to fraudulently protect it from collection. In early 2021, Debtor Maritas signed a merger agreement, *merging* Debtor LEOSU and non-debtor LEOS-PBA into another new union that, unsurprisingly, was also under his control - the Federation. [**Ex. G**, Maritas Dep at 30:18-22]; *see, also* [**Ex. J**, Strebeck Dep at 36:11-22, 37:1-2]. In the year following the merger, LEOS-PBA's 2022 LM Report disclosed that it transferred $900,000 to an undisclosed union.[6] [**Ex. K**, LM Report, dated March 31, 2023]. On information and belief, this nearly one-million-dollar transfer (and likely much more) was actually made to the Federation. Unfortunately, the SPFPA has not been able to confirm this fact ***because the Federation has never filed a required LM Report*** – despite the absolute requirements of Federal Law and criminal penalties for failure to do so – which would disclose these (and other)

---

6 The line item reflecting this $900,000 transfer of cash is referred to as a "Per Capita Tax." This is the terminology used in DOL filings to refer to funds transferred to another sister/parent/or affiliated union.

transfers. And neither Debtor LEOSU nor non-debtor LEOS-PBA have filed their federally required LM Reports for 2023 onward, despite those reports being due long ago. Title II of the Labor Management Reporting and Disclosure Act of 1959, 29 U.S.C. 431 makes it a criminal act to willfully fail to file a required LM Report, with penalties including imprisonment and fines. 29 U.S.C. 439. The Debtors are choosing to ignore the law requiring that they file the LM Reports in hopes that they will hide their years of fraudulent transfers from prying eyes.

15. The Federation is yet another non-debtor alter ego that Debtor Maritas deliberately kept outside of bankruptcy and away from the bankruptcy court's requirements of full disclosure. Notably, however, the Federation is one of 22 insider individuals and entities that the proposed 9019 Settlement purports to forever release. Though, more light would be shed on non-debtor LEOSU-PBA's and the Federation's transfers if such entities were substantively consolidated with Debtor LEOSU, thereby subjecting those entities to the Bankruptcy Code's requirements to disclose their assets.

## III. THE CHAPTER 7 CASES

16. On July 8, 2024, Debtor LEOSU and Debtor Maritas filed petitions under Chapter 7 of the Bankruptcy Code (the "Chapter 7 Cases").

17. On July 10, 2025, Eric E. Bononi was appointed as chapter 7 trustee (the "Trustee") in the Debtors' Chapter 7 Cases.

18. In the early stages of these Chapter 7 Cases, counsel for SPFPA provided extensive materials to the Trustee highlighting fraudulent transfers by these Debtors and documenting much of the history of fraudulent transfers detailed above. See, e.g., [**Ex. L**, Letter dated August 22, 2024].

19. On April 24, 2025, by the Trustee's application [Docket No. 66], the Court entered the *Order Granting Application to Employ Charles P. Dahlmann and Chuck Dahlmann Investigations as Forensic Accountant and Private Investigator* [Docket No. 70], tasking the investigator (the "Investigator") to, among other things, analyze the Debtors' books and records to account for any asset dispositions, the findings of which to be compiled in a summary report (a "Summary Report"). The 9019 Motion provides no information whatsoever regarding any facts discovered by the Trustee and his Investigator that would presumably be set forth in the Summary Report.

20. On July 15, 2025, the Trustee filed the *Motion for Mediation and to Appoint a Mediator* [Docket No. 75] (the "Mediator Motion"), whereby the Trustee requested the services of a mediator to "resolve preference, insider transactions, and fraudulent transfers per the report of [the Investigator]" (collectively, the "Fraudulent Transfer Claims"). *See* Mediator Motion, ¶ 3. No more information was provided on the nature of the Fraudulent Transfer Claims.

21. On August 14, 2024, the Court entered the *Consent Order of Court Directing Parties to Mediation and Appointing a Mediator* [Docket No. 79] whereby the mediator was appointed (the "Mediator"). The mediation was conducted on September 9th and 10th, 2025 (the "Mediation").

22. Based on discussions with the Trustee that occurred on September 9, 2025, the Trustee has identified at least $1.8 Million of fraudulent transfers executed by these Debtors.

23. On September 10, 2025, the Trustee and Debtor LEOSU reached a purported settlement. *See Mediator's Certificate of Completion of Mediators Conference* [Docket No. 88].

## IV. THE PROPOSED 9019 SETTLEMENT

24. On October 7, 2025, the Trustee filed the 9019 Motion. The terms of the 9019 Settlement, as well as the "support" offered in the 9019 Motion, are rife with inconsistencies, overly broad, wholly unsupported, and exceedingly problematic.

25. *First*, the scope of the "claims" that the Trustee holds and is seeking to release are not only transient, but also deceptively and impermissibly broad. The 9019 Motion defines "Claim" as a "Preferential / Fraudulent Transfer Settlement." 9019 Motion, ¶ 4. However, the 9019 Settlement uses another term, "Claims and Causes of Action," which is to mean "certain preference(s), insider transactions,

fraudulent transfers and alleged successor liability claims." 9019 Settlement, Recitals. To add to the uncertainty, the Trustee introduces yet another "Claim" definition in the proposed order attached to the 9019 Motion (the "9019 Order") and appears to have mistakenly used undefined terms throughout the documents. *See*, 9019 Order; *see, e.g.*, 9019 Motion, ¶ 10 ("The Trustee and debtor have agreed to settle the *claim* in the amount of $140,000.") (emphasis added).

26. Regardless of numerous ambiguities in the settlement documents, the scope of the release greatly exceeds the fraudulent transfer and preference claims that were the topics of the Trustee's apparent investigations. Section 3 of the 9019 Settlement provides that ***twenty-two insider parties*** (the "Union Insiders") will be released from both the "Claims and Causes of Action" and:

> "any and all past, present or future claims, liabilities, demands, causes of action, and/or other claims known or unknown, fixed or contingent, which the Trustee may now have or which may hereafter accrue, including, without limitation, claims arising out of or in any way connected to its business dealing with Debtor, any of the other Union Parties and/or any litigation, including claims for successor liability, alter ego, piercing the corporate veil, equitable relief, compensatory, punitive, or other damages, expenses (including attorneys' fees) and reimbursements or compensation of any kind."

9019 Settlement, Section 3.

The 9019 Settlement then goes further, providing an even broader release that states:

> "the Trustee, on behalf of the Debtor and its bankruptcy estate forever releases and discharges the Union Parties,

> including without limitation each of their officers, directors, agents, affiliates, successors and assigns from each and every right, claim, demand, account, action, cause of action, obligation, suit, proceeding, loss, liability, and lien of every kind and character whatsoever, including but not limited to any claim for subrogation, indemnification, or contribution, and under any federal, state, city, foreign or local statute, ordinance, regulation, and/or order, all as amended, and under the common law of any jurisdiction from the beginning of time up to and including the date of this Agreement, whether now known or unknown, whether based in contract, tort, statute or other legal or equitable theory of recovery, whether asserted or unasserted, contingent or noncontingent, liquidated or unliquidated, disputed or undisputed, or secured or unsecured, whether in rem or in personam, whether at law, at equity, or otherwise, arising out of or relating to any claims, rights, or interests that the Trustee, on behalf of the Debtor and its bankruptcy estate had, have, or may have against the Union Parties.
>
> This Agreement shall permanently enjoin, restrain, and bar any person or entity who has held, holds, or could hold or assert any claim, action, or cause of action of any kind, both known and unknown, against the Union Parties that was or could have been raised by the Trustee."
>
> 9019 Settlement, Section 3.

The scope of this release arguably includes the causes of action that SPFPA may hold or could hold and assert against non-debtors LEOS-PBA and the Federation (*e.g.* alter ego and successor liability claims the Trustee could have raised, but apparently did not, against such non-debtors, among other claims). As explained below, many of these claims are not derivative in nature but are rather direct causes of action held by creditors not party to the 9019 Settlement. Given the extreme

breadth of the release, the proposed consideration for its exchange must be substantial and free from uncertainty, which leads to the next issue.

27. *Second*, the 9019 Motion asserts that the "debtor" will pay the $140,000, while the 9019 Settlement rather asserts that non-debtors LEOS-PBA and the Federation will pay the $140,000. Confusing to say the least, but it may confirm that the Trustee, too, has concluded that Debtor Maritas' entities are mere alter egos of each other. Regardless, in addition to LEOS-PBA and the Federation, twenty other parties are set to be forever released from potentially valuable claims, but only one (or two) parties are remitting funds to the Trustee. This presents an even greater issue—what consideration are the Union Insiders providing in exchange for the release? The Trustee fails to provide information on the Union Insiders' assets, what claims the Trustee investigated against them, nor any factual support of any kind for the proposed settlement.

28. *Third*, in support of the 9019 Settlement, the 9019 Motion perfunctorily concludes that the settlement is "fair and reasonable," "in the best interests of the estate and its creditors," and that a "better 'net result' would not be obtained by continued litigation of the matters in dispute." Nothing more was provided in support of the 9019 Settlement. The Trustee does not cite to any findings contained the Investigator's Summary Report nor is that Report even attached for the Court's (or the creditors') review. The Trustee does not detail the nature of the claims it

may assert against the Union Insiders, the purported defenses the Union Insiders may have to those claims, what assets the Union Insiders may have that could be collected, the amounts of the preferences, insider transactions, and fraudulent transfers at issue, or how the proposed settlement of those undefined claims is remotely reasonable to discharge the Fraudulent Transfer Claims in the amount of $1.8 million if there were no settlement.

## OBJECTION

### I. THE 9019 SETTLEMENT SHOULD NOT BE APPROVED

29. The 9019 Motion should not be approved for the simple fact that it offers no evidence to show that the 9019 Settlement satisfies the Third Circuit's *Martin* factors, is fair and equitable, and in the best interests of creditors. The 9019 Motion does not divulge any information to explain the results of the Investigator's findings. The nature and amounts of the Fraudulent Transfer Claims are all undisclosed and unknown. The assets of the non-debtor settling parties / payors are not mentioned. The nature of the Mediation and the rounds of offers and counteroffers are unknown. Instead, the Trustee has an unsupported *belief* that "a better 'net-result' would not be obtained by continued litigation of the matters in dispute." 9019 Motion, ¶12.

30. While the Trustee bears the initial burden to show by the preponderance of evidence that the 9019 Motion should be approved (which he has failed to do),

this Objection, however, provides this Court with ample information to be applied to the Third Circuit's standards for analyzing 9019 settlements. As already discussed, the Debtors' blatant shell-game and sheer magnitude of the fraudulent transfers are troubling, especially in light of the fact that the 9019 Settlement contemplates the broad release of the Union Insiders without SPFPA and other creditors (*i.e.* the victims) involvement.

31. For the more particular reasons set for below, the 9019 Motion should be denied.

**A. <u>The 9019 Motion Lacks Meaningful Disclosure</u>**

32. Rule 9019(a) imposes a duty on the bankruptcy court "to make an informed, independent judgement" and not merely rely on the movant's unsupported conclusions on whether or not to approve a compromise. *See In re Zambrano Corp.*, No. ADV 09-02045-JAD, 2014 WL 585305, at *3 (Bankr. W.D. Pa. Feb. 13, 2014). Approval of a settlement without sufficient factual foundation constitutes an abuse of discretion. *In re Y-Knot Const., Inc.*, 369 B.R. 405, 408 (B.A.P. 8th Cir. 2007); *U.S. v. AWECO, Inc.* (*In re AWECO, Inc.*), 725 F. 2d 293, 299 (5th Cir. 1984); *see also In re Wheeling-Pittsburgh Steel Corp.*, 103 B.R. 672, 690 (W.D. Pa. 1989) ("A sufficient factual record must exist before a settlement may be approved."). The bankruptcy court "must be apprised of all relevant information that will enable it to determine what course of action will be in the best interest of the estate". *See*

*In re Martin*, 91 F.3d 389, 394 (3d Cir. 1996); *see also TMT Trailer Ferry*, 390 U.S. at 424 (the bankruptcy court must "[appraise itself] of all facts necessary for an intelligent and objective opinion of the probabilities of ultimate success should the claim be litigated. Further, the judge should form an educated estimate of the complexity, expense, and likely duration of such litigation, the possible difficulties of collecting on any judgment which might be obtained, and all other factors relevant to a full and fair assessment of the wisdom of the proposed compromise."). The movant has the ultimate burden of demonstrating by a preponderance of the evidence that the 9019 settlement is in the best interest of the estate. *Velde v. First Int'l Bank & Trust* (*In re Y-Knot Const.*), 369 B.R. 405, 408 (B.A. 8 th Cir. 2007).

33. *TMT Trailer Ferry* is controlling. There, the district court confirmed a plan of reorganization that compromised major creditors' claims and excluded stockholders after finding debtor TMT insolvent based largely on the valuation of past earnings. *TMT Trailer Ferry*, 390 U.S. at 420-24. The SEC and a stockholders' committee objected, arguing the compromises lacked factual inquiry and that valuation ignored future earning capacity. *Id*. The Fifth Circuit affirmed. *Id*. However, the Supreme Court reversed and remanded to the district court, holding that the plan cannot be confirmed because debtor TMT's business was not properly valued. *Id*. at 453. In so holding, the Supreme Court reasoned that "it is essential that every important determination in reorganization proceedings receive the

'informed, independent judgment' of the bankruptcy court" and to not rely on the "bald conclusions of the trustee." *Id*. at 424, 433.

34. This Court has closely followed the principal set forth in *TMT Trailer Ferry*. In *In re Zambrano Corp.*, the trustee held two post-trial judgments totaling about $4.7 million against the defendants (*i.e.* insiders). No. ADV 09-02045-JAD, 2014 WL 585305, at *1 (Bankr. W.D. Pa. Feb. 13, 2014). The trustee later obtained charging orders against the defendants' partnership and limited liability company interests to pay the trustee any and all of its distributions on account of the defendants' judgment. *Id*. After difficulty in collecting on the defendants and their companies due to numerous real property and other asset transfers, the trustee sought approval of a settlement for $130,000 to satisfy the judgments in full. *Id*. at *2. An objecting creditor argued the settlement amount was too low. *Id*. This Court held that the trustee had not met its burden of proving that the 9019 settlement falls within the reasonable range of litigation possibilities. *Id*. at *3. It was found that the trustee provided no concrete estimate that the cost and delay of litigation outweighed settlement and also failed to provide persuasive evidence that the hurdles to collecting the judgment favored settlement. *Id*. at *4-5.

35. Here, the 9019 Motion offers no evidence whatsoever to even try to meet this burden. The 9019 Motion does not attach or even mention the Summary Report to explain the results of the Investigator's findings. The nature and amounts

of the preferences, insider transactions, and fraudulent transfers are all undisclosed and unknown. The assets of the non-debtor settling parties / payors are not mentioned. The nature of the Mediation and the rounds of offers and counteroffers are unknown. At the very least, the Trustee must explain the process by which it valued the release for $140,000 against (i) the probability of success on the merits, (ii) the complexity, expense, inconvenience, and delay caused by litigation, (iii) the difficulty of collection, and (iv) the paramount interest of creditors. There is not a shred of evidence in the 9019 Motion that demonstrates that the settlement amount and claim release is appropriate or supported. The 9019 Motion is two pages long and provides no discussion of these key issues. Instead, the Trustee has an unsupported *belief* that "a better 'net-result' would not be obtained by continued litigation of the matters in dispute." 9019 Motion, ¶12.

36. While *TMT Trailer Ferry's* and *Zambrano's* facts are a bit dissimilar to the present facts (*i.e.* the Supreme Court and this Court had *some* evidence that could be applied to analyze the reasonableness of the settlement), both cases are illuminating. In each case, the trustees failed to provide the courts with sufficient evidence to support approval of the settlements. In *TMT Trailer Ferry* and *Zambrano*, whatever scant evidence the courts had to work with to determine if the proposed settlements were in the best interests of creditors, such evidence was ruled to be insufficient to support settlement. Here, however, the Trustee offered *no*

*evidence* to the Court, but rather made a conclusory statement that the proposed settlement is "fair and reasonable," is "in the best interests of the estate," and that a "better 'net result' would not be obtained by continued litigation."

37. Therefore, as mandated by *TMT Trailer Ferry*, and for this reason alone, the Court should deny entry of the 9019 Motion.

**B. <u>The Trustee Does Not Satisfy the Rule 9019 Standards for Approval</u>**

38. Assuming *arguendo* that the Trustee eventually proffers any evidence in its 9019 Motion to survive immediate dismissal, the 9019 Settlement would still not satisfy the four criteria established by the Third Circuit in *Martin*, and neither is the 9019 Settlement fair and equitable nor in the best interests of creditors.

**1. <u>The 9019 Settlement Does Not Satisfy the Martin Factors</u>**

39. In determining whether to approve a settlement under Rule 9019, a bankruptcy court must "assess and balance the value of the claim that is being compromised against the value to the estate of the acceptance of the compromise proposal." *In re Martin*, 91 F.3d at 393. The Third Circuit "recognize[s] four criteria that a bankruptcy court should consider in striking this balance: (1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of the creditors." *Id*. (citation omitted).

Ultimately, the court must determine whether the settlement falls within the lowest range of reasonableness. *See In re Zambrano Corp.*, No. ADV 09-02045-JAD, 2014 WL 585305, at *3 (Bankr. W.D. Pa. Feb. 13, 2014) (citing *In re Neshaminy Office Bldg. Associates*, 62 B.R. 798, 803 (E.D.Pa.1986)).

40. The Court should deny the 9019 Motion based on the *Martin* factors because:

a. ***Probability of Success***.

The 9019 Motion is bereft of any real discussion of the likelihood that the Trustee can recover value on account of the fraudulent transfers. However, for the reasons set forth herein, SPFPA believes that the Fraudulent Transfer Claims are likely to succeed and be collectable, resulting in the Trustee's ability to recover at least $1.8 million, which result the Debtors seek to escape for grossly insufficient consideration.

b. ***Collectability***.

SPFPA believes the facts would show that the potential defendants of the avoidable transfer actions would be collectable in amounts that far exceed the proposed settlement amount. Based on the filed LM Reports for Debtor LEOSU and non-debtor LEOS-PBA alone, those reports clearly indicate that the latter is the recipient of millions of dollars over the course of just a few years. The Trustee offers no evidence to dispute these facts.

c. ***Complexity/Expense/Inconvenience/Delay***.

None of these considerations support the 9019 Motion. First, fraudulent conveyance law is relatively well-settled, and while there are complicated factual issues involved, some factual discovery has presumably already been undertaken per the Investigator's Summary Report. *See* Mediator Motion. Secondly, SPFPA is familiar with the operations of the Debtors and its relationship with LEOS-PBA, the Federation and other alter-egos. SPFPA is willing and capable in assisting the Trustee in its Fraudulent Transfer Claim actions (as it has done to date) against the Union Insiders to further reduce the expense to the estate. Third, inconvenience and delay do not support settlement: the Trustee's litigation of the Fraudulent Transfer Claims is directed primarily at the non-debtor transferees. Debtor LEOSU's liquidation and dissolution in its Chapter 7 case will not be inconvenienced nor delayed by the Trustee's adversary proceedings.

d. ***Paramount Interest of Creditors***.

The proposed settlement is certainly not in the paramount interest of creditors, as it seeks to settle claims that would provide the only meaningful recovery for the estates' unsecured creditors for pennies on the dollar without any justification whatsoever. The Trustee has previously indicated to SPFPA that it could seek to claw back approximately $1.8 million in funds that the Debtors' fraudulently transferred to LEOS-PBA and the Federation, among other of Debtor Maritas'

unions, many of which are identified as parties to receive releases, yet only one (or two) of which are contributing a penny in exchange for such a gift. Thus, the Trustee now seeks a mere $140,000 in exchange for the release of twenty-two non-debtor parties, many of whom are the Debtors' insiders, potentially permanently barring any person or entity who has held, holds, or could hold or assert any claim against the Union Insiders that was or could have been raised by the Trustee.

Debtor LEOSU reported on its schedules that it holds approximately $410,000 in liabilities, all of which are general unsecured claims. *See* Debtor-LEOSU Schedule E/F [Docket No. 1]. That amount is very likely to increase by approximately $2.4 million once the court in the Federal Lawsuit delivers its judgment in November 2025. In such event, if the 9019 Settlement were approved, the creditor body as a whole would receive dismal recoveries. Such result is not in the paramount interests of creditors, where creditors would likely receive significant recoveries if the Trustee pursued the $1.8 million of Fraudulent Transfer Claims against all of the Debtors' alter egos.

41.For these reasons, the Court should deny the 9019 Motion.

**2. The 9019 Settlement is Not Fair and Equitable, and is Not in the Best Interest of Creditors**

42. The Third Circuit has held that "before a bankruptcy court approves a particular settlement, it must determine that such settlement is 'fair and equitable'." *Will v. Northwestern Univ.* (*In re Nutraquest, Inc.*), 434 F.3d 639, 644 (3d Cir. 2006)

(citing *TMT Trailer Ferry*, 390 U.S. at 424). The movant has the burden of demonstrating by a preponderance of the evidence that the 9019 Settlement meets the "fair and equitable" standard and should be approved. *Velde v. First Int'l Bank & Trust* (*In re Y-Knot Const.*), 369 B.R. 405, 408 (B.A. 8th Cir. 2007).

43. Courts place considerable weight on the adverse effect a settlement may have on other stakeholders who are not parties to the settlement. *See In re Med. Asset Mgmt., Inc.*, 249 B.R. 659, 664 (Bankr. W.D. Pa. 2000) (denying a 9019 compromise where "the proposed settlement would enjoin certain objecting junior creditors who are not parties to the settlement from pursuing causes of action they may have against a party to the settlement other than debtor"); *In re Devon Cap. Mgmt., Inc.*, 261 B.R. 619 (Bankr. W.D. Pa. 2001) (approving the 9019 compromise after removal of a bar order provision that effectively extinguished non-settling parties claims without such parties receiving sufficient consideration in exchange); *In re Nutritional Sourcing Corp.*, 398 B.R. 816, 835 (Bankr. D. Del. 2008) (debtors' settlement with certain creditors disapproved because, despite the probability of success in litigation and the complexity, expense, and delay necessarily attending it weighed in favor of approving the settlement, the settlement "severely adversely impact[ed]... creditors who were not at the negotiating table and who were not adequately represented in their absence").

44. Furthermore, in applying the above factors to a settlement involving insiders, negotiated without participation from other stakeholders, and opposed by creditors and/or equity holders, ***the "court's scrutiny [of the settlement] must be great" and is heightened***. *Conn. Gen, Life Ins. Co. v. United Cos. Fin. Corp.* (*In re Foster Mortgage Corp.*), 68 F.3d 914, 919 (5th Cir. 1995) (emphasis added) (bankruptcy court abused its discretion by approving proposed settlement without considering either the fact that settlement agreement was negotiated between debtor and parent without benefit of creditor participation or that there was near unanimous creditor opposition to settlement); *see*, *e.g., In re Matco Elecs. Group, Inc.*, 287 B.R. 68, 78 (Bankr. N.D.N.Y. 2002) (debtors' settlement which provided releases of claims against insiders disapproved because the committee of unsecured creditors, a non-settling party, would be permanently enjoined from pursuing valuable claims against the insiders); *In re Present Co., Inc.*, 141 B.R. 18 (Bankr. W.D.N.Y. 1992) (debtor's settlement compromising estate's claims against insiders cannot be approved "over the objection of the only appearing non-insider parties so long as [the] insiders limit the information [about the claims] available to those parties.").

45. The 9019 Settlement is neither fair and equitable nor in the best interests of creditors. First, the 9019 Settlement involves an insider of Debtor LEOSU, a convicted criminal, and a couple dozen of his faux union entities and co-participants in the fraudulent transfers. As evidenced by the significant transfers of

membership dues from Debtor LEOSU to non-debtor LEOS-PBA per the LM Reports, the willful non-filing of the LM Reports for the Federation to further hide those funds, the destruction of evidence in the Lawsuits, the filing of bankruptcy to stay proceedings on the eve of the Federal Lawsuit's jury trial, the Debtors will take whatever nefarious action needed to shield their assets from creditors. Second, neither SPFPA nor other creditors were party to the negotiations, despite the 9019 Settlement's aim to potentially permanently enjoin such non-settling parties from pursuing claims against the Union Insiders. Third, it is not apparent that any creditor supports the 9019 Settlement. SPFPA, being a large creditor to the Debtors (if not the largest creditor), vehemently opposes the 9019 Settlement. These factors weigh against approval of the 9019 Settlement, as set by *In re Foster Mortgage Corp.* To prejudice the rights of the non-settling parties by permanently enjoining them from pursuing their causes of action against the Insider Unions for the unreasonably small consideration of $140,000 is not in the creditor's best interests, but rather for the paramount interest of Debtor Maritas.

46. This is especially true in light of the SPFPA's Lawsuits, one of which entering into an evidentiary hearing on damages, specifically against Debtor LEOSU in a matter of weeks. If the 9019 Settlement is entered prior to the court's ruling in the Federal Lawsuit, the Debtors and the Union Parties will be released from the Fraudulent Transfer Claims totaling $1.8 million prior to the delivery of the

approximately $2.4 million judgment against the Debtors, successfully shielding millions of dollars from their victims' last attempt for recovery for a fraction of what they would otherwise be liable for and have the ability to pay. Moreover, this is particularly troubling because the judgment against the Debtors is almost certainly nondischargeable under section 727 of the Bankruptcy Code.[7] To approve the 9019 Settlement would effectively make the debts derived from the Debtors' willful and malicious conduct impermissibly dischargeable to the detriment of the Debtors' victims.

47. Accordingly, the 9019 Settlement is neither fair and equitable nor in the best interests of creditors. Therefore, the 9019 Settlement should not be approved.

## CONCLUSION

WHEREFORE, for the foregoing reasons, the SPFPA respectfully requests this Court to (i) deny to 9019 Motion and (ii) grant such other relief as is just and proper.

---

[7] This Court is currently considering this issue in INTERNATIONAL UNIONS, SECURITY POLICE AND FIRE PROFESSIONALS OF AMERICA (SPFPA), an International Union, DAVID L. HICKEY, the International President of the Security Police and Fire Professionals of America, and JOSEPH MCCRAY, Plaintiffs, v. STEVE ANGELO MARITAS, Defendant (Adv. Pro. No. 24-07014-JAD).

Dated: October 28, 2025

Respectfully submitted,

*/s/ J. David Garcia*
VARNUM LLP
J. David Garcia, Esq. (admitted *pro hac vice*)
Brendan G. Best, Esq. (admitted *pro hac vice*)
Jaye Quadrozzi, Esq. (admitted *pro hac vice*)
480 Pierce Street, Suite 300
Birmingham, Michigan 38009
Phone: (248) 567-7800
Email: jdgarcia@varnumlaw.com
bgbest@varnumlaw.com
jcquadrozzi@varnumlaw.com

and

TUCKER ARENSBERG, P.C.
Maribeth Thomas, Esquire
PA ID No. 208376
1500 One PPG Place
Pittsburgh, Pennsylvania 15222
Phone: (412) 566-1212
Fax: (412) 594-5619
Email: mthomas@tuckerlaw.com

*Counsel for the International Union, Security Police and Fire Professionals of America, David L. Hickey and Joseph McCray*