# EXHIBIT L

Letter, dated August 22, 2024

VARNUM

480 Pierce Street | Suite 300
Birmingham, Michigan 48009
Telephone 248 / 567-7800 | Fax 248 / 567-7423 | www.varnumlaw.com

**J. David Garcia** Direct 248 / 567-7820
Admitted in Michigan and North Carolina jdgarcia@varnumlaw.com

August 22, 2024

Via Email

Eric E. Bononi
20 North Pennsylvania Avenue
Greensburg, PA 15601
bankruptcy@bononilaw.com

Re: In re LEOSU, Case No.24-21647; In re Steve Angelo Maritas, Case No. 24-70275-JAD

Dear Mr. Bononi:

I represent International Unions, Security Police and Fire Professionals of America ("SPFPA"), David L. Hickey and Joseph McCray (collectively, "Plaintiffs"), the plaintiffs in three lawsuits currently pending against debtors Law Enforcement Officers Security Union ("LEOSU") and Steven A. Maritas ("Maritas") (collectively, "Debtors"). My clients are therefore creditors in these estates. As the appointed Trustee over both of these related matters, I look forward to working with you going forward.

The purpose for this letter is to provide you with certain background information relevant to the LEOSU matter, in particular, in advance of the meeting of creditors scheduled for August 28, 2024.[1]In short, Debtors have been engaged in a series of clear actions designed to transfer and hide assets of both LEOSU and Maritas for years in order to avoid judgments against them in the aforementioned lawsuits. As to Debtor LEOSU, Plaintiffs already have obtained evidence showing that Debtors have been fraudulently conveying assets from Debtor LEOSU to other unions/entities controlled by Debtor Maritas *for years*. The claims that LEOSU has no assets are simply fraudulent and should be the subject of significant scrutiny in these proceedings.

**Background on Debtors Maritas and LEOSU and the Lawsuits Against Them**

Debtor Maritas titles himself as an "executive director" or "organizer" of multiple labor unions that he has created, including Debtor LEOSU. In these roles, Debtor Maritas, his various unions, and others employed by those unions, have engaged in a decade-long campaign of obscene defamation against SPFPA and its officers, including Hickey and McCray. Debtor Maritas and his cronies routinely post online and disseminate throughout the country many entirely false claims, such as:

[1] A separate meeting of creditors has been scheduled for September 11, 2024, as to Debtor Maritas.

- Maritas' Video claiming "***Corruption & Embezzlement*** going on at SPFPA" [Ex. 1]
- Video claiming SPFPA is ***"Corrupt Union"*** [Ex. 2]
- Maritas' Video Claiming SPFPA has a "Long History of ***'Corruption & Embezzlement'"*** [Ex. 3]
- Maritas' Video comparing SPFPA to ***heroin addicts*** [Ex. 4]
- Maritas' Tweet, blog post and video disgustingly claiming SPFPA President Hickey had ***incestuous relationship with his daughter*** [Ex. 5]
- Maritas' Video claiming SPFPA is "linked to ***PizzaGate***" [Ex. 6]
- Maritas' Video claiming SPFPA hired ***mafia hitmen*** [Ex. 7]
- Maritas' Obscenity laced blog post claiming "***F***ING Corruption & Embezzlement***" [Ex. 8]

These are but a sliver of many, many defamatory statements at issue in the three lawsuits, which are: Eastern District of Michigan, Case No. 19-cv-10743, Oakland County Circuit Court, Case No. 23-203923-CB and First Circuit Court State of Hawaii, Case No. 1CCV-24-0000593 (collectively, the "Lawsuits").

In addition to claims for willful and intentional defamation and interference with business expectancies, Plaintiffs also assert claims based on Debtor Maritas' brazen theft of SPFPA's intellectual property, giving rise to trademark infringement and unfair competition counts. Finally, the Hawaii matter involves Maritas sinking to a new level of depravity. That matter arises from Debtor Maritas' sexual assault of an SPFPA officer (McCray) during a union campaign event in Honolulu last year. Maritas was convicted of this assault in June and awaits sentencing. [Ex. 9].

The exact scope and nature of Plaintiffs' claims in the three pending lawsuits is beyond the scope of this letter. However, in the aggregate, Plaintiffs possess unliquidated claims against the Debtors in the amount of at least $3,500,000, not including punitive damages, attorney's fees, costs and pre- and post- judgment interest, which are specifically recoverable pursuant to the aforementioned claims. Plaintiffs currently estimate that these latter categories of claims amount to at least $1,000,000 in additional damages. All of these claims and amounts are based on Debtors' willful and intentional conduct and are therefore, as to Debtor Maritas, non-dischargeable in his pending Chapter 7 proceeding, pursuant to 11 U.S.C. § 523(a)(6) of the Bankruptcy Code. However, despite this, Debtors filed their bankruptcy petitions to delay a scheduled jury trial which would have resolved many of these claims. Plaintiffs' have already moved the Court in both bankruptcy matters to lift the bankruptcy stay and allow Plaintiffs' claims to proceed to trial against the Debtors. [Attached as Exs. 10 and 11 are Motion of International Unions, Security Police and Fire Professionals of America, David L. Hickey and Joseph McCray for Abstention and Relief from the Automatic Stay Pursuant to 11 U.S.C. §362(d) and Plaintiff's Complaint Seeking Determination of Non-Dischargeability Debt]. A hearing on those motions will take place on September 11, 2024.

**<u>Federal Judge's Findings About Debtors Maritas and LEOSU</u>**

Debtor Maritas filed, and caused Debtor LEOSU to file, bankruptcy petitions on July 8, 2024. This occurred merely one week before a jury was scheduled to be seated in the lawsuit pending in the Eastern District of Michigan, and as the federal judge considered imposing massive sanctions on two separate fronts against Debtors. Debtors sought to run from those sanctions for their additional willful and unlawful conduct by fleeing to bankruptcy court.

First, the Court appointed a Special Master specifically to investigate Debtors' destruction of relevant evidence while that lawsuit was pending. After an eighteen-month forensic investigation, the Special Master made numerous key findings against Debtors, such as:

(1) Maritas and LEOSU were aware of their obligations to preserve evidence [Ex. 12, ECF 98, PageId.4366]

(2) Despite this, Maritas and LEOSU deleted evidence (ESI) that would have been responsive to Plaintiffs' discovery requests while the litigation was pending; [Ex. 13, ECF 61, PageID.2326]

(3) The deleted evidence did not result from any routine practice or policy of the Defendants, rather Maritas' and LEOSU's "deletions were selective and limited rather than routine and universal" [Ex. 12, ECF 98, PageId.4367-68]

(4) Plaintiffs were prejudiced by Defendants' deletions [*Id.* at 4363];

As a result, the Special Master recommended several forms of sanctions, including adverse inference instructions to the jury and an award of attorney's fees and costs against the Debtors, which would have amounted to a substantial six-figure amount. [*Id.* at 4364 and 4371]. The Special Master's report detailing these findings was submitted on June 17, 2024, and was awaiting the Judge's adoption or revision at the time Debtors fled to the bankruptcy court.

Second, and unrelated to Debtors' willful destruction of evidence, the federal judge ordered Debtors and their counsel to show cause for why they should not be sanctioned under Fed.R.Civ.P. 11, based on their "bad faith litigation" tactics. [Ex. 14, Opinion and Order Denying Motion for Recusal]. This was based on the numerous misrepresentations of fact made by Debtors and their counsel and their "demonstrable bad faith" in filing an ill-advised hail-Mary motion to disqualify the judge before trial. [*Id.* at PageId.4316]. This show cause order, and the imposition of additional Rule 11 sanctions, also remained pending before the court when Debtors filed their bankruptcy petitions.

In addition to sanctions, Debtors also plainly saw the proverbial "writing on the wall" that their case was doomed, because the same federal judge made many findings about Debtors' criminal backgrounds and other bad acts, such as the Court's finding that:

(1) "…Maritas threatened to stalk and kill his girlfriend and their daughter…" [Ex. 15, ECF 70, PageID.2421]

(2) "Maritas spent time in jail, and he in fact *pleaded guilty* to stalking" [*Id. at* 2423]
(3) "…Maritas served time in connection with a crime of which he was guilty…" [*Id.* at 2423]
(4) Maritas failed to fulfill his child support obligations in 2017. [*Id.* at 2426]
(5) "…no genuine issue of material fact that Mr. Maritas was experiencing tax issues in the amount of $100,000. [*Id.* at 2428]
(6) "…Maritas had "collections problems" and financial judgments against him" [*Id.* at 2430]
(7) "Maritas has a criminal record" [*Id.* at 2431]
(8) "The suggestion that LEOSU was "criminal run" was also not false because there is not dispute that Mr. Maritas ran the organization" [*Id.* at 2431]
(9) "…Maritas, who is the organizing director of LEOSU has a criminal record and a history of crime" [*Id.* at 2432]

**Debtors Fraudulently Transfer Massive Cash Amounts from Debtor LEOSU to Other Unions Controlled by Maritas While the Lawsuits Are Pending**

In truth, Debtors did not need to wait until the eve of trial to conclude that a jury would certainly find them liable to Plaintiffs for millions of dollars. That would have been apparent to even a distant observer of the case. The Debtors' conduct shows that they, in fact, reached this conclusion years ago and accordingly took steps -- albeit nakedly fraudulent ones -- to hide Debtor LEOSU's assets. This fact is apparent both from deposition testimony given by Debtor Maritas and his accomplices and from critical annual reports filed by Debtor LEOSU and other unions formed and controlled by Debtor Maritas.

Debtor Maritas formed Debtor LEOSU and filed the report required to evidence this formation on March 6, 2018. [Ex. 16] That form disclosed that LEOSU expected to receive annual receipts (ie, dues from members) of between $10,000 and $199,999. [*Id.* at p.1]. Of note, the lawsuit against Debtors (and others) in the Eastern District of Michigan was filed nine months later, in December 2018, and has been continuously pending ever since. Thus, Debtors were plainly on notice as of that filing date that Debtors faced a multi-million dollar judgment against them and in favor of Plaintiffs. It is evident from Debtors' filings with the Department of Labor[2] that the Plaintiffs' lawsuit caused Debtors to move enormous amounts of funds, in the form of dues

[2] The importance of Debtors' Department of Labor filings cannot be overstated. Specifically, Title II of the Labor Management Reporting and Disclosure Act of 1959, 29 U.S.C. 431, requires labor organizations to file with the U.S. Department of Labor ("DOL") written reports (known as "LM Reports") each year detailing their structure, collection of dues and expenditures. The law requires the DOL to make the reports public, to be reviewed by the labor organization's members and other interested parties. 29 U.S.C. 435. All reports are available to the public on the DOL website on the day they are filed. The reports are required by law to be filed within 90 days of the end of the fiscal year. 29 U.S.C. 437. ***The willful failure to file a required report is a criminal act*** with penalties including imprisonment and fines. 29 U.S.C. 439.

paid by Debtor LEOSU's members, to other unions formed by Debtor Maritas in order to unlawfully hide those assets from Plaintiffs' collection efforts, as will be detailed below.

After the founding of Debtor LEOSU in February 2018, it filed its first LM reports in March of 2019 -- a few months after Plaintiffs filed their lawsuit against Debtors (and others) in the Eastern District of Michigan. Debtor LEOSU actually filed two LM reports in March 2019 -- one for year 2018 and one for year 2017 that was a year past due under federal law. Those filings revealed that Debtor LEOSU had 217 and 557 union members in those respective years, but somehow received zero dollars. [Exs. 17 and 18, at p.2]. A footnote on both LM reports states that Debtor LEOSU does not maintain any cash and, instead, all funds are kept by the "International Union." [*Id.* at p.3]. In deposition testimony, Debtor Maritas confirmed that the "International Union" is another union he created named LEOS-PBA. [Ex. 19, Maritas Dep. at 25:19-26:1]. The next year's report (for 2020) showed that Debtor LEOSU's membership rose to 655 members, yet Debtor LEOSU still received zero dollars in union dues. [Ex. 20, at p.2]. For year 2021, its LM report showed membership had risen to 1,724, yet it still received absolutely zero dues from these members. [Ex. 21]. Debtor LEOSU filed a substantially identical LM form for year 2022, showing flat membership of the same 1,724 union members and still not a dollar of funds in union dues. [Ex. 22]. The same footnote stating that all of Debtor LEOSU's membership dues are kept by its sister-union, LEOS-PBA appears on each annual report. Notably, each and every LM report filed by Debtor LEOSU was filed well after Plaintiffs filed their December 2018 lawsuit.

Notably, non-debtor LEOS-PBA's LM reports prove that Debtor LEOSU simply deposited these funds in non-debtor LEOS-PBA's bank:

| Date Received | FY Filing Status | Filing Type | Fiscal Year | Total Assets | Total Liabilities | Total Receipts | Total Disbursements | Total Membership |
|---|---|---|---|---|---|---|---|---|
| | Report Not Received | | 2023 | $0 | $0 | $0 | $0 | 0 |
| 03-31-2023 | Received On Time | LM-2 | 2022 | $147,088 | $0 | $916,062 | $1,310,379 | 1,724 |
| 08-25-2022 | Received After Due Date | LM-2 | 2021 | $541,405 | $0 | $841,299 | $509,059 | 1,724 |
| 10-11-2021 | Received After Due Date | LM-2 | 2020 | $227,832 | $1,159 | $366,592 | $253,172 | 1,724 |
| 08-10-2020 | Received After Due Date | LM-2 | 2019 | $119,745 | $12,000 | $311,583 | $256,998 | 655 |
| 04-01-2019 | | LM-3 | 2018 | $50,160 | $1,302 | $161,343 | $124,268 | 557 |
| 08-10-2020 | Received After Due Date | LM-3 | 2017 | $7,930 | $2,622 | $48,897 | $44,812 | 217 |
| 03-14-2019 | | LM-3 | 2017 | $7,930 | $2,622 | $48,897 | $44,812 | 217 |
| 08-10-2020 | Received After Due Date | LM-4 | 2016 | $0 | $0 | $0 | $0 | 0 |

[Ex. 23] In short, LEOS-PBA reported the exact same union membership as Debtor LEOSU, each and every year, and further reported receiving total receipts of over $2 million dollars over the relevant period. Debtor Maritas plainly decided, after the filing of Plaintiffs suit, to transfer these funds to LEOS-PBA and to treat these unions as one-in-the-same. In fact, Debtor Maritas confirmed in deposition testimony that union members wrote dues checks to Debtor LEOSU and

Maritas simply deposited those checks into LEOS-PBA's bank account. [Ex. 18, Maritas Dep at 26:23-27:4]]

Debtor Maritas would attempt a similar trick just a few years later in order to further hide his union's assets from collection. Specifically, in early 2021, Debtor Maritas apparently signed a merger agreement, merging Debtor LEOSU and non-debtor LEOS-PBA, into another new union that he formed called the United Federation LEOS-PBA (the "Federation"). [Ex. 19, Maritas Dep at 30:18-22; Ex. 24, Strebeck Dep at 36:11-22, 37:1-2]. Through the end of 2021, Maritas confirmed that, despite the new merger, his practice of depositing checks made out to Debtor LEOSU into the account of non-debtor LEOS-PBA continued. [Ex. 18, Maritas Dep at 25:19-26:1].

What occurred after this purported "merger" is even more interesting. On its LM report for 2021, non-debtor LEOS-PBA reported that it held $541,405 in cash, in the form of dues received from Debtor LEOSU's members. [Ex. 25]. LEOS-PBA's annual report for the following year (2022) disclosed that, during that year, it transferred $900,000 to another union.[3] [Ex. 26] On information and belief, this nearly one million dollars (and likely much more) was transferred to the new "merged" entity, the Federation. Of course, Plaintiffs have not been able to confirm this fact because the new Federation has *never* filed a required LM report, which would disclose these (and other) transfers. And neither Debtor LEOSU nor non-debtor LEOS-PBA have filed their federally required LM reports for 2023, despite those reports being due nearly six months ago. The Debtors and Maritas' other unions' continued violations of federal labor reporting law has been done with the obvious intended purpose of concealing these facts from Plaintiffs and from the fact-finder in these bankruptcy proceedings. Thus, Debtor LEOSU comes to the bankruptcy court for relief despite its status of blatantly violating federal law in its required financial disclosures to the Department of Labor.

Based on all of the facts recited herein, Plaintiffs request that the Trustee issue discovery subpoenas to Debtors Maritas and LEOSU, and to non-debtor affiliated entities LEOS-PBA and the Federation, to ascertain what funds have been transferred between these unions since 2017, to obtain a copy of the purported merger agreement by which the Federation was allegedly created, and all correspondence related to that merger and agreement, as well as additional topics related to these issues. If you so desire, my office can prepare a draft subpoena for your review.

Once you have the opportunity to review this correspondence and the attached evidence, please let me know your availability for a telephone or Zoom call to discuss.

Very truly yours,

VARNUM

J. David Garcia

---

[3] The line item reflecting this $900,000 transfer of cash is referred to as a "Per Capital Tax." This is the terminology used in DOL filings to refer to funds transferred to another sister/parent/or affiliated union.

# EXHIBIT 1

SPFPA - Feds Investigate Securit ×

youtube.com/watch?v=BQDDrHrATDY

Apps · Wayne County · Eastern District of... · Oakland County Cir... · Supreme Court · TrueFiling · Washtenaw E Fling · U.S. District Court •... · COA and MSC Truef... · CA Court rules · San Diego Court · Michigan Process S... · DomainWeb - Coun...

Premium

Search




SPFPA - Feds Investigate Security Union Leader Dave Hickey

2,752 views • Feb 10, 2018

24 · 2 · SHARE · SAVE

John Johnson
11 subscribers

SUBSCRIBE

TRIAL EXHIBIT
13
SPFPA v. Maritas
CASE NO. 19-173125-CB




President Trump
VPM
342 views • 3 years ago




Celebrity Family Feud: Super Bowl Edition - SNL
Saturday Night Live
30M views • 4 years ago




Natalie Merchant: NPR Music Tiny Desk Concert
NPR Music
2.3M views • 5 years ago




AIMI KOBAYASHI – final round (18th Chopin Competition,...
Chopin Institute
1.2M views • 4 weeks ago




Sting: A Winter's Night... Live from Durham Cathedral
muzizlife
1.4M views • 6 years ago




Sean Lock On Global Warming & The Environment | BEST OF |...
Universal Comedy
1.2M views • 1 year ago




Nicole Kidman Is Blown Away By Stephen Fry's Intelligence |...
The Graham Norton Show
10M views • 2 years ago




Lulu Cash Gibson (Child Genius) on Letterman, December 15,...
Don Giller
844K views • 4 years ago



Top 20 Most Difficult Songs to Sing
WatchMojo.com
1.2M views • 4 months ago

SPFPA - Feds Investigate Security

youtube.com/watch?v=BQDDrHrATDY&list=WL&index=16

Apps | Wayne County | Eastern District of... | Oakland County Cir... | Supreme Court | TrueFiling | Washtenaw E Fling | U.S. District Court •... | COA and MSC Truef... | CA Court rules | San Diego Court | Michigan Process S... | DomainWeb - Coun...

Premium

Search

# Want More Information on SPFPA President David L. Hickey and all of the Corruption & Embezzlement going on at SPFPA Try doing a Doodle Search

3:25 / 4:22

SPFPA - Feds Investigate Security Union Leader Dave Hickey

2,747 views • Feb 10, 2018

24 | 2 | SHARE | SAVE

John Johnson
11 subscribers

SUBSCRIBE

Watch later
Private 16 / 22

12 
0:32
LEOSU YES Despite the Union...
Law Enforcement Officers Security ...

13 
1:46
SPFPA Corruption News Update 2-13-18 RUPD votes...
John Johnson

14 
3:58
SPFPA: Federal Settlement Forces SPFPA Union Officials...
John Johnson

15 
9:57
SPFPA - Feds Raid Home Of Jesus Campos' Handler SPFP...
John Johnson

▶ 
4:23
SPFPA - Feds Investigate Security Union Leader Dave...
John Johnson

17 
0:16
Like Detroit the SPFPA has Abandoned You! Don't Be...
Law Enforcement Officers Security ...

18 
6:18
SPFPA LOSERS - SPFPA Continues to LOSE Elections ...
SPFPA CORRUPTION NEWS

19 
0:16
SPFPA Corruption Zone
Law Enforcement Officers Security ...

20 

5:04
The Corrupt SPFPA Union Busting Rat Union (LOSES)...
Law Enforcement Officers Security ...


Georgetown University Police

All | Listenable | Live


6:37
Ryan Reynolds Reacts To Paul Rudd Being Named People's...
TODAY
1M views • 8 days ago

SPFPA - Feds Investigate Securit ×

youtube.com/watch?v=BQDDrHrATDY&list=WL&index=16

Apps | Wayne County | Eastern District of... | Oakland County Cir... | Supreme Court | TrueFiling | Washtenaw E Fling | U.S. District Court •... | COA and MSC Truef... | CA Court rules | San Diego Court | Michigan Process S... | DomainWeb - Coun...

Premium

Search




SPFPA - Feds Investigate Security Union Leader Dave Hickey

2,747 views • Feb 10, 2018

24 | 2 | SHARE | SAVE

John Johnson
11 subscribers

SUBSCRIBE

Watch later
Private 16 / 22

12 | 0:32 | LEOSU YES Despite the Union... | Law Enforcement Officers Security ...
13 | 1:46 | SPFPA Corruption News Update 2-13-18 RUPD votes... | John Johnson
14 | 3:58 | SPFPA: Federal Settlement Forces SPFPA Union Officials... | John Johnson
15 | 9:57 | SPFPA - Feds Raid Home Of Jesus Campos' Handler SPFP... | John Johnson
▶ | 4:23 | SPFPA - Feds Investigate Security Union Leader Dave... | John Johnson
17 | 0:16 | Like Detroit the SPFPA has Abandoned You! Don't Be... | Law Enforcement Officers Security ...
18 | 6:18 | SPFPA LOSERS - SPFPA Continues to LOSE Elections ... | SPFPA CORRUPTION NEWS
19 | 0:16 | SPFPA Corruption Zone | Law Enforcement Officers Security ...
20 | 5:04 | The Corrupt SPFPA Union Busting Rat Union (LOSES)... | Law Enforcement Officers Security ...
Georgetown University Police

All | Listenable | Live

6:37 | Ryan Reynolds Reacts To Paul Rudd Being Named People's... | TODAY | 1M views • 8 days ago

SPFPA - Feds Investigate Securit ×

youtube.com/watch?v=BQDDrHrATDY&list=WL&index=16

Apps | Wayne County | Eastern District of... | Oakland County Cir... | Supreme Court | TrueFiling | Washtenaw E Fling | U.S. District Court •... | COA and MSC Truef... | CA Court rules | San Diego Court | Michigan Process S... | DomainWeb - Coun...

Premium

Search




SPFPA - Feds Investigate Security Union Leader Dave Hickey

2,747 views • Feb 10, 2018

24 | 2 | SHARE | SAVE | ...

John Johnson
11 subscribers

SUBSCRIBE

Watch later
Private 16 / 22

12 Clinton Nuclear Votes NUNSO / LEOSU YES Despite the Union... 0:32
Law Enforcement Officers Security ...

13 SPFPA Corruption News Update 2-13-18 RUPD votes... 1:46
John Johnson

14 SPFPA: Federal Settlement Forces SPFPA Union Officials... 3:58
John Johnson

15 SPFPA - Feds Raid Home Of Jesus Campos' Handler SPFP... 9:57
John Johnson

▶ SPFPA - Feds Investigate Security Union Leader Dave... 4:23
John Johnson

17 Like Detroit the SPFPA has Abandoned You! Don't Be... 0:16
Law Enforcement Officers Security ...

18 SPFPA LOSERS - SPFPA Continues to LOSE Elections ... 6:18
SPFPA CORRUPTION NEWS

19 SPFPA Corruption Zone 0:16
Law Enforcement Officers Security ...

20 The Corrupt SPFPA Union Busting Rat Union (LOSES)... 5:04
Law Enforcement Officers Security ...

All | Listenable | Live | Recently uploaded

Kyle Rittenhouse trial: Jury deliberates during third day |...
FOX6 News Milwaukee
9K watching
LIVE NOW

# EXHIBIT 2

SPFPA Corruption & Embezzlem × | you tube john johnson channel × | +

youtube.com/watch?v=aUnItZ92Ye8

Apps | Wayne County | Eastern District of... | Oakland County Cir... | Supreme Court | TrueFiling | Washtenaw E Fling | U.S. District Court •... | COA and MSC Truef... | CA Court rules | San Diego Court | Michigan Process S... | DomainWeb - Coun...

Premium

spfapa corruption




SPFPA Corruption & Embezzlement

3,350 views • Feb 11, 2018

49 | 5 | SHARE | SAVE

John Johnson
11 subscribers

SUBSCRIBE

SPFPA has a long history of Corruption and Embezzlement under the leadership of SPFPA International President David L. Hickey.

TRIAL EXHIBIT
14
SPFPA v. Maritas
CASE NO. 19-173125-CB




Judge out of order?
WXYZ-TV Detroit | Channel 7
697K views • 10 years ago




William Basinski - Watermusic II
Akshobhya Buddha
4.1M views • 8 years ago




Our Role In Evolution | Neale Donald Walsch
Mindvalley Talks
2.6M views • 3 years ago




LITERAL CRY LAUGHING After Greg Davies' AWFUL Impressi...
Channel 4
12M views • 3 years ago




The Most COMPLEX Pop Song of All Time
Rick Beato
3.1M views • 4 months ago




David Attenborough Loses It at Steve Carell's Improvised...
The Jonathan Ross Show
1.4M views • 1 year ago



Kyle Rittenhouse trial verdict watch, top stories | LiveNOW...
LiveNOW from FOX
5.9K watching
LIVE NOW




Sting: A Winter's Night... Live from Durham Cathedral
muzizlife
1.4M views • 6 years ago



BEST SHAPE OF MY LIFE S1 • E1
Can Will Smith Lose 20lbs In 20 Weeks? | Best Shape Of My Life

SPFPA Corruption & Embezzlem ×

youtube.com/watch?v=aUnltZ92Ye8

Apps | Wayne County | Eastern District of... | Oakland County Cir... | Supreme Court | TrueFiling | Washtenaw E Fling | U.S. District Court -... | COA and MSC Truef... | CA Court rules | San Diego Court | Michigan Process S... | DomainWeb - Coun...

Premium

spfapa corruption




SPFPA Corruption & Embezzlement

3,350 views • Feb 11, 2018

49 | 5 | SHARE | SAVE

John Johnson
11 subscribers

SUBSCRIBE

SPFPA has a long history of Corruption and Embezzlement under the leadership of SPFPA International President David L. Hickey.




Judge out of order?
WXYZ-TV Detroit | Channel 7
697K views • 10 years ago




William Basinski - Watermusic II
Akshobhya Buddha
4.1M views • 8 years ago




Our Role In Evolution | Neale Donald Walsch
Mindvalley Talks
2.6M views • 3 years ago




LITERAL CRY LAUGHING After Greg Davies' AWFUL Impressi...
Channel 4
12M views • 3 years ago




The Most COMPLEX Pop Song of All Time
Rick Beato
3.1M views • 4 months ago




David Attenborough Loses It at Steve Carell's Improvised...
The Jonathan Ross Show
1.4M views • 1 year ago



Kyle Rittenhouse trial verdict watch, top stories | LiveNOW...
LiveNOW from FOX
5.9K watching
LIVE NOW




Sting: A Winter's Night... Live from Durham Cathedral
muzizlife
1.4M views • 6 years ago



BEST SHAPE OF MY LIFE S1 • E1
Can Will Smith Lose 20lbs In 20 Weeks? | Best Shape Of My Life

SPFPA Corruption & Embezzlem ×

youtube.com/watch?v=aUnItZ92Ye8

Apps · Wayne County · Eastern District of... · Oakland County Cir... · Supreme Court · TrueFiling · Washtenaw E Fling · U.S. District Court •... · COA and MSC Truef... · CA Court rules · San Diego Court · Michigan Process S... · DomainWeb - Coun...

Premium

spfapa corruption




SPFPA Corruption & Embezzlement

3,350 views • Feb 11, 2018

49 · 5 · SHARE · SAVE

John Johnson
11 subscribers

SUBSCRIBE

SPFPA has a long history of Corruption and Embezzlement under the leadership of SPFPA International President David L. Hickey.




Judge out of order?
WXYZ-TV Detroit | Channel 7
697K views • 10 years ago




William Basinski - Watermusic II
Akshobhya Buddha
4.1M views • 8 years ago




Our Role In Evolution | Neale Donald Walsch
Mindvalley Talks
2.6M views • 3 years ago




LITERAL CRY LAUGHING After Greg Davies' AWFUL Impressi...
Channel 4
12M views • 3 years ago




The Most COMPLEX Pop Song of All Time
Rick Beato
3.1M views • 4 months ago




David Attenborough Loses It at Steve Carell's Improvised...
The Jonathan Ross Show
1.4M views • 1 year ago



Kyle Rittenhouse trial verdict watch, top stories | LiveNOW...
LiveNOW from FOX
5.9K watching
LIVE NOW




Sting: A Winter's Night... Live from Durham Cathedral
muziclife
1.4M views • 6 years ago



BEST SHAPE OF MY LIFE S1 • E1
Can Will Smith Lose 20lbs In 20 Weeks? | Best Shape Of My Life

SPFPA Corruption & Embezzlem... ×

youtube.com/watch?v=aUnltZ92Ye8

Apps | Wayne County | Eastern District of... | Oakland County Cir... | Supreme Court | TrueFiling | Washtenaw E Fling | U.S. District Court •... | COA and MSC Truef... | CA Court rules | San Diego Court | Michigan Process S... | DomainWeb - Coun...

Premium

spfapa corruption




SPFPA Corruption & Embezzlement

3,350 views • Feb 11, 2018

49 | 5 | SHARE | SAVE

John Johnson
11 subscribers

SUBSCRIBE

SPFPA has a long history of Corruption and Embezzlement under the leadership of SPFPA International President David L. Hickey.

Judge out of order?
WXYZ-TV Detroit | Channel 7
697K views • 10 years ago
4:34

William Basinski - Watermusic II
Akshobhya Buddha
4.1M views • 8 years ago
1:06:38

Our Role In Evolution | Neale Donald Walsch
Mindvalley Talks
2.6M views • 3 years ago
1:28:01

LITERAL CRY LAUGHING After Greg Davies' AWFUL Impressi...
Channel 4
12M views • 3 years ago
13:42

The Most COMPLEX Pop Song of All Time
Rick Beato
3.1M views • 4 months ago
20:28

David Attenborough Loses It at Steve Carell's Improvised...
The Jonathan Ross Show
1.4M views • 1 year ago
6:12

Kyle Rittenhouse trial verdict watch, top stories | LiveNOW...
LiveNOW from FOX
5.9K watching
LIVE NOW

Sting: A Winter's Night... Live from Durham Cathedral
muzizlife
1.4M views • 6 years ago
1:30:47

BEST SHAPE OF MY LIFE S1 • E1
Can Will Smith Lose 20lbs In 20 Weeks? | Best Shape Of My Life

# EXHIBIT 3

SPFPA Has a Long History of (CC

youtube.com/watch?v=XiDBJKh-V7k

Apps | Wayne County | Eastern District of... | Oakland County Cir... | Supreme Court | TrueFiling | Washtenaw E Fling | U.S. District Court •... | COA and MSC Truef... | CA Court rules | San Diego Court | Michigan Process S... | DomainWeb - Coun...

Premium

leosu




NEW YORK

SPFPA Has a Long History of (CORRUPTION & EMBEZZLEMENT) Just Say NO to Corruption & SPFPA

24,472 views • Oct 27, 2018

216 | 3 | SHARE | SAVE

Law Enforcement Officers Security Unions LEOSU

SUBSCRIBE

SPFPA The True Authority of (CORRUPT) Security Police Unions.

TRIAL EXHIBIT
15
SPFPA v. Maritas
CASE NO. 19-173125-CB

deliberates during third day |...
FOX6 News Milwaukee
14K watching
LIVE NOW

Taylor Swift - All Too Well (10 Minute Version) (Live on...
Taylor Swift
5.3M views • 4 days ago
New

LIVE: Kyle Rittenhouse Trial: Awaiting verdict (via CourtTV)
Yahoo Finance
16K watching
LIVE NOW

India Arie Live at Java Jazz Festival 2014
JavaJazzFest
2.6M views • 7 years ago

Life begins at 40: the biological and cultural roots of the midlif...
The Royal Society
2.7M views • 2 years ago

The Most COMPLEX Pop Song of All Time
Rick Beato
3.1M views • 4 months ago

Nathaniel Rateliff: Tiny Desk (Home) Concert
NPR Music
385K views • 7 months ago

Flight Announcement - Saturday Night Live
Saturday Night Live
7.2M views • 8 years ago

Why You Will Marry the Wrong Person
The School of Life

SPFPA Has a Long History of (C
youtube.com/watch?v=XiDBJKh-V7k
Apps Wayne County Eastern District of... Oakland County Cir... Supreme Court TrueFiling Washtenaw E Fling U.S. District Court •... COA and MSC Truef... CA Court rules San Diego Court Michigan Process S... DomainWeb - Coun... Readi
Premium
leosu




NEW YORK

SPFPA Has a Long History of (CORRUPTION & EMBEZZLEMENT) Just Say NO to Corruption & SPFPA

24,472 views • Oct 27, 2018

216 3 SHARE SAVE

Law Enforcement Officers Security Unions LEOSU

SUBSCRIBE

SPFPA The True Authority of (CORRUPT) Security Police Unions.

Kyle Rittenhouse trial: Jury deliberates during third day |...
FOX6 News Milwaukee
14K watching
LIVE NOW

Taylor Swift - All Too Well (10 Minute Version) (Live on...
Taylor Swift
5.3M views • 4 days ago
New
10:08

LIVE: Kyle Rittenhouse Trial: Awaiting verdict (via CourtTV)
Yahoo Finance
16K watching
LIVE NOW

India Arie Live at Java Jazz Festival 2014
JavaJazzFest
2.6M views • 7 years ago
1:48:54

Life begins at 40: the biological and cultural roots of the midlif...
The Royal Society
2.7M views • 2 years ago
47:16

The Most COMPLEX Pop Song of All Time
Rick Beato
3.1M views • 4 months ago
20:28

Nathaniel Rateliff: Tiny Desk (Home) Concert
NPR Music
385K views • 7 months ago
18:25

Flight Announcement - Saturday Night Live
Saturday Night Live
7.2M views • 8 years ago
5:59

Why You Will Marry the Wrong Person

SPFPA Has a Long History of (CO

youtube.com/watch?v=XiDBJKh-V7k

Apps | Wayne County | Eastern District of... | Oakland County Cir... | Supreme Court | TrueFiling | Washtenaw E Fling | U.S. District Court •... | COA and MSC Truef... | CA Court rules | San Diego Court | Michigan Process S... | DomainWeb - Coun...

Premium

leosu




NEW YORK

SPFPA Has a Long History of (CORRUPTION & EMBEZZLEMENT) Just Say NO to Corruption & SPFPA

24,472 views • Oct 27, 2018

216 | 3 | SHARE | SAVE

Law Enforcement Officers Security Unions LEOSU

SUBSCRIBE

SPFPA The True Authority of (CORRUPT) Security Police Unions.

Kyle Rittenhouse Trial: Jury deliberates during third day |...
FOX6 News Milwaukee
14K watching
LIVE NOW

Taylor Swift - All Too Well (10 Minute Version) (Live on...
Taylor Swift
5.3M views • 4 days ago
New

LIVE: Kyle Rittenhouse Trial: Awaiting verdict (via CourtTV)
Yahoo Finance
16K watching
LIVE NOW

India Arie Live at Java Jazz Festival 2014
JavaJazzFest
2.6M views • 7 years ago

Life begins at 40: the biological and cultural roots of the midlif...
The Royal Society
2.7M views • 2 years ago

The Most COMPLEX Pop Song of All Time
Rick Beato
3.1M views • 4 months ago

Nathaniel Rateliff: Tiny Desk (Home) Concert
NPR Music
385K views • 7 months ago

Flight Announcement - Saturday Night Live
Saturday Night Live
7.2M views • 8 years ago

Why You Will Marry the Wrong Person

# EXHIBIT 4

Like All (HEROIN ADDICTS) SPFP

youtube.com/watch?v=gx4tfPvMg1s

Apps | Wayne County | Eastern District of... | Oakland County Cir... | Supreme Court | TrueFiling | Washtenaw E Fling | U.S. District Court -... | COA and MSC Truef... | CA Court rules | San Diego Court | Michigan Pr

knock 0/0

Premium

leosu




NEW YORK

Like All (HEROIN ADDICTS) SPFPA's Impaired Mental State of Mind is Clear to See. Your Obsessed!

10,985 views • Nov 16, 2018

121 | 2 | SHARE | SAVE

Law Enforcement Officers Security Unions LEOSU

SUBSCRIBE

TRIAL EXHIBIT
17
SPFPA v. Maritas
CASE NO. 19-173125-CB

FOX6 News Milwaukee
14K watching
LIVE NOW

NEVER TOO SMALL Paris Architect's Micro Apartment -...
NEVER TOO SMALL
3.6M views • 2 months ago
8:14

Jon Batiste - FREEDOM
Jon Batiste
4.8M views • 5 months ago
3:43

Carol Burnett Discusses The People She Won't Work With |...
The Dick Cavett Show
838K views • 4 months ago
9:02

Kyle Rittenhouse trial verdict watch, top stories | LiveNOW...
LiveNOW from FOX
5.2K watching
LIVE NOW

Could you be Autistic and not even know? | 15 Signs of...
Hunter Hansen - The Life Autistic
1M views • 2 months ago
16:02

Lulu Cash Gibson (Child Genius) on Letterman, December 15,...
Don Giller
819K views • 4 years ago
5:52

Amy Winehouse - Jonathan Ross 2004 HQ (I Heard Love Is...
simasf
9.7M views • 10 years ago
6:49

Richard & Noel Fielding's Summer Holiday - Gadget Man...
Travel Man
1M views • 1 year ago
23:49

# EXHIBIT 5

Not secure | spfpacorruption.blogspot.com/2018/12/fed-raid-uncovers-spfpa-pres-hickey.html
Apps Wayne County CM/ECF - U.S. Distri... Eastern District... Oakland County... TrueFiling Supreme Court Washtenaw E Fling Best Books of 2014... Massachusetts Distr
More ▾ Create Blo




# SPFPA

**The Real Authority of Corrupt Security Police Unions**

Super Pathetic Financial Poachers Association (SPFPA)

SPFPA CORRUPTION - SPFPA has a Long History of Corruption & Embezzlement Under the Leadership of SPFPA President David L. Hickey

Thursday, December 13, 2018

## Fed Raid Uncovers SPFPA PRES HICKEY (Slept in the Same Room with his (YOUNGEST DAUGHTER)




**SPFPA PRESIDENT DAVE HICKEY & Convicted Felon & Former SPFPA DC Director Celab A Gray -Burriss**



Press the Picture to Find Out More

**More on Caleb Gray-Burriss SPFPA Hickeys Former Partner**

- Founder and President of Labor Union Sentenced to 76 Months for Stealing from Union's Treasury and Pension Fund
- Founder and President of Labor Union Convicted in Washington for Stealing from Union's Treasury and Pension Fund,

TRIAL EXHIBIT
20
SPFPA v. Maritas
CASE NO. 19-173125-CB




0:00:28

0:01:30

TRIAL EXHIBIT
21
SPFPA v. Maritas
CASE NO. 19-173125-CB

# EXHIBIT 6

SPFPACORRUPTION (@spfpacor... ×   #SPFPACORRUPTION - Twitter S... ×   +

twitter.com/spfpacorruption?lang+en

Apps   Wayne County   Eastern District of...   Oakland County Cir...   Supreme Court   TrueFiling   Washtenaw E Fling   U.S.

Home

Explore

Notifications

Messages

Bookmarks

Lists

Profile

More

Tweet

**SPFPACORRUPTION**
175 Tweets

Follow




1



**SPFPACORRUPTION** @spfpacorruption · Dec 17, 2018

Tucker Carlson said immigrants make the U.S. 'poorer and dirtier.' Four companies have pulled ads #SPFPA #SPFPACORRUPTION

VEGAS UNION LEADER LINKED TO PIZZAGATE
10/26/17Tucker Carlson's painful interview with David Hickey, Juan Campos's union boss, in a search for rea...
youtube.com

TRIAL EXHIBIT
22
SPFPA v. Maritas
CASE NO. 19-173125-CB




TRIAL EXHIBIT
23
SPFPA v. Maritas
CASE NO. 19-173125-CB

# He has an interesting past. It's related to pizzagate.

0:07:08

0:03:41

# EXHIBIT 7

SPFPA Corruption - Threats (STA ×

youtube.com/watch?v=rjQKLZOkBh0&list=WL&index=10

Apps | Wayne County | Eastern District of... | Oakland County Cir... | Supreme Court | TrueFiling | Washtenaw E Fling | U.S. District Court •... | COA and MSC Truef... | CA Court rules | San Diego Court | Michigan Process S... | DomainWeb - Coun...

Premium

Search




0:06 / 1:34

1. Stand Up Desk Energising Workout — 2:22 — Two Minute Moves
2. SPFPA Cockroaches Exposed — 0:16 — Law Enforcement Officers Security ...
3. The Truth About SPFPA and its War Against UGSOA — 4:48 — John Johnson
4. SPFPA President Dave Hickey Attempted to Bribe Two... — 0:48 — John Johnson
5. SPFPA LEGAL TEAM Concludes there is no... — 4:52 — Law Enforcement Officers Security ...
6. SPFPA Under PRESSURE A Closer Look @ SPFPA's... — 4:05 — SPFPA CORRUPTION NEWS
7. Meet SPFPA President Hickey aka DAVE ("THE CLOWN")... — 1:54 — SPFPA CORRUPTION NEWS
8. UGSOA Files a Decertification Election 4/23/19 Against The... — 2:24 — SPFPA CORRUPTION NEWS
▶ SPFPA Corruption - Threats (STALKING) & (MAFIA... — 1:35 — Law Enforcement Officers Security ...

Ryan Reynolds Shows Up Instead of Will Ferrell | The... — 7:48
The Tonight Show Starring Jim...
6.8M views • 7 days ago

Celebrity Family Feud: Super Bowl Edition - SNL — 7:25
Saturday Night Live
30M views • 4 years ago

NEW YORK

SPFPA Corruption - Threats (STALKING) & (MAFIA TACTICS) - SPFPA President Hickey is Out of Control

11,714 views • Dec 20, 2018

165 | 1 | SHARE | SAVE | ...

Law Enforcement Officers Security Unions LEOSU

TRIAL EXHIBIT
24
SPFPA v. Maritas
CASE NO. 19-173125-CB

SUBSCRIBE

Like a scene played out in a mafia movie the corrupt SPFPA security police Union continues to stalk

# EXHIBIT 8

More Create Blog Sign In





# SPFPA The Real Authority of Corrupt Security Police Unions

Super Pathetic Financial Poachers Association (SPFPA)

TRIAL EXHIBIT
42
SPFPA v. Maritas
CASE NO. 19-173125-CB

## SPFPA CORRUPTION - SPFPA has a Long History of Corruption & Embezzlement Under the Leadership of SPFPA President David L. Hickey

Showing posts with label **SPFPA Dave Hickey Why Don't YOU Play Hide and Go FUCK Yourself.** Show all posts

**Friday, August 9, 2019**

### History of the F Word: HickeyMustGo.Org 2 Million Views - Say F**K NO to SPFPA Corruption

History of the F Word




- SPFPA Has a Long History of FUCKING Corruption & Embezzlement Under the Leadership of David L. Hickey.
- Over 2 Million Viewers have Visited our FUCKING www.HickeyMustGo.Org Blog.




**Total Pageviews**

**SPFPA PRESIDENT DAVE HICKEY & Convicted Felon & Former SPFPA DC Director Celab A Gray -Burriss**



Press the Picture to Find Out More

**More on Caleb Gray-Burriss SPFPA Hickeys Former Partner**

- Founder and President of Labor Union Sentenced to 76 Months for Stealing from Union's Treasury and Pension Fund
- Founder and President of Labor Union Convicted in Washington for Stealing from Union's Treasury and Pension Fund Related Crimes
- Eye On Caleb - This Website Was Created & Still Run by SPFPA
- SPFPA President Dave Hickey's Former Washington Director Assane Faye Was Also Convicted of Embezzlement for Stealing Over $350,000 Dollars

**Former SPFPA Washington DC Director Assane Faye Convicted of Embezzlement**

# EXHIBIT 9

| STATE OF HAWAI`I<br>CIRCUIT COURT OF THE FIRST CIRCUIT | JUDGMENT<br>OF CONVICTION AND PROBATION SENTENCE<br>NOTICE OF ENTRY | Electronically Filed<br>FIRST CIRCUIT<br>1CPC-23-0001226<br>19-JUN-2024<br>02:15 PM<br>Dkt. 46 JOC |
|---|---|---|
| CASE NUMBER<br>1CPC-23-0001226 | REPORT NUMBER(S):<br>23349263-001 | |
| STATE VS. (DEFENDANT)<br>Steven Maritas<br><br>Social Sec. No.: XXX-XX-<br><br>SID: A 6139593 DOB: XX-XX- 1960 | | |

| DEFENSE COUNSEL: Victor Bakke, Esq. | DATE OF HEARING: June 19, 2024 |
|---|---|
| **PLEA:** No Contest | TRIAL: N/A |
| ORIGINAL CHARGE(S):<br>SEXUAL ASSAULT IN THE FOURTH DEGREE (§707-733(1)(a) HRS) | CHARGE(S) TO WHICH DEFENDANT PLED<br>Assault in the Third Degree (§707-712 (1)(a), H.R.S.) |

DEFENDANT IS CONVICTED AND FOUND GUILTY OF:

Assault in the Third Degree (§707-712 (1)(a), H.R.S.)

**FINAL JUDGMENT AND SENTENCE OF THE COURT:**

Probation: One (1) Year

See Mandatory and Special Terms and Conditions attached.

| DATE | JUDGE | SIGNATURE |
|---|---|---|
| June 19, 2024 | TIMOTHY E. HO | |

**NOTICE OF ENTRY**

THIS ORDER HAS BEEN ENTERED AND COPIES MAILED OR DELIVERED TO ALL PARTIES.

| DATE | CLERK | SIGNATURE |
|---|---|---|
| June 19, 2024 | V. NOMURA | /s/ Valerie J. Nomura |

Form CC-CR-DIV-022

| **STATE OF HAWAI`I**<br>CIRCUIT COURT OF THE FIRST CIRCUIT | **TERMS AND CONDITIONS OF PROBATION** | CASE NUMBER<br>1CPC-23-0001226 |
|---|---|---|

**TO DEFENDANT:**

Steven Maritas

**IT IS THE ORDER OF THE COURT THAT DURING YOUR TERM OF PROBATION YOU SHALL COMPLY IN ALL RESPECTS WITH THE FOLLOWING TERMS AND CONDITIONS:**

1. You shall not commit another federal or state crime or engage in criminal conduct in any foreign jurisdiction or under military jurisdiction that would constitute a crime under Hawaii law during your deferred term or term of probation;

2. You shall report to your probation officer as ordered by the court or by your probation officer. After this hearing or upon your release from confinement, you are ordered to report immediately to:

   Adult Client Services
   777 Punchbowl Street
   Honolulu, HI 96813
   (808) 539-4500

   or upon release from any term of confinement, you are ordered to schedule an appointment with your probation officer or an Adult Client Services Branch designee within 24 hours of release;

3. You shall not leave the island of O`ahu unless you first obtain permission to leave from your probation officer or the Court;

4. You shall report any change of address, telephone number, or employment to your probation officer before any such change;

5. You shall promptly notify your probation officer if you are arrested or questioned by a law enforcement officer; and

6. You shall permit your probation officer to visit your home and any other places specified by the Court at all reasonable times.

7. You shall make restitution for losses suffered by the victim(s) if the court has ordered restitution pursuant to §706-646, H.R.S.;

8. Your further special conditions of probation are as follows: You shall:

   a. Follow all reasonable instructions which are given to you by your probation officer;

   b. Not own or possess any firearms or ammunition. If you have any firearms or ammunition, you must immediately turn them in to the appropriate county police department;

YOUR FURTHER SPECIAL TERMS AND CONDITIONS OF PROBATION ARE ATTACHED.

WARNING:
IF YOUR WHEREABOUTS BECOME UNKNOWN TO YOUR PROBATION OFFICER BECAUSE OF YOUR FAILURE TO KEEP HIM/HER INFORMED, THE COURT MAY ORDER YOUR ARREST. UPON ANY FAILURE TO COMPLY WITH EACH OF THE TERMS AND CONDITIONS OF YOUR PROBATION, INCLUDING SPECIAL CONDITIONS, THE COURT MAY REVOKE YOUR PROBATION AND SENTENCE YOU TO PRISON OR CHANGE OR ADD TO THE CONDITIONS OF YOUR PROBATION.

YOU ARE FURTHER INFORMED THAT YOU ARE PROHIBITED FROM OWNING OR POSSESSING ANY FIREARM OR AMMUNITION PURSUANT TO HRS § 134-7.

**THE TERMS AND CONDITIONS OF PROBATION HAVE BEEN EXPLAINED TO ME; I FULLY UNDERSTAND THEM, AGREE TO ABIDE BY THEM IN EVERY WAY AND UNDERSTAND THE CONSEQUENCES. I HAVE RECEIVED A COPY OF THESE TERMS AND CONDITIONS OF PROBATION.**

| DATE | DEFENDANT'S SIGNATURE | SIGNATURE OF PROBATION OFFICER |
|---|---|---|
| | | |

CASE NO. 1CPC-23-0001226
State of Hawaii vs. Steven Maritas

## 8. SPECIAL CONDITIONS PROBATION/DAGP/DANCP

**YOU SHALL:**

_X_ a. Follow all reasonable instructions which are given to you by your probation officer;

_X_ b. Not own or possess any firearms or ammunition. If you have any firearms or ammunition, you must immediately turn them in to the appropriate county police department;

___ You are only allowed to own or possess firearms or ammunition for employment-related purposes in the performance of your duties;

_X_ c. Provide buccal swab samples and print impressions of each hand and, if required by the collecting agency's rules or internal regulations, blood specimens required for law enforcement identification analysis;

_X_ d. Pay a monetary assessment of $500 or the actual cost of the DNA analysis, whichever is less, to the DNA registry special fund;

___ e. Serve an imprisonment of ___________, with credit for time already served. Mittimus to issue forthwith;

___ Serve a term of imprisonment of time equal to credit for time already served as of ____________;

___ Serve a term of imprisonment of _____ days, with credit for time served. Following this term of imprisonment, you shall enter directly into a residential treatment program, either the Salvation Army Adult Rehabilitation Center or another program at the discretion of your probation officer, with the prior authorization of your probation officer, and remain there until clinical discharge with the concurrence of your probation officer. Mittimus to issue forthwith;

___ f. Serve a term of imprisonment of _____ consecutive weekends (Friday, 6:00 p.m. to Sunday, 6:00 p.m.). Mittimus effective ____________________ at 6:00 p.m.;

___ g. Serve a term of imprisonment of __________, subject to early release after __________ upon your acceptance and entry into a residential __________ program, with the prior authorization of your probation officer, and remain there until clinically discharged with the concurrence of your probation officer;

___ h. Even if the full term of imprisonment is served, enter and remain in an outpatient or residential drug/alcohol treatment program, as deemed appropriate by your probation officer, until clinically discharged with the concurrence of your probation officer;

___ i. Serve a term of imprisonment of __________, subject to early release after __________, upon completion of the necessary arrangements for and commencement of your departure for __________ with the prior authorization of your probation officer;

__ j. Serve a term of imprisonment [ ] equal to [ ] of__________, with credit for time already served;

X k. Work full time or attend educational/vocational training as approved by your probation officer throughout the period of probation or deferral except as precluded by residential treatment and/or disability;

X l. Pay restitution in the amount of $______________ as a free-standing order [ ] to the Department of Human Services (DHS Collections). If a bench warrant has been issued for your arrest or if the full amount of restitution is not paid off prior to the end of the probation period, it shall be considered delinquent and the amount shall be sent to the collection agency. You shall be responsible for any fees assessed by the collection agency;

Restitution hearing set for 8-21-2024 @ ~~2:00~~ 10:00 a.m. ~~p.m.~~
Study

X m. Pay to the crime victim compensation fund $105.00; [ ] WAIVED

X n. Pay a probation services fee in the amount of $150.00; [ ] WAIVED

___ o. Pay a DNA assessment in the amount of $______________;

___ p. Pay a driver's education assessment (DE) in the amount of $__________;

X q. Pay a drug demand reduction assessment in the amount of $105.00; [ ] WAIVED

___ Pay an internet crimes against children fee in the amount of $ 100.00; [ ] WAIVED

___ ____- year license suspension

___ You shall pay a neurotrauma fee in the amount of $ ______________.

___ You shall pay a administrative fee (ADF) in the amount of $ ____________.

___ You shall pay a DUI driver education assessment fee in the amount of $_____.

___ You shall attend Driver's Improvement Program (classes).

___ Permanent Revocation of License;

___ r. Pay a mandatory fine in the amount of $_____________;

X s. Pay all incurred extradition costs to the State of Hawaii, Department of Finance upon being extradited to Hawaii under the

Interstate Compact for Adult Offender Supervision or as requested by the Adult Client Services Branch;

___ t. Contribute $__________ to the State General Fund with the payment to be made forthwith/by __________;

X u. Pay the [ ] restitution [X ]crime victim compensation fee [X ] probation services fee [ ] Internet Crime Against Children Fee [X] DNA assessment [ ]driver's education assessment [X ]drug demand reduction assessment [ ] fine and [ ] possible extradition costs at the rate of at least $_50_ per month, unless incarcerated. Payment shall be applied to the foregoing obligations in the same order as they are listed in this paragraph. Any modifications in the manner of payment must be approved by the court;

**For welfare cases,** payments to be made directly to the Department of Human Services, Collections Recovery Section;

___ v. Perform _____ hours of community service, to commence by ______________ and to be completed by ______________;

X w. Not possess, use, or consume any alcohol, unprescribed or illegal drug nor possess any drug-related paraphernalia or be in the presence of anyone using any illegal drugs;

X x. Submit to urinalysis and/or other alcohol/drug testing protocol, at your own expense as directed by your probation officer. **Any positive finding(s), a failure to provide a valid specimen within thirty (30) minutes, the use of a tampering device or a specimen determined to be adulterated or inconsistent with human urine by laboratory testing may be considered prima facie evidence of probation/deferral violation**;

___ y. Submit to drug/alcohol assessment at your own expense as directed by your probation officer;

_ z. Obtain/maintain/and participate satisfactorily in substance abuse treatment as directed by your probation officer until clinically discharged with the concurrence of your probation officer. You shall be responsible for payment for such treatment;

X aa. Submit at reasonable times to a search of your person, residence, vehicle, or other sites and property under your control by any probation officer, with or without a warrant, based on reasonable suspicion that illicit substance(s) or other contraband may be in the place(s) of a search. Any illicit substance(s) or contraband found or observed in such a search may be seized;

X bb. Obtain/maintain/and participate satisfactorily in ~~mental health treatment or services including~~ [X]anger management treatment or services, [ ] domestic violence intervention, medication and/or tests if ordered, as directed by your probation officer, until clinically discharged with the concurrence of your probation officer. You shall be responsible for payment for such treatment;

X cc. Not contact or attempt to contact, directly or indirectly, Joseph McCray, nor any other party significantly related to him, without the prior knowledge and authorization of your probation officer;

X dd. Apply for transfer of your case to the State of New York under the Interstate Compact for the Supervision of Adult Offenders; and, if accepted, abide by all rules and regulations under the Compact;

X ee. Sign a Waiver of Extradition;

___ ff. Refrain from entering the geographical area bounded by the following streets: __________, __________, ___________, and _____________, except for legitimate reasons with the prior approval of your probation officer;

___ gg. Refrain from entering the geographical area bounded by the following streets: Nu'uanu Avenue, North Beretania Street, Bethel Street, Nimitz Highway, River Street, North King Street, Dillingham Boulevard, Kokea Street, and Lunalilo Freeway, except for legitimate reasons with the prior approval of your probation officer;

___ hh. Refrain from entering the geographical area bounded by the following: H-1 Freeway, Waikele Stream, Waipahu Street, Waipahu Depot Road, Kapakahi Street, West Loch shoreline, Waipahu border of the West Loch Shoreline Park, Kaihuopala'ai Street, and Kunia Road, except for legitimate reasons with the prior approval of your probation officer;

___ ii. Refrain from entering the geographical area bounded by the following: Essex Road, Geiger Road, Barbers Point fence line, north perimeter of the Ewa Villages Gold Course, along Cane Haul Road, Arizona Road, fence line of West Loch Drive, Iroquois Drive, North Road, eastern fence line of the New Ewa Beach Golf Course, Fort Weaver Road, Iroquois Point fence line, and the ocean, except for legitimate reasons with the prior approval of your probation officer;

___ jj. Refrain from entering the geographical area bounded by the following: Kapahulu Avenue, Date Street, Kapiolani Boulevard, Atkinson Drive, and the Waikiki Peninsula to Ala Moana Beach shoreline, Ala Moana Boulevard, Kalakaua Avenue and the Waikiki shoreline, except for legitimate reasons with the prior approval of your probation officer;

___ kk. Refrain from participating in any gambling activities or entering any gambling establishments/cockfights;

___ ll. As determined by your probation officer, participate in and complete service plan(s) in relation to your Level of Service Inventory - Revised and other assessment results.

___ mm. Defendant has voluntarily admitted in open court his paternity of ______________ __________ born ________________. Defendant has stated his intention to provide child support for him/her/them. As a condition of probation as provided by HRS 706-624(2) (c), this court orders Defendant to "support his dependents

and meet other family responsibilities by cooperating with the Child Support Enforcement Agency of the Department of the Attorney General and/or the Family Support Division of the Office of the Corporation Counsel in (a) establishing paternity of said child/children and (b) establishing and paying child support including any arrearage due;

___ nn. You shall undergo violence intervention (anger management) at your expense as directed by your probation officer;

___ oo. Obtain/maintain and participate satisfactorily in domestic violence intervention including polygraph examinations, medication and/or tests, as directed by your probation officer until clinically discharged with the concurrence of your probation officer. You shall be responsible for payment for such treatment;

___ pp. Participate satisfactorily in the Hawaii Sex Offender Treatment Program (HSOTP) with the provision that you obtain and maintain sex offender treatment, as approved by your probation officer, at your own expense until clinically discharged with the concurrence of your probation officer. Monthly progress reports are to be submitted to your probation officer by your therapist. If your probation officer deems you to be financially unable to pay, you shall participate in treatment with a Judiciary contracted therapist with payment to be made in accordance with the Adult Client Services Branch payment formula;

___ qq. Refrain from purchasing or possessing or accessing via the Internet or other electronic database, inappropriate audio or visual materials as clinically defined by your primary therapist; nor shall you frequent any place where such material is available to you;

___ rr. Abide by any curfew, travel, and leisure time restrictions imposed by your probation officer;

___ ss. Refrain from hitchhiking and picking up hitchhikers;

___ tt. Not contact or attempt to contact, directly or indirectly, any minor child nor reside in the same residence with minor children without the permission of your probation officer;

___ uu. Obtain and maintain a residence as approved by your probation officer;

___ vv. Refrain from pursuing or conducting surveillance on the victim;

___ ww. Refrain from using force, threats or violence on another person;

___ xx. Provide photograph and/or fingerprints;

___ Arrange for child visitation, supervised or unsupervised, through your probation officer;

# EXHIBIT 10

Case 24-07007-JAD Doc 1 Filed 08/22/24 Entered 08/22/24 15:13:44 Desc Main
Document Page 1 of 24

**UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| In the matter of:<br><br>STEVE ANGELO MARITAS,<br><br>Debtor. | Case No. 24-70275-JAD<br><br>Chapter 7<br><br>Hon. Jeffery A. Deller |
| INTERNATIONAL UNIONS, SECURITY POLICE AND FIRE PROFESSIONALS OF AMERICA (SPFPA), an International Union, DAVID L. HICKEY, the International President of the Security Police and Fire Professionals of America, and JOSEPH MCCRAY,<br><br>Plaintiffs,<br><br>v.<br><br>STEVE ANGELO MARITAS,<br><br>Defendant. | Adv. Pro. No. __________ |

**PLAINTIFFS' COMPLAINT SEEKING DETERMINATION OF NON-DISCHARGEABILITY OF DEBT**

Plaintiffs International Union, Security, Police and Fire Professionals of America ("SPFPA"), David L. Hickey ("Hickey") its International President, and Joseph McCray ("McCray") (together, "Plaintiffs"), by and through their attorneys, Varnum LLP and Tucker Arensberg, P.C., pursuant to 11 U.S.C. § 523(a)(6) of the Bankruptcy Code and Federal Rules of Bankruptcy Procedure 4007 and 7001(6),

hereby state as their Complaint Seeking Determination of Nondischargeability of Debt ("Complaint") against the above-captioned Debtor and Defendant Steve Maritas ("Defendant" or "Maritas"), as follows:

**PARTIES, JURISDICTION, AND VENUE**

1. SPFPA is an unincorporated international union, organized and existing under the laws of the State of Michigan. SPFPA's International Headquarters is located in Roseville, Michigan, and SPFPA is doing business throughout the State of Michigan. SPFPA represents security, police, and fire professionals across the United States and Canada.

2. Hickey is a Michigan resident and is SPFPA's International President.

3. McCray is an employee and official of Plaintiff SPFPA.

4. Maritas claims to be a Pennsylvania resident and is/was the founder, president, and organizing director of LEOSU and LEOS-PBA; and Maritas is/was the co-founder, organizing director, and executive director of UFLEOS-PBA.

5. LEOSU and LEOS-PBA are effectively one and the same. Maritas founded both unions, and although he markets his union services under the LEOSU name, when union members pay dues, they pay those dues to LEOS-PBA. Dues checks are deposited into the LEOS-PBA bank account even when those checks are made out to LEOSU. LEOS-PBA (including LEOSU) subsequently merged with two other unions to form UFLEOS-PBA, which is also effectively one and the same

as LEOSU and LEOS-PBA. As just one example, UFLEOS-PBA's website, run by Maritas, even uses the address https://www.leospba.org/ (along with other websites, the "Websites").

6. On July 8, 2024, the Defendant filed a Voluntary Petition for relief under Chapter 7 of the Bankruptcy Code ("Code"), thus commencing the underlying bankruptcy proceeding and seeking discharge of his debts.

7. Plaintiffs commence this adversary proceeding under Rules 4007 and 7001(6) of the Federal rules of Bankruptcy Procedure and 11 U.S.C. §523(a)(6) of the Code seeking a determination of non-dischargeability of debts and liability.

8. This Court has jurisdiction over this proceeding pursuant to 28 U.S.C. §§ 1334 and 157.

9. Venue is proper in this district by virtue of 28 U.S.C. § 1409(a) as this proceeding arises in and relates to a case under the Code pending in this district.

10. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I). Plaintiffs consent to entry of a final order or judgment by the Court.

## FACTS

### A. General Facts Common to all Claims

11. SPFPA hired Maritas in 2002 in the capacity of organizing director.

12. On or about February 7, 2013, SPFPA terminated the employment of Maritas.

13. Thereafter, Maritas founded or attempted to found multiple unions to compete with SPFPA, including, but not limited to, LEOSU, LEOS-PBA, and UFLEOS-PBA (the "LEOSU Entities").

14. Since SPFPA terminated him, Maritas, personally and through the LEOSU Entities, has published numerous scurrilous, untrue, misleading, and defamatory statements against SPFPA and Hickey.

15. Defendant disseminates these publications through multiple internet Websites and social media accounts that he operates and controls.

16. Defendant also disseminates these publications through emails and text messages sent to SPFPA employees, local SPFPA union members, and members of other security officer, police officer, and fire professional unions.

17. Maritas has also personally travelled to many states in which SPFPA local members reside to attempt to convince them, SPFPA employees, and members of other security officer, police officer, and fire professional unions—through scurrilous, untrue, misleading, and defamatory statements—to leave SPFPA and/or join the LEOSU Entities.

**B. Litigation Pending Against Maritas in the U.S. District Court for the Eastern District of Michigan and the Circuit Court of Oakland County Michigan**

*(i) <u>The U.S. District Court for the Eastern District of Michigan Case</u>*

18. On his Websites, Defendant has published defamatory statements

against Plaintiffs, and Defendant continues to publish additional defamatory statements against Plaintiffs on a regular basis. These defamatory statements, hereafter referred to as “Defamatory Statements,” include, but are not limited to, those summarized in Exhibit 1 and 2, attached hereto.

19. On November 15, 2018, Plaintiffs originally filed claims against Maritas in the Oakland County Circuit Court in the state of Michigan initiating the case styled *International Unions, Security Police and Fire Professionals of America (SPFPA), and David L. Hickey v. Steve Maritas, and Law Enforcement Officers Security Union*, Case No. 2018-169946-CZ. Defendants filed a Petition for Removal to Federal Court on March 12, 2019. The case was moved to the U.S. District Court for the Eastern District of Michigan, Case No. 19-cv-10743 (the "Federal Lawsuit"). Plaintiffs filed an Amended Complaint on August 28, 2019. [See Ex. 3, Federal Lawsuit Amended Complaint]. Thereafter, Plaintiffs also filed a Third-Party Complaint asserting additional claims. [See Ex. 4, Third Party Complaint]

20. As a result of these pleadings, Plaintiffs' claims against Maritas in the Federal Lawsuit consist of:

a) Defamation/Business Defamation/Defamation by Implication;
b) False Light;
c) Tortious Interference with a Contract or Advantageous Business Relationship or Expectancy;
d) Knowing Misrepresentation of Copyright Claims Under the Digital Millennium Copyright Act ("DMCA");
e) Permanent Injunctive Relief;
f) Breach of Contract regarding 2013 Agreement;

g) Breach of Contract regarding 2016 Agreement;
h) Common Law Trademark Infringement; and
i) Unfair Competition.

21. The Federal Lawsuit was scheduled for trial on July 16, 2024, but that trial was cancelled due to Maritas filing for bankruptcy protection as a tactic to attempt to evade liability for his Defamatory Statements.

22. As is alleged in the Federal Lawsuit, the Defamatory Statements were made by Defendant willfully, maliciously and with the intent to injure Plaintiffs by, among other things, causing Plaintiffs to lose business with union members and potential union members throughout the country.

23. Extensive discovery has been conducted in the Federal Lawsuit. In an effort to avoid the consequences of his willful and malicious conduct, in the course of the discovery Maritas was found to have deleted electronically stored information ("ESI") with the intent to deprive Plaintiffs of their use of it in litigation. [See Ex. 5, Report and Recommendation, ECF 98, PageID. 4366-4367] Maritas' selective deletion of relevant information is directly relevant to the level of his willful and malicious conduct.

24. Relevant to its trademark claim in the Federal Lawsuit, SPFPA's trademarked slogan is as follows: "One Union, One Pride!" (the "Slogan").

25. SPFPA has expended substantial time, money, and resources marketing, advertising, and promoting the union services sold under the Slogan, including

Case 24-70075-JAD Doc 99 Filed 08/19/24 Entered 08/19/24 11:57:13 Desc
Document Page 7 of 24

through SPFPA's marketing, advertising, and promotional efforts and channels for services.

26. Without SPFPA's authorization and beginning after SPFPA acquired protectable exclusive rights in its Slogan, LEOS-PBA and Maritas adopted and began using SPFPA's Slogan to promote LEOS-PBA.

27. Maritas has failed to refrain from using SPFPA's trademark, specifically, SPFPA's Slogan, which Maritas uses to promote his own, competing union, LEOS-PBA.

*(ii)* *The Oakland County Circuit Court (Michigan) Case*

28. Plaintiffs SPFPA and Hickey also commenced another action in the Oakland County Circuit Court in the state of Michigan by filing a complaint on November 16, 2023 (the "Michigan Lawsuit"). A true and correct copy is attached as Exhibit 6. That complaint asserts claims for:

a) Defamation/Business Defamation/Defamation by Implication;
b) False Light;
c) Tortious Interference with a Contract or Advantageous Business Relationship or Expectancy;
d) Permanent Injunctive Relief.

29. On July 9, 2024, Maritas (through his counsel) filed documentation in the Michigan Lawsuit stating that Maritas had filed the bankruptcy proceeding now pending before this Court. Thereafter, on July 10, 2024, the Honorable Victoria Valentine entered an order staying further proceedings in the Michigan Lawsuit

given Defendant's bankruptcy petition. [Ex. 7, Order].

### C. Litigation Pending Against Maritas in Hawaii State Court Arising From Maritas' Sexual Assault of an SPFPA Officer.

30. On September 13, 2023, McCray and several other SPFPA representatives were hosting meetings in Honolulu, Hawaii. They were set up at two tables near the curb and were in the area to have a meet & greet with Union-represented employees on Oahu and specifically at the Federal Building.

31. Maritas came to the same area to conduct his own meetings with Union-represented employees on Oahu and chose tables behind those of McCray and SPFPA.

32. Maritas approached the table at which McCray and SPFPA representatives had been sitting and began to rifle through McCray's paperwork on the table. McCray asked Maritas politely to put McCray and SPFPA's stuff down and *leave* the table. Maritas repeatedly told Plaintiff McCray to "go fuck himself".

33. Maritas told Plaintiff McCray that he'd grab Plaintiff McCray's balls ("male genital appendage") and suddenly, Maritas reached from his chair and grabbed Plaintiff McCray's male genital appendage and squeezed.

34. The police were called and Maritas was arrested and subsequently charged with fourth degree sexual assault. McCray was not arrested or charged.

35. Maritas was released after posting bond on September 13. He entered a no contest plea to assault in the third degree on June 17, 2024 and was set to serve a

year probation. However, on June 21, 2024, the court entered an order vacating the judgment of conviction and re-set a sentencing hearing for August 21, 2024.

36. The intentional and malicious sexual and physical assault caused McCray emotional trauma.

37. Following the physical attack, Maritas defamed McCray by posting on his Website https://www.leospba.org/ false, malicious, and hateful comments directed against McCray, falsely stating that McCray initiated and assaulted Maritas instead of the other way around as it really happened (the "McCray Defamatory Statements").

38. The McCray Defamatory Statements were made by Maritas to harm and ruin McCray's reputation and were made willfully, maliciously and with the intent to injure McCray.

39. The emotional stress, physical pain and embarrassment of the sexual assault and subsequent defamation committed by Maritas has damages McCray and hindered his ability to perform his duties as a SPFPA representative.

40. A civil suit was filed by Joseph McCray and SPFPA on May 8, 2024, in the Circuit Court of the First Circuit, State of Hawaii, Case No. 1CCV-24-0000593 (the "Hawaii Lawsuit") citing claims for Sexual Assault and Battery / General Assault and Battery, Defamation / Business Defamation, False Light, Intentional Infliction of Emotion Distress, Negligent Infliction of Emotional Distress, Tortious

Interference with a Contract or Advantageous Business Relationship or Expectancy, and Permanent Injunctive Relief. The named defendants are Steven Maritas, Charles Strebeck, Brikener Jean-Giles, Law Enforcement Officers Security Union, Law Enforcement Officers Security & Police Benevolent Association, United Federation-LEOS-PBA Law Enforcement Security & Benevolent Association; and United Federation LEOS-PBA Hawaii, Guam, Saipan, and America Samoa. A true and correct copy of the Hawaii Lawsuit is attached as Exhibit 8. As of the date of this filing, not all parties have been served with the complaint and further efforts at serving Defendant have been delayed by the bankruptcy stay.

**COUNT 1**
**(Collateral Estoppel)**

41. Plaintiffs repeat and reallege the preceding Paragraphs as if fully set forth herein.

42. Any findings of fact and conclusions of law and final judgments from the Federal Lawsuit are *res judicata*, and Maritas is collaterally sopped from contesting such finding of facts and conclusions of law.

43. Any findings of fact and conclusions of law from other proceedings involving Maritas are *res judicata*, and Maritas is collaterally estopped from contesting such finding of facts and conclusions of law.

44. Res judicata has two branches: claim preclusion and collateral estoppel/issue preclusion. *See Taylor v. Sturgell*, 553 U.S. 880, 892 (2008). Both

branches are applied in bankruptcy. *See Grogan v. Garner*, 498 U.S. 279, 284 n.11 (1991) (issue preclusion applied); *Brown v. Felsen*, 442 U.S. 127 (1979) (claim preclusion applied). "The fundamental notion of the doctrine of collateral estoppel, or issue preclusion, is that an issue of law or fact actually litigated and decided by a court of competent jurisdiction in a prior action may not be relitigated in a subsequent suit between the same parties or their privies." *Ali v. Mukasey*, 529 F.3d 478, 489 (2d Cir. 2008) (citation and internal quotation marks omitted).

45. Collateral estoppel applies when: (1) the issues in both proceedings are identical, (2) the issue in the prior proceeding was actually litigated and actually decided, (3) there was a full and fair opportunity for litigation in the prior proceeding, and (4) the issues previously litigated were necessary to support a valid and final judgment on the merits.

46. Plaintiffs' claims in this instant matter are identical to ones that have been raised in concurrent proceedings against the Defendant. The issues in the concurrent proceedings are being "actually litigated and actually decided" by a court of competent jurisdiction. Defendant has been active in the underlying proceedings and has had a full and fair opportunity to participate therein. Finally, the issues being litigated in the cases pending against the Defendant are necessary to support a valid and final judgment and bear the same elements and evidence necessary that would be required to show "willful and malicious" conduct in the instant matter.

47. Therefore, this Court should declare and conclude that Plaintiff's claims are exempt from the Defendant's discharge pursuant to 11 U.S.C. 523(a)(6) insomuch as: (i) the Defendant caused willful and malicious injury to the Plaintiffs.

WHEREFORE, Plaintiffs request that this court enter a non-dischargeable judgment in their favor and against Defendant for compensatory damages in an amount in excess of $75,000 that is sufficient to compensate Plaintiffs for their actual, consequential, and incidental losses, including lost financial support sustained as a result of Defendant's wrongful actions, plus interest, costs, reasonable attorney fees, and such other relief that this Court deems just and equitable.

**COUNT 2**
**(Non-Dischargeability of Plaintiffs' Claims Pursuant to 11 U.S.C. § 523(a)(6) - Defamation by SPFPA and Hickey Against Maritas)**

48. Plaintiffs repeat and reallege all paragraphs above as if fully set forth herein.

49. 11 U.S.C. §523(a)(6) of the Bankruptcy Code excepts from discharge any debt "for willful and malicious injury by the debtor to another entity or to the property of another entity."

50. Where defamation was ""willful (i.e., involving deliberate and intentional conduct); (2) malicious (i.e., wrongful); and (3) intended or substantially certain to cause injury" it satisfies the elements for a determination of non-dischargeability under §523(a)(6). *In re Jacobs*, 381 B.R. 128, 144 (E.D. PA. 2008).

51. The Defamatory Statements complained of herein were made by Defendant willfully, maliciously and with the intent to injure Plaintiffs.

52. As stated above, throughout 2017 and continuing through today, Defendant has published numerous scurrilous, untrue, misleading, and Defamatory Statements against SPFPA, Hickey and McCray. These statements falsely characterize Plaintiffs as, or state that Plaintiffs are, corrupt, criminal, and otherwise unworthy of support.

53. Defendant maliciously published the Defamatory Statements regarding Plaintiffs to current and potential SPFPA local union members, SPFPA employees, and the millions of third parties who viewed Defendants' blogposts and/or videos posted on Defendant's Websites.

54. Defendant published the Defamatory Statements to third parties with knowledge of the falsity of the Defamatory Statements.

55. Defendant made the Defamatory Statements with the intent to injure Plaintiffs.

56. The Defamatory Statements did injure Plaintiffs.

57. The Defamatory Statements Defendant made were not privileged.

58. Plaintiffs have demanded, and Defendant has failed to issue, any retractions.

59. As a direct and proximate result of Defendant's wrongful conduct,

Plaintiffs have suffered substantial economic injury, loss of goodwill, harm to their business reputations, loss of esteem and standing in the community, loss of business opportunities, and other damages that may arise during the course of discovery and the course of this trial; and Hickey has further suffered emotional distress, humiliation, mortification, and embarrassment.

60. Defendant's Defamatory Statements were defamation per se.

61. The requirements of 11 U.S.C. § 523(a)(6) are met with respect to Defendant's defamation, and as such, any debts or liabilities incurred by Defendant arising from this Claim are nondischargeable.

WHEREFORE, Plaintiffs request that this court enter a non-dischargeable judgment in their favor and against Defendant for compensatory damages in an amount in excess of $75,000 that is sufficient to compensate Plaintiffs for their actual, consequential, and incidental losses, including lost financial support sustained as a result of Defendant's wrongful actions, plus interest, costs, reasonable attorney fees, and such other relief that this Court deems just and equitable.

**COUNT 3**
**(Non-Dischargeability of Plaintiffs' Claims Pursuant to 11 U.S.C. § 523(a)(6) - Tortious Interference with a Business Relationship or Expectancy by SPFPA and Hickey Against Maritas)**

62. Plaintiffs repeat and reallege all paragraphs above as if fully set forth herein.

63. 11 U.S.C. §523(a)(6) of the Bankruptcy Code excepts from discharge

Case 24-70205-JAD Doc 9 Filed 10/28/25 Entered 10/28/25 17:22:04 Desc
Document Page 15 of 24

any debt "for willful and malicious injury by the debtor to another entity or to the property of another entity."

64. Federal law determines what constitutes 'willful' and 'malicious' " for the purposes of § 523(a)(6)." *In re Larson,* No. ADV 08-1214, 2009 WL 2144079 (D.N.J. July 14, 2009), at *5. [attached as Ex. 9]. "The Third Circuit ... defined an injury as willful and malicious when the actor purposefully inflicts the injury or acts in such a manner that he is substantially certain that injury will result." *In re Hawkins,* 231 B.R. 222, 228 (D.N.J.1999) (citing *In re Conte,* 33 F.3d 303, 305 (3d Cir.1994); *In re Marks*, 192 B.R. 379, 385 (E.D. Pa.), *aff'd,* 106 F.3d 386 (3d Cir. 1996).

65. Defendant's conduct interfering with Plaintiffs' business relationships complained of herein was done willfully, maliciously and with the intent to injure Plaintiffs.

66. Plaintiffs enjoy advantageous business relationships with its local unions and union members and are constantly looking to use those advantageous business relationships to gain additional local members around the country.

67. By Defendant's conduct described above, Defendant intentionally and improperly interfered with the business relationship and expectancies between SPFPA and its employees, current local union members, and potential local union members, including, but not limited to the following parties: MGM National (Harbor

Casino, MD); NASA (Washington, DC); Georgetown University; Paris Casino (Las Vegas, NV); Catholic University; Core Civic (Leavenworth); Paragon (Kentucky); Paragon (Los Angeles); Paragon (California); Paragon (Riverside); Paragon (Pasadena, CA); Fiore (Pasadena, CA); Triple Canopy (California).

68. The conduct described above was willful, malicious, intended to, and did, interfere with the business relationships and expectancies causing their breach, disruption, or termination.

69. As a direct and proximate result of Defendant's wrongful conduct, Plaintiffs have suffered substantial economic injury, loss of goodwill, harm to their business reputation, loss of esteem and standing in the community, and loss of business opportunities.

70. The requirements of 11 U.S.C. § 523(a)(6) are met with respect to the claim for tortious interference, and as such, any debts or liabilities incurred by Defendant arising from this Claim are nondischargeable.

WHEREFORE, Plaintiffs request that this court enter a non-dischargeable judgment in their favor and against Defendant for compensatory damages in an amount in excess of $75,000 that is sufficient to compensate Plaintiffs for their actual, consequential, and incidental losses, including lost financial support sustained as a result of Defendant's wrongful actions, plus interest, costs, reasonable attorney fees, and such other relief that this Court deems just and equitable.

## COUNT 4
## (Non-Dischargeability of Plaintiffs' Claims Pursuant to 11 U.S.C. § 523(a)(6) - Common Law Trademark Infringement by SPFPA and Hickey Against Maritas)

71. Plaintiffs repeat and reallege all paragraphs above as if fully set forth herein.

72. 11 U.S.C. §523(a)(6) of the Bankruptcy Code excepts from discharge any debt "for willful and malicious injury by the debtor to another entity or to the property of another entity."

> "Federal law determines what constitutes 'willful' and 'malicious' " for the purposes of § 523(a)(6). "*In re Larson,* 2009 WL 2144079, at *5" The Third Circuit ... defined an injury as willful and malicious when the actor purposefully inflicts the injury or acts in such a manner that he is substantially certain that injury will result." *In re Hawkins,* 231 B.R. 222, 228 (D.N.J.1999) (citing *In re Conte,* 33 F.3d 303, 305 (3d Cir.1994).

73. Defendant's trademark infringement was done willfully, maliciously and with the intent to injure Plaintiffs.

74. SPFPA has used its Slogan continuously throughout the United States since at least October 1, 2020 in connection with the promotion of its business representing security, police, and fire professionals.

75. As a result of its widespread, continuous, and exclusive use of the Slogan to identify its business representing security, police, and fire professionals, SPFPA owns valid and subsisting common law rights to the Slogan.

76. SPFPA's Slogan is distinctive to both the consuming public and SPFPA's trade/industry.

77. SPFPA has expended substantial time, money, and resources marketing, advertising, and promoting the union services sold under the Slogan, including through SPFPA's marketing, advertising, and promotional efforts and channels for services.

78. The union services SPFPA offers and advertises using its Slogan are of high quality.

79. As a result of SPFPA's expenditures and efforts, the Slogan has come to signify the high quality of the union services designated by the Slogan, and acquired incalculable distinction, reputation, and goodwill belonging exclusively to SPFPA.

80. LEOS-PBA, through Maritas, directly competes with SPFPA.

81. Without SPFPA's authorization, and upon information and belief, beginning after SPFPA acquired protectable exclusive rights in its Slogan, LEOS-PBA and Maritas adopted and began using SPFPA's Slogan to promote LEOS-PBA.

82. Upon information and belief, the union services offered by LEOS-PBA and Maritas using SPFPA's Slogan are of lower quality than the union services provided by SPFPA.

83. LEOS-PBA and Maritas' infringing acts as alleged herein have caused

and are likely to cause confusion, mistake, and deception among the relevant consuming public and have and are likely to deceive the relevant consuming public into believing, mistakenly, that LEOS-PBA and Maritas are associated or affiliated with, or otherwise authorized by SPFPA.

84. LEOS-PBA and Maritas' acts are willful with the deliberate intent to trade on the goodwill of SPFPA's Slogan, cause confusion and deception in the marketplace, and divert potential sales of SPFPA's services to LEOS-PBA.

85. LEOS-PBA and Maritas' acts are causing, and unless restrained, will continue to cause damage and immediate irreparable harm to SPFPA and to its valuable reputation and goodwill with the consuming public for which SPFPA has no adequate remedy at law.

86. The requirements of 11 U.S.C. § 523(a)(6) are met with respect to the claim for trademark infringement, and as such, any debts or liabilities incurred by Defendant arising from this claim are nondischargeable.

WHEREFORE, SPFPA requests that this Court enter judgment in its favor and against Defendant for an amount in excess of $75,000, and award SPFPA all costs and attorney fees, equitable relief, including injunctive relief requiring Defendant cease using SPFPA's Slogan, and such other relief that this Court deems just.

## COUNT 5
## (Non-Dischargeability of Plaintiffs' Claims Pursuant to 11 U.S.C. § 523(a)(6) - Sexual Assault and Battery/ General Assault and Battery)
## (By McCray Against Maritas)

87. McCray reiterates and incorporates by reference the preceding paragraphs of this Complaint as though set forth fully herein.

88. 11 U.S.C. §523(a)(6) of the Bankruptcy Code excepts from discharge any debt "for willful and malicious injury by the debtor to another entity or to the property of another entity."

89. Sexual assault and battery satisfy the elements for a determination of dischargeability under §523(a)(6).

90. As described stated above, on September 13, 2023, Maritas sexually and physically assaulted and battered McCray in the middle of the Honolulu Hawaii in front of the SPFPA and Defendant's employees and representatives.

91. Maritas was premeditated in his actions and acted with the intent to physically harm McCray.

92. As a result of his sexual and physical attack, McCray has sustained physical bodily injuries and severe emotional distress and mental trauma.

93. The requirements of 11 U.S.C. § 523(a)(6) are met with respect to the claim for sexual assault and battery, and as such, any debts or liabilities incurred by Defendant arising from this Claim are nondischargeable.

94. McCray suffered actual losses or damages as a result in excess of $500,000.00.

95. McCray was damaged in an amount to be proven at trial.

96. McCray is entitled to recover his damages from Maritas, together with prejudgment interest and attorneys' fees and costs.

WHEREFORE, Plaintiffs request that this court enter a non-dischargeable judgment in their favor and against Defendant for compensatory damages in an amount in excess of $75,000 that is sufficient to compensate Plaintiffs for their actual, consequential, and incidental losses, including lost financial support sustained as a result of Defendant's wrongful actions, plus interest, costs, reasonable attorney fees, and such other relief that this Court deems just and equitable.

**COUNT 6**
**(Non-Dischargeability of Plaintiffs' Claims Pursuant to 11 U.S.C. § 523(a)(6) - Defamation)**
**(By SPFPA and McCray Against Maritas)**

97. SPFPA and McCray reiterates and incorporates by reference the preceding paragraphs of this Complaint as though set forth fully herein.

98. 11 U.S.C. §523(a)(6) of the Bankruptcy Code excepts from discharge any debt "for willful and malicious injury by the debtor to another entity or to the property of another entity."

99. Where defamation was ""willful (i.e., involving deliberate and intentional conduct); (2) malicious (i.e., wrongful); and (3) intended or substantially

certain to cause injury" it satisfies the elements for a determination of non-dischargeability under §523(a)(6). *In re Jacobs*, 381 B.R. 128, 144 (E.D. PA. 2008).

100. Maritas has published with malice several false statements about SPFPA and McCray - the McCray Defamatory Statements.

101. Maritas has repeatedly accused McCray of doing things that he never did and falsely accused of him initiating an attack on Maritas.

102. The McCray Defamatory Statements were made by Defendant willfully, maliciously and with the intent to injure Plaintiffs.

103. In publicly disseminating and spreading these blatant lies and misleading statements about SPFPA and McCray to the public on his Websites, Maritas harmed SPFPA and McCray's reputation.

104. The McCray Defamatory Statements by Maritas were purposely meant to harm SPFPA and McCray.

105. Maritas, with actual malice, published the McCray Defamatory Statements to current and potential SPFPA local union members, SPFPA employees, and the millions of third parties who viewed Maritas' blogposts and/or videos posted on Maritas' Websites.

106. The McCray Defamatory Statements made were not privileged.

107. Maritas published the McCray Defamatory Statements intentionally, willfully and maliciously to third parties with knowledge of their falsity.

108. As a direct result of the international, willful and malicious wrongful conduct, SPFPA and McCray has sustained substantial damages, including, but not limited to economic loss, severe emotional distress, personal humiliation, mental trauma and anguish and suffering and are therefore entitled to recover special, general, and compensatory damages in such amounts as shall be shown at a trial or hearing hereof.

109. Defendant's defamatory statements were defamation per se.

110. The requirements of 11 U.S.C. § 523(a)(6) are met with respect to Defendant's defamation, and as such, any debts or liabilities incurred by Defendant arising from this Claim are nondischargeable.

111. SPFPA and McCray have been damaged in an amount to be proven at trial.

112. SPFPA and McCray are entitled to recover damages from Maritas, together with prejudgment interest and attorneys' fees and costs.

WHEREFORE, Plaintiffs request that this court enter a non-dischargeable judgment in their favor and against Defendant for compensatory damages in an amount in excess of $75,000 that is sufficient to compensate Plaintiffs for their actual, consequential, and incidental losses, including lost financial support sustained as a result of Defendant's wrongful actions, plus interest, costs, reasonable attorney fees, and such other relief that this Court deems just and equitable.

Respectfully submitted,

Dated: August 9, 2024

TUCKER ARENSBERG, P.C.

*<u>/s/ Maribeth Thomas</u>*
Maribeth Thomas, Esquire
PA ID No. 208376
1500 One PPG Place
Pittsburgh, Pennsylvania 15222
Phone: (412) 566-1212
Fax: (412) 594-5619
Email: mthomas@tuckerlaw.com

and

VARNUM LLP

J. David Garcia, Esq. (admitted *pro hac vice*)
Brendan G. Best, Esq. (admitted *pro hac vice*)
Jaye Quadrozzi, Esq. (admitted *pro hac vice*)
480 Pierce Street, Suite 300
Birmingham, Michigan 38009
Phone: (248) 567-7800
Email: jdgarcia@varnumlaw.com
bgbest@varnumlaw.com
jcquadrozzi@varnumlaw.com

*Counsel for the International Union, Security Police and Fire Professionals of America, David L. Hickey and Joseph McCray*

# EXHIBIT 11

**UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| In the matter of:<br><br>LAW ENFORCEMENT OFFICERS SECURITY UNION (LEOSU),<br><br>Debtor. | Case No. 24-70277-JAD<br><br>Chapter 7<br><br>Hon. Jeffery A. Deller |
| INTERNATIONAL UNIONS, SECURITY, POLICE AND FIRE PROFESSIONALS OF AMERICA; DAVID L. HICKEY; and JOSEPH MCCRAY,<br><br>Movants,<br><br>v.<br><br>LAW ENFORCEMENT OFFICERS SECURITY UNION (LEOSU),<br><br>Respondent. | Hearing Date: September 11, 2024, at 10:00 a.m.<br><br>Response Deadline: August 26, 2024 |

**MOTION OF INTERNATIONAL UNIONS, SECURITY POLICE AND FIRE PROFESSIONALS OF AMERICA, DAVID L. HICKEY ITS INTERNATIONAL PRESIDENT, AND JOSEPH MCCRAY FOR ABSTENTION AND RELIEF FROM THE AUTOMATIC STAY PURSUANT TO 11 U.S.C. §362(d)**

International Unions, Security, Police and Fire Professionals of America ("SPFPA"), David L. Hickey ("Hickey") its International President, and Joseph McCray ("McCray") (together, the "SPFPA Parties") move this Court pursuant to 11 U.S.C. § 362(d)(1) Fed. R. Bankr. P. 4001(a)(1) and 9014, 28 U.S.C § 1334(c)(1), and W.PA.LBR 4001-1, to grant relief from the automatic stay to allow certain

prepetition litigation to proceed against the above-captioned Debtor and other debtor and non-debtor parties. In support of this Motion, SPFPA Parties state as follows:

**JURISDICTION**

1. This Court has jurisdiction to entertain this motion under 28 U.S.C §§ 1334(a) and 157(a) because Debtor filed its petition under Chapter 7 in this district.

2. The statutory predicates for the relief sought here are 11 U.S.C. § 362(d), and Fed. R. Bankr. P. 4001 and 9014. Venue is proper in this district pursuant to 28 U.S.C. § 1409. This is a core proceeding under 11 U.S.C. § 157(b)(2)(G) because this motion seeks the Court's order modifying the automatic stay.

**I. PROCEDURAL BACKGROUND**

3. This Chapter 7 case was commenced on July 8, 2024 when Debtor and the Debtor's principal, Steve Angelo Maritas ("Maritas"), filed voluntary petitions under Chapter 7 of the Bankruptcy Code (*see* Maritas Chapter 7 at Case No. 24-70275 (the "Maritas Chapter 7")) (the above-captioned Debtor and Maritas sometimes referred to herein as the "Debtors").

4. Concurrently with the filing of this Motion, the SPFPA Parties have filed a similar motion in the Maritas Chapter 7 along with an adversary proceeding complaint to determine the non-dischargeability of the claims against Maritas.

5. On July 22, 2024, Debtor Maritas filed in the Maritas Chapter 7 a motion stating that he was unable to timely submit his schedules because his bankruptcy case "was filed on an emergency basis." [Ex. 1, Maritas Doc. 8, ¶ 2] The "emergency" referenced by Debtor Maritas was the fact that a jury trial was scheduled to commence merely one week after the Debtors' hasty bankruptcy filings in the United States Court for the Eastern District of Michigan captioned *International Unions, Security, Police and Fire Professionals of America ("SPFPA"), an International Union, and David L. Hickey ("Hickey"), the International President of the Security Police and Fire Professionals of America v. Steve Maritas*, *Calvin Wells and Law Enforcement Officers Security Union*, Case No. 2:19-cv-10743, pending before Judge Steven J. Murphy III (the "Federal Lawsuit"). SPFPA and Hickey are plaintiffs in the Federal Lawsuit. The above-captioned Debtor LEOSU and Debtor Maritas are both defendants in the Federal Lawsuit, along with a co-defendant non-debtor party, Calvin Wells. The Debtor has identified the Federal Lawsuit in its Statement of Financial Affairs. [Ex. 2, Doc 1, page 22 of 39]

6. The Federal Lawsuit as well as two pending state court lawsuits will be addressed below. Each suit involves the Debtors' decade-long campaign of defamatory statements aimed squarely at the SPFPA Parties and designed to willfully and intentionally harm the SPFPA Parties.

Case 24-70277-JAD Doc 79-1 Filed 06/12/25 Entered 06/12/25 13:42:14 Desc Exhibit L - Letter Document Page 4 of 20

7. To protect their good names and business interests, the SPFPA Parties have been forced to file multiple actions against the Debtors and their affiliates over the past decade. The three remaining pending lawsuits now at issue will be addressed below.

## A. THE FEDERAL LAWSUIT AGAINST DEBTOR MARITAS

8. SPFPA and Hickey possess unliquidated claims against this Debtor of at least $1,600,000, and likely over $2 million, arising out of counts for defamation, tortious interference and trademark infringement which have been asserted in the Federal Lawsuit. A true and correct copy of the First Amended Complaint filed in the Federal Lawsuit is attached hereto as Exhibit 3, and a true and correct copy of the SPFPA Third Party Complaint, alleging additional claims against Debtor Maritas and non-debtor party United Federation LEOS-PBA ("LEOS-PBA"), is attached hereto as Exhibit 4.[1]

9. The Federal Judge was also scheduled to hear and rule on motions for: (1) extensive sanctions against both Debtors based on their intentional and willful destruction of relevant evidence during the Federal Lawsuit, and (2) imposition of additional Fed.R.Civ.P. Rule 11 sanctions against both Debtors and their counsel

[1] Each of these claims also involves willful, intentional and malicious conduct by Debtor Maritas, giving rise to intentional tort claims that are also non-dischargeable in in the separate Maritas individual Chapter 7. See 11 U.S.C. § 523(a)(6).

based on, as the Federal Judge appropriate summarized it, their "bad faith litigation" tactics. [See Ex. 5 and 6].

10. All fact and expert discovery in the Federal Lawsuit was long ago completed. The parties' Joint Final Pre-Trial Order was filed on July 3, 2024, and the Final Pre-Trial conference was scheduled for July 15, 2024. A jury trial was set to begin the next day, on July 16, 2024. [Ex. 7, Case Management Order, ECF 106]. Debtors filed their "emergency" bankruptcies on July 8, 2024, merely one week before trial.

11. As a result of the automatic stay imposed by Debtors' Chapter 7 filings, the final pre-trial conference did not occur, and the trial was cancelled. [Ex. 8, Text-Only Notice, dated July 9, 2024]

12. Importantly, through discovery in the Federal Lawsuit, it was discovered that Maritas is/was the founder, president, and organizing director of not only the above-captioned Debtor LEOSU, but also an affiliate called LEOS-PBA. LEOSU and LEOS-PBA are effectively one and the same. Maritas founded both unions, and although he markets his union services under the LEOSU name, when union members pay dues, they pay those dues to LEOS-PBA. Dues checks are deposited into the LEOS-PBA bank account even when those checks are made out to LEOSU. LEOS-PBA (including LEOSU) subsequently merged with two other unions to form UFLEOS-PBA, which is also effectively one and the same as LEOSU

and LEOS-PBA. As just one example, UFLEOS-PBA's website, run by Maritas, even uses the address https://www.leospba.org/ (along with other websites, the "Websites"). In summary, the Federal Lawsuit, among other thing, seeks findings of fact from that court, developed through extensive discovery, that would have significant impact on this Chapter 7 case. A finding that UFLEOS-PBA is effectively one and the same as LEOSU and LEOS-PBA would tend to show that the above-captioned Debtor either: no longer exists and hence may not be eligible to be a Debtor; has valuable fraudulent transfer claims against LEOS-PBA, UFLEOS-PBA and possibly other affiliates; or, should be substantively consolidated with LEOS-PBA and UFLEOS-PBA.

## B. THE STATE COURT LAWSUITS AGAINST DEBTOR MARITAS

13. Separate from the Federal Lawsuit, the Debtors (together with other non-debtor individuals and entities) face two other lawsuits brought by SPFPA, Hickey and/or McCray, and Debtors seek to stay both lawsuits via their bankruptcy filings.

14. Specifically, on November 16, 2023, SPFPA and Hickey filed suit in the Oakland County Circuit Court, State of Michigan, against Debtors and other non-parties, asserting claims for Defamation / Business Defamation / Defamation by Implication, False Light, Tortious Interference with a Contract or Advantageous Business Relationship or Expectancy, and Permanent Injunctive Relief, and

captioned *International Unions, Security, Police & Fire Professionals of America (SPFPA), an International Union, and David L. Hickey, the SPFPA International President v. Steve Maritas, Charles Strebeck, Brikener Jean-Giles, Law Enforcement Officers Security Union, Law Enforcement Officers Security & Police Benevolent Association, and United Federation LEOS-PBA*, at Case No. 2023-203923-CZ/CB (the "Michigan Lawsuit").

15. The claims in the Michigan Lawsuit all arise from the same campaign of willful and intentional defamation by Debtors against SPFPA and Hickey. A true and correct copy of the Complaint in the Michigan Lawsuit is attached hereto as Exhibit 9.

16. In addition, on May 8, 2024, SPFPA and McCray filed suit in the Circuit Court of the First Circuit, State of Hawaii, captioned *Joseph McCray and International Unions, Security, Police and Fire Professionals of America (SPFPA) v. Steven Maritas, Charles Strebeck, Brikener Jean-Giles, Law Enforcement Officers Security Union ("LEOSU"), Law Enforcement Officers Security & Police Benevolent Association ("LEOS-PBAA"), United Federation-LEOS-PBA Law Enforcement Security & Benevolent Association ("UFLEOS-PBA") and United Federation LEOS-PBA Hawaii, Guam, Saipan and America Samoa*, at Case No. CCV-24-0000593 (the "Hawaii Lawsuit"). A true and correct copy of the Complaint in the Hawaii Lawsuit is attached hereto as Exhibit 10.

17. The Hawaii Lawsuit, among other things, details how Debtor Maritas willfully and intentionally physically assaulted McCray, was arrested by the Honolulu Police Department and subsequently charged by the appropriate Hawaiian authorities with sexual assault. [Ex. 11, Maritas Arrest Record and Ex. 12, Criminal Complaint]. Debtor Maritas subsequently pleaded "no contest" to assault charges in June 2024. [Ex. 13, Judgment of Conviction and Probation Sentence]. The claims based on Debtor Maritas' criminal conduct are against both Debtors, i.e. both individually *and* in his capacity as agent for the above-captioned Debtor LEOSU and other non-debtor entities. Furthermore, both Debtors' willful and intentionally defamatory statements about SPFPA and McCray are asserted as counts in the Hawaii Lawsuit. A true and correct copy of the Complaint is attached hereto as Exhibit 10.

18. The Federal Lawsuit, the Michigan Lawsuit and the Hawaii Lawsuit will be referred to herein, collectively, as the "Lawsuits." The claims brought against Debtors in the Lawsuits will be referred to herein, collectively, as the "Unliquidated Claims."

## C. <u>RELIEF FROM THE STAY IS APPROPRIATE IN THE LAWSUITS</u>

19. Under 11 U.S.C. § 362(d)(1), "[o]n request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or

Case 24-70277-JAD Doc 79-1 Filed 08/02/24 Entered 08/02/24 15:13:22 Desc Main Document Page 9 of 20

conditioning such stay - (1) for cause, including the lack of adequate protection of an interest in property of such party in interest." The decision to lift the automatic stay for cause is within the bankruptcy court's discretion. *See In re Myers*, 941 F.3d 120, 128 (3d Cir. 2007) ("Whether to annul the automatic stay is a decision committed to the bankruptcy court's discretion").

20. The relief sought herein is not a futile effort. The findings of fact sought in the Lawsuits (in the case of the Federal Lawsuit, after extensive discovery) would have a significant impact on this Chapter 7 case. A finding that UFLEOS-PBA is effectively one and the same as LEOSU and LEOS-PBA would tend to show that the above-captioned Debtor either: no longer exists and hence may not be eligible to be a Debtor; has valuable fraudulent transfer claims against LEOS-PBA, UFLEOS-PBA and possibly other affiliates; or, should be substantively consolidated with LEOS-PBA and UFLEOS-PBA.

21. Furthermore, failure to lift the stay with respect to the above-captioned Debtor would greatly prejudice the SPFPA Parties due to the likely granting of its request for lift to stay in the companion individual Chapter 7 case, given the fact that the Unliquidated Claims sound in defamation, tortious interference and other intentional torts, and are intentional, willful, and malicious claims that are non-dischargeable in that case. If the Court did not lift the stay with respect to the above-captioned Debtor but only as to the individual Chapter 7 debtor in the companion

Case 24-70277-JAD Doc 79-1 Filed 09/24/24 Entered 09/24/24 15:34:22 Desc Main Document Page 10 of 40

case, the SPFPA Parties would be unduly and unnecessarily burdened by the confusion created in the Lawsuits regarding the lift of stay as to one defendant / Chapter 7 debtor and the continuation of the stay as to another.

22. “Cause is an intentionally broad and flexible concept which must be determined on a case-by-case basis." *In re Brown*, 311 B.R. 409, 412-13 (E.D.Pa. 2004), *citing In re Merchant*, 256 B.R. 572, 576 (W.D. Pa 2000). In the analogous case of *Pursifull v. Eakin*, 814 F.2d 1501, 1506 (10th Cir. 1987), the district court in that case lifted the stay because there was a Texas state court proceeding pending which dealt with the same issues that were at issue in the bankruptcy case, and because the issues involved were matters of state law best decided by the state courts. *Id*. The 10th Circuit found that the reasons given by the district court constituted sufficient cause for lifting the stay as to the Texas proceedings. *Id*.

23. In cases involving a creditor’s request to return to court proceedings suspended by the automatic stay, the following factors are relevant to determine if cause exists:

> 1) judicial economy; 2) trial readiness; 3) the resolution of preliminary bankruptcy issues; 4) the creditor’s chance of success on the merits; and 5) the cost of defense or other potential burden to the bankruptcy estate and the impact of the litigation on other creditors.

*In re Garzoni*, 35 Fed. Appx. 179, 181 (6th Cir. 2002) (unpublished); *In re Harmon*, No. DG-18-04298, 2019 WL 6492475 (Bankr. W.D. Mich. March 25, 2019); *see*

*also In re Daniel G. Martin*, 542 B.R. 199 (6th Cir. BAP 2015) ("[w]here the stayed non-bankruptcy litigation has reached an advanced stage, courts have shown a willingness to lift stay to allow the litigation to proceed.")

24. All of these factors are present here and establish the requisite cause to modify the automatic stay to allow the Unliquidated Claims to be adjudicated in the pending court proceedings.

## II. ANALYSIS OF FACTORS TO LIFT THE AUTOMATIC STAY AS TO THE FEDERAL LAWSUIT

25. **Judicial Economy.** This factor strongly favors modifying the automatic stay to permit the Unliquidated Claims to proceed, particularly in the Federal Lawsuit to be tried in the Eastern District of Michigan. The Federal Lawsuit has been pending for nearly six years, since 2018. All discovery – fact and expert – is complete. Judge Murphy has ruled on cross-motions for summary judgment filed by both parties. Pre-trial materials, including a final pretrial order and motions *in limine*, have been submitted to the court and were ready for argument and ruling on the day of the scheduled final pre-trial conference. A jury trial was scheduled to begin on July 16, 2024, only a week after the Debtor commenced the present bad faith bankruptcy proceeding. The interests of judicial economy are not served by requiring SPFPA and Hickey to reinitiate this litigation against this Debtor in this Court when the proceedings are at such an advanced stage and, indeed, fully ripe for trial.

Moreover, there are state law claims remaining against Debtor Maritas (assuming that the motion for abstention and lift stay filed in the Maritas Chapter 7 is granted) that will be tried in the Federal Lawsuit regardless of this Debtor's bankruptcy case. Those claims are the same claims for defamation and tortious interference pending against this Debtor, and are based on the same operative facts. [Ex. 3, First Amended Complaint, ECF 13, PageID 402-406]. Additionally, SPFPA and Hickey also assert a third-party complaint containing claims for willful trademark infringement against both Debtor Maritas and another non-debtor unions – adjudication of which would be directly relevant to, among other things, whether there are assets in this Chapter 7 case related to those other entities.[2]

26. **Trial Readiness.** This factor goes hand-in-hand with the first and is easily satisfied. Indeed, Debtors commenced their bad faith bankruptcy case on an admitted "emergency basis" mere days before the start of a jury trial in the Federal Lawsuit. The parties had submitted witness lists, exhibit lists, and motions in limine for ruling by Judge Murphy. The Federal Lawsuit could not have been more trial ready unless Debtors filed their petitions during the trial itself.

[2] As mentioned above, Movant also reserves its rights with respect to, among other things, whether the Debtor is eligible to be a debtor in bankruptcy pursuant to 11 U.S.C. § 109 or otherwise, as the Debtor may no longer exist and may have been merged into another non-debtor entity.

27. **<u>Resolution of Preliminary Bankruptcy Issues</u>.** This factor is inapplicable as there are no preliminary bankruptcy issues requiring resolution that would be impacted by the trial of the Federal Lawsuit.

28. **<u>Creditor's Chance of Success on the Merits</u>.** SPFPA and Hickey's chance of success on the merits also weighs in favor of lifting the automatic stay. The Federal Lawsuit was filed in 2018. Since then, SPFPA and Hickey have survived motions for summary judgment filed by Debtors, with SPFPA's and Hickey's claims entirely intact, as well as motions to reconsider several of those rulings. Further, in dismissing nearly all of the Debtors' counter-claims against SPFPA and Hickey, the Court has already made many key findings against the Debtors, including that:

a. "…Maritas threatened to stalk and kill his girlfriend and their daughter…" [ECF 70, PageID. 2421]
b. "Maritas spent time in jail, and he in fact *pleaded guilty* to stalking" [ECF 70, PageID. 2423]
c. "…Maritas served time in connection with a crime of which he was guilty…" [ECF 70, PageID. 2423]
d. Maritas failed to fulfill his child support obligations in 2017. [ECF 70, PageID. 2426]
e. "…no genuine issue of material fact that Mr. Maritas was experiencing tax issues in the amount of $100,000. [ECF 70, PageID. 2428]
f. "…Maritas had "collections problems" and financial judgments against him" [ECF 70, PageID. 2430]
g. "Maritas has a criminal record" [ECF 70, PageID. 2431]
h. "The suggestion that LEOSU was "criminal run" was also not false because there is not dispute that Mr. Maritas ran the organization" [ECF 70, PageID. 2431]
i. "…Maritas, who is the organizing director of LEOS has a criminal record and a history of crime" [ECF 70, PageID. 2432]

[Ex. 14, Opinion and Order, ECF 70]

Faced with the inevitability that these damning facts will be displayed for the jury, and additionally facing all of the affirmative claims asserted by SPFPA and Hickey against him, Debtors chose to file this "emergency" bankruptcy.

29. However, Debtors' "emergency" was not limited only to escaping trial. Rather, the Federal Judge also appointed a Special Master to forensically investigate the Debtors' deletion of evidence during the litigation. That Special Master tendered his final report only two weeks before the bankruptcy filing in this Court and found, among other things, that Debtor Maritas -- acting individually and on behalf of Debtor LEOSU -- intentionally and selectively deleted evidence, in the form of emails, text messages, and website posts -- while that case was pending and with the specific intent of depriving SPFPA and Hickey of the use of this willfully deleted evidence at trial. [Ex. 5, Report and Recommendation, ECF 98, PageID.4366-68]. Thus, Debtors also faced the Special Master's recommendation that the Court implement adverse inferences against the Debtors and the imposition of significant monetary sanctions for their willful misconduct. [*Id.* at 4364, 4371] The Special Master's report was before the Court awaiting the Judge's adoption in a final order at the time of the "emergency" bankruptcy filing.

30. The Court's and the Special Master's finding demonstrate that SPFPA and Hickey have an excellent chance of success of prevailing in the Federal Lawsuit when those claims are put before a jury.

31. **Burden on Estate.** Lifting the stay to allow SPFPA and Hickey to return to the Eastern District of Michigan to begin trial of the Federal Lawsuit would not burden the bankruptcy estate or impact other creditors. To the contrary, it is the most expeditious and efficient means of resolving the Federal Lawsuit and consequently liquidating the Movants' claims in this case and discovering potentially valuable estate causes of action and/or assets. On the other hand, refusing to lift the stay and requiring litigation of claims in this case that are ready for trial in the Federal Lawsuit would require an unnecessary expenditure of attorneys' fees and costs by both Debtors and SPFPA and Hickey for work that would be entirely duplicative of that already accomplished over five years of litigation in the Eastern District of Michigan proceedings. Additionally, trial in the Federal Lawsuit is ready to commence as soon as the stay is lifted. It is inconceivable that a more expeditious resolution of the Federal Lawsuit will be achieved in this Court.

## A. ANALYSIS OF FACTORS TO LIFT THE AUTOMATIC STAY AS TO THE MICHIGAN LAWSUIT AND THE HAWAII LAWSUIT

32. Analysis of the same factors strongly weighs in favor of lifting the stay as to the Michigan Lawsuit and the Hawaii Lawsuit. Analysis of these factors as applicable to those pending cases will be presented below.

33. **<u>Judicial Economy</u>.** This factor strongly favors modifying the automatic stay to permit the unliquidated claims to be tried in the Michigan Lawsuit and Hawaii Lawsuit as well. While both matters must still proceed through discovery, each involves state law claims particular to Michigan and Hawaii, respectively. Further, and similar to the Federal Lawsuit, both the Michigan Lawsuit and the Hawaii Lawsuit involve factually overlapping claims against both the Debtors and numerous non-debtor individuals and entities, which must be litigated in those forums, regardless of any bankruptcy proceedings by the Debtors.

34. For example, the Michigan Lawsuit asserts claims for defamation, false light, tortious interference and permanent injunctive relief not only against Debtors Maritas and LEOSU, but also -- jointly and severally -- against two non-debtor individuals (Charles Strebeck and Brikener Jean-Giles) and two other security unions controlled and operated by Debtor Maritas, namely LEOSU Benevolent Association and United Federation LEOS-PBA which are believed to be alter egos of Debtor LEOSU. [See Ex.9]. Similarly, the Hawaii Lawsuit asserts claims against not only Debtors Maritas and LEOSU, but against the same non-debtor individuals (Strebeck and Jean-Giles) and other non-debtor union entities, namely LEOS-PBAA, UFLEOS-PBA and United Federation LEOS-PBA Hawaii, Guam, Saipan and America Samoa. [See Ex. 10].

35. Also, similar to the Federal Lawsuit, if the instant Motion is denied, the SPFPA Parties will have to go to trial on these claims twice – once in Michigan or Hawaii state courts against the non-debtor parties, and once before this Court against Debtors Maritas and LEOSU. Such an outcome would not only result in judicial ineconomy by having two courts preside over trials about the identical facts and legal issues, but visit a manifest injustice upon the SPFPA Parties, who would bear the costs of trying the same exact issues twice in separate forums.

36. **Trial Readiness.** This factor relates to the prior factor. While neither state court matter is ready for trial, the Michigan Lawsuit and the Hawaii Lawsuit each assert claims under the differing state laws of those jurisdictions. Both cases must proceed through discovery and, ultimately, dispositive motions and/or trial on the merits. The SPFPA Parties respectfully suggest that the state courts of these respective jurisdictions are more efficiently able to adjudicate state law claims particular to those jurisdictions.

37. **Resolution of Preliminary Bankruptcy Issues.** This factor is inapplicable as there are no preliminary bankruptcy issues requiring resolution that would be impacted by the trial of any of the relevant claims.

38. **Creditor's Chance of Success on the Merits.** The SPFPA Parties chance of success on the merits also weighs in favor of lifting the automatic stay. Concerning the Hawaii Lawsuit, Debtor Maritas has already plead "no contest" to

willfully physical assaulting McCray. Criminal liability will be established with Debtor Maritas' conviction to the assault charges against him, with a remaining trial as to damages only. The related claims based on respondeat superior (for the admitted assault) and for the Debtors' defamatory statements about SPFPA and McCray cannot be seriously disputed. Concerning the Michigan Lawsuit, SPFPA and Hickey assert claims for the same vile stream of defamatory statements issued by the Debtors and detailed in the complaint filed in that matter. [See Ex. 9, ¶¶ 18 to 22 a-c]. The Debtors have no factual defense to these claims whatsoever.

39. **Burden on Estate.** Lifting the stay to allow the SPFPA Parties to return to the Michigan and Hawaii courts would not burden the bankruptcy estate or impact other creditors and, on the contrary, is the most expeditious and efficient means of resolving these claims. Denying this request to lift the stay and requiring litigation of the Michigan Lawsuit claims and the Hawaii Lawsuit claims in this Court would require an unnecessary expenditure of attorneys' fees and costs by both Debtors and by the SPFPA Parties for work that would be entirely duplicative of litigation that must be undertaken, at minimum, against the non-debtor parties in the Michigan and Hawaii proceedings. Both Debtor Maritas as well as the above-captioned Debtor will be central witnesses and discovery targets in both state court matters, regardless of the existence of any bankruptcy proceedings.

40. Finally, permitting the trial of the Michigan Lawsuit and the Hawaii Lawsuit will not adversely impact the bankruptcy estate or other creditors of the Debtors, and in fact will benefit this estate, but greatly increasing the likelihood of discovering assets of this estate that could be liquidated and distributed for the benefit of creditors. Furthermore, the stay would only be lifted for the purpose of liquidating the Unliquidated Claims in these forums. The Movants' claims would then be asserted in this bankruptcy case, along with claims against any other non-debtors sounding in fraudulent transfer, substantive consolidation, or similar theory.

## III. CONCLUSION

41. In conclusion, cause exists for this Court to modify the automatic stay in order to permit the SPFPA Parties to continue their litigation in the Federal Lawsuit, the Michigan Lawsuit and the Hawaii Lawsuit against the above-captioned Debtor.

WHEREFORE, the SPFPA Parties pray this Court enter an order in substantially the form as that attached hereto, modifying the automatic stay and granting such other and further relief this Court deems just and appropriate under the circumstances.

Respectfully submitted,

Dated: August 9, 2024

TUCKER ARENSBERG, P.C.

*<u>/s/ Maribeth Thomas</u>*
Maribeth Thomas, Esquire
PA ID No. 208376
1500 One PPG Place
Pittsburgh, Pennsylvania 15222
Phone: (412) 566-1212
Fax: (412) 594-5619
Email: mthomas@tuckerlaw.com

and

VARNUM LLP

J. David Garcia, Esq. (admitted *pro hac vice*)
Brendan G. Best, Esq. (admitted *pro hac vice*)
Jaye Quadrozzi, Esq. (admitted *pro hac vice*)
480 Pierce Street, Suite 300
Birmingham, Michigan 38009
Phone: (248) 567-7800
Email: jdgarcia@varnumlaw.com
bgbest@varnumlaw.com
jcquadrozzi@varnumlaw.com

*Counsel for the International Union, Security Police and Fire Professionals of America, David L. Hickey and Joseph McCray*

# EXHIBIT 12

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

INTERNATIONAL UNIONS, SECURITY POLICE AND FIRE PROFESSIONALS OF AMERICA (SPFPA), an International Union, and DAVID L. HICKEY, the International President of the Security Police and Fire Professionals of America,

Plaintiffs,

v.

STEVE MARITAS, an individual, CALVIN WELLS, an individual, and LAW ENFORCEMENT OFFICERS SECURITY UNION, an unincorporated union,

Defendants.

Case No.: 2:19-cv-10743

Hon. Stephanie Dawkins Davis

Magistrate Judge R. Steven Whalen

---

**REPORT AND RECOMMENDATION OF DISCOVERY MASTER No. 4 RE: PLAINTIFFS' RENEWED MOTION FOR DEFAULT JUDGMENT OR ALTERNATIVE SPOLIATION SANCTIONS (ECF No. 84)**

## I. __Introduction__.

In the Court's Order Adopting Report and Recommendation [61] (the "Order" -- ECF No. 64), the Court granted in part Plaintiffs' Motion for Default Judgment or Alternative Spoliation Sanctions (the "Initial Motion" -- ECF No. 29), ordered an expert computer forensic examination of Defendants' Electronic Devices, and denied Plaintiffs' requests for sanctions without prejudice, preserving Plaintiffs'

right to renew or revise their requests for the same or other relief based on the results of the expert's examination and report. ECF No. 64, PageID.2353-54.

Pursuant to the Order and the Report and Recommendation ("R&R No. 1" – ECF No. 61), Avalon Legal ("Avalon") was retained as the electronic discovery vendor. Avalon subsequently collected and imaged multiple types of electronic data and submitted an initial Analysis/Reporting Overview as of 12/19/2022 (ECF No 84-2). Avalon then loaded the email files to a Relativity ECA workspace, filtered by the search terms identified by the Discovery Master based on input from counsel for all parties, and made the workspace available to Defendants' counsel for a privilege and relevancy review. Defendants counsel subsequently completed the privilege and relevancy review, and in December 2023 Avalon issued its final report (ECF No 84-3).

On January 5, 2024, Plaintiffs filed a Renewed Motion for Default Judgment or Alternative Spoliation Sanctions. ECF No. 84 (the "Renewed Motion"). Defendants[1] subsequently filed a response to the Renewed Motion (ECF No. 91) and

---

[1] The response was filed on behalf of all Defendants. With that exception, all further references to "Defendants" shall mean and include only Defendant Steve Maritas and Defendant Law Enforcement Officers Security Union ("LEOSU"), but not Defendant Calvin Wells. Defendants contend that Mr. Wells is not alleged to have

Plaintiffs filed a reply in support of the Renewed Motion (ECF No. 92). This Report and Recommendation addresses the Renewed Motion.

## II. Background

### a. The Order

The Initial Motion sought sanctions under Federal Rule of Civil Procedure 37(e)(1) and 37(e)(2). ECF No. 61, PageID.2321-24. As noted in R&R No. 1, the threshold question for application of Rule 37(e) is whether: (i) ESI that should have been preserved in the anticipation or conduct of litigation (ii) is lost because a party failed to take reasonable steps to preserve it, and (iii) it cannot be restored or replaced through additional discovery. ECF No. 61, PageID.2324.[2] As to factors (i) and (ii), R&R No. 1 concluded that Defendants failed to preserve (deleted) ESI that would have been responsive to SPFPA's discovery requests concerning Defendants' allegedly defamatory postings, emails and text messages. ECF No. 61,

---

posted or deleted any material, and Plaintiffs have made no separate arguments or contentions of conduct by Mr. Wells relevant to their motion for spoliation sanctions. Plaintiffs contend, and I agree, that LEOSU is responsible for the spoliation along with Mr. Maritas because Mr. Maritas was at all relevant times acting as its officer and on its behalf.

[2] R&R No. 1 is adopted herein by reference and will not be repeated except for the purpose of providing perspective for the analysis, findings and recommendations of this R&R.

PageID.2317-18 and 2327-28. As for factor (iii), the Court ordered a computer forensic examination of Defendants' devices to determine whether the lost information could be restored or replaced through additional discovery, and in the event the deleted ESI cannot be restored or replaced, to better inform the Court's judgment on the requisite questions of prejudice and intent. ECF No. 64, PageID.2355; *see also* ECF No. 61, PageID.2330-31.

**b. The Computer Forensic Examination**

**i. The Deleted Items**

Following up on its forensic review of Defendants' devices, Avalon produced an initial report summarizing its review of an external hard drive used by Defendants as a backup for various other devices. Avalon found six videos in a Recycle Bin/Folder. ECF No84-2, PageID2764. Three of the deleted video files appeared to have been related to SPFPA. Two of these files were in a computer directory that Defendants titled "E:\FuckSPFPA\" and a third video was titled "Steve Maritas SPFPA.mp4" ECF No84-2, PageID2765. The report states that all these files were deleted on August 19, 2019, months after SPFPA filed its complaint and five months after the Defendants removed the lawsuit to this Court. ECF No. 1. All the deleted

video files were corrupted, and none were retrievable or viewable. ECF No84-2, PageID2765.[3]

Following an initial review of the remaining devices, a narrowing of the search term parameters, and a responsiveness and privilege review of the ESI on the remaining devices, Avalon issued its final report in December 2023. ECF No. 84-3. In that report, Avalon reconfirmed that the only deleted data recovered from Defendants' external hard drive was the corrupted/unviewable video files and irrelevant other documents previously summarized in Avalon's initial report. Avalon did not find and was unable to recover the articles, blogposts, videos, comments, images, photographs, or other documents disseminated to third parties relating to, concerning, or referencing Plaintiffs which Mr. Maritas permanently deleted. ECF No. 61, PageID.2318. *See also*: ECF No. 84-6, PageID.3095 (Avalon email confirming it recovered no deleted items other than those listed in its initial report). Avalon further confirmed that it was not able to view the email automatic deletion settings from the email accounts it reviewed, and that for the deleted data, "it is

---

[3] Avalon's initial report also noted that it was able to retrieve 153 other deleted documents form the hard drive. After a privilege and responsiveness review, counsel for Defendants identified all these retrieved documents as irrelevant and nonresponsive.

highly unlikely that further data could be recovered after the searches and processes that were performed." ECF No. 84-3, PageID2770-71.

Based on Avalon's computer forensic examination of Defendants' devices, I find that the ESI admittedly deleted by Plaintiff (described in Section 1(c) of R&R No. 1) while under an obligation to preserve it cannot be restored or replaced through additional discovery. ECF No. 61, PageID.2317-21. Consequently, the Court should proceed to an evaluation of prejudice under Rule 37(e)(1), an evaluation of intent to deprive under Rule 37(e)(2), and the appropriateness of a sanction, if any. *See* Section III (a) and (b), below.

**ii. Other Potentially Responsive ESI**

While conducting its forensic computer examination, Avalon not only determined that it could not recover the *deleted* ESI, but it also found that Defendants' devices contained a significant amount of *non-deleted* ESI responsive to the search terms ordered by the Court ("SPFPA", "Hickey", and "Phillips"). ECF No. 81, PageID.2724. Plaintiffs contend that this *non-deleted* ESI likely contained information that should have been produced in the first place, in response to their original discovery requests. Defendants reviewed the *non-deleted* ESI and, following a privilege and responsiveness review, Defendants produced

approximately 1,460 documents. Plaintiffs now contend they should have done better. Although Plaintiffs have not filed a motion to compel production, their Renewed Motion for sanctions seeks production of *all* non-privileged ESI responsive to the search terms ordered by the Court, and not just those responsive to the discovery requests at issue. ECF No. 84, PageID.2743-48.

Plaintiffs' Initial Motion sought spoliation sanctions for Defendants' deletion of ESI responsive to Plaintiffs' Interrogatory No. 2, which asked Defendants to "identify all articles, blogposts, videos, comments, images, photographs, and any other Documents disseminated by any Defendant to any third party relating to, concerning, or referencing Plaintiffs" (the "Content") and their Document Request No. 2, which asked Defendants to produce "Documents and Correspondence . . . sent by any Defendant to any third-party which reference Plaintiffs in any way" (the "Communications"). ECF No. 61, PageID.2317-18.

In its November 7, 2023 Order adopting the Discovery Master's report and recommendation on search terms and scope of the review, the Court ordered Defendants to "COMPLETE their relevancy and privilege review of the documents yielded by application of the search terms in above; PROVIDE Plaintiffs with a privilege log . . . and PRODUCE all ESI not identified on the privilege log within

thirty-five days." ECF No. 81, PageID.2724. Plaintiffs contend that compelled Defendants to produce all non-privileged ESI responsive to the search terms, period. Defendants contend that means they were to produce, from the ESI responsive to the search terms, all non-privileged documents responsive to the discovery requests at issue (meaning the Content and the Communications). ECF No. 91, PageID.3573.

Regarding the *scope* (as distinguished from the *application*) of the Court's November 7, 2023 Order (ECF No. 81), I agree with Defendants. First, the purpose of the forensic examination was to determine whether ESI responsive to Interrogatory No. 2 and/or Document Request No. 2 could be recovered, not to re-open discovery on anything Plaintiffs had or might have requested during discovery. Second, if the Court had intended to require Defendants to produce *all* ESI responsive to the search terms, there would be no reason for it to require Defendants to first complete a relevancy *and* a privilege review before production rather than simply a privilege review. Finally, requiring production of all ESI with the search terms would be substantially overbroad, and would likely include, among other things, inter-company communications about election and operational strategies that would likely be outside the scope of permissible discovery. The Renewed Motion is a motion for spoliation sanctions and not a motion to compel discovery.

Consequently, this R&R will consider Plaintiffs' request for additional production of ESI in that context.

Regarding the *application* of the Court's November 7, 2023 Order (ECF No. 81), Plaintiffs point out that a number of the documents identified as among *non-deleted* ESI appear to be Content responsive to the discovery requests at issue. Avalon also created an Excel document report with a forensic listing of data on (both folders and files) on Defendant's hard drive. *See* Avalon's initial report, ECF No. 84-2, PageID.2765, ¶3 and ECF 84-5, PageID.3090. In December 2023, Avalon applied the Court-ordered search terms to that report and generated a new Excel report containing only the lines with search term hits. *See* ECF No's 84-4 and 84-5. The narrowed Excel report identifies 5,290 forensic file listings from the hard drive, many of which appear to be empty folders or forensic listings of data from the hard drive, and others of which show file name extensions such as .pdf, .jpg, .png, or .mp4, indicating that they are documents, images and/or videos referring to Plaintiffs. Here are a few examples:

- \SPFPA CORRUPTION OQUINN INVESTIGATION.png [1070]
- \SPFPA-ANTHONY-WEINER-SEX-OFFENDER.jpg [1076]
- \spfpa-threatens-its-members-local-506-pg-2.jpg [1077]
- \spfpa-corruption-devon.jpg [1081]

- \spfpa-corruption-maryland.png [1082]
- \SPFPA-CORRUPTION-LOCAL-238.png [1094]
- \SPFPA-CORRUPTION-HICKEY.jpg [1098]
- \HICKEY-RESIGN.png [1886]
- \NLRB-CHARGES AGAINST-SPFPA-SPECTRUM.pdf [2239]
- \SPFPA-Joe-McCray-Wise-Guy.png [2322]
- \SPFPA-THREATS.png [2329]
- \spfpa-trap-video.mp4 [2332]
- \SPFPA-CORRUPTION-LOGO.png [2334]
- \SPFPA-PATRONUS-CONFLICT-OF-INTEREST-REPORT.mp4 [2337]
- \SPFPA-CORRUPTION.png [2339]
- \SPFPA LIES EXPOSED - LIKE CRIMINALS SPFPA HIDES IN THE SHADOWS OF THE DARK.mp4 [2346]
- \2019-01\SPFPA CORRUPTION VIRGINIA SPFPA.png [3837]
- \2019-01\SPFPA CORRUPTION MGM DETROIT CASINO.png [3844]
- \2019-01\SPFPA-CORRUPTION-SPFPA-UNION(2019_02_26 02_38_27 UTC).jpg [3845]
- \2019-01\SPFPA-CORRUPTION-SPFPA-UNION.jpg [3846]
- \2019-01\SPFPA-CORRUPTION-SPFPA-LOCAL-UNIONCORRUPTION (2019_02_26 02_38_27 UTC).jpg [3851]
- \2019-01\SPFPA-CORRUPTION-HICKEY.jpg [3854]
- \2019-01\SPFPA CORRUPTION CARTOON (2019_02_26 02_38_27 UTC).png [3861]

Case 2:19-cv-10743-SJM-RSW ECF No. 98, PageID.4359 Filed 08/27/24 Page 11 of 24

- \2019-01\SPFPA-CORRUPTION RAT.jpg [3865]
- \2019-01\SPFPA CORRUPTION CARTOON.png [3874]
- \2019-02\MGM Springfield Casino Security Officers Tell The CORRUPT SPFPA UNION To Go Away.jpg [4156]
- \2019-02\spfpa-corruption in hickeys union.jpg [4184]

Avalon's New Excel Report, ECF No. 84-4.

The forensic listings of data on the new Excel report that identify empty folders or other miscellaneous data from the hard drive have been identified, and beyond that would have no evidentiary or other value. But those that reflect documents, images and/or videos (the .pdf, .jpg, .png, or .mp4 files) referring to Plaintiffs appear to reflect the existence of Content that is consistent with the type of materials Defendants admittedly published to third parties in the context of union elections. I find that these documents, images, and videos should have been produced by Defendants during discovery in their original responses to the discovery requests at issue. I also find that these documents are within the scope of the Court's November 7, 2023 Order (ECF No. 81) and, to the extent they continue to exist on Defendant's hard drive, should have been produced in response to that Order.

Defendants contend that, to the extent such Content existed on the hard drive, it was among the ESI they screened and already produced. Plaintiffs contend they

were unable to find this Content in the 1,460 documents produced by Defendants following their privilege and responsiveness review. Defendants offered to have the Discovery Master conduct an *in-camera* inspection to determine whether all the documents, images and/or videos on the new Excel report were included within its production. I find it would be more efficient to simply have Avalon generate copies and have Plaintiffs produce the entire set of documents, images and/or videos identified by the new Excel report. Again, this is relevant and responsive Content, and not Communications which could be privileged. To the extent it has already been produced, there will be no harm in producing another copy. To the extent it has not already been produced, it should have. And to the extent a privilege claim could apply, the documents should already be identified on Plaintiffs' privilege log and can be withheld by Avalon.

Consequently, I recommend that the Court enter an order compelling Defendants to produce copies of all non-privileged documents, images and/or videos (the .pdf, .jpg, .png, or .mp4 files) identified on the new Excel report (ECF No's 84-4) to Plaintiffs within one week.

## III. <u>Rule 37Analysis</u>

### a. Rule 37(e)(1)

Based on the findings set forth in Section II.b.i. above and in R&R No.1, Rule 37(e)(1) provides that the Court, upon finding prejudice to another party from loss of the information, may order measures no greater than necessary to cure the prejudice. Under Rule 37(e)(1), the Court should next proceed to an evaluation of whether the moving party experienced prejudice resulting from such a non-remediable loss. "Prejudice" can be "properly understood as a party's ability to obtain the proofs necessary for its case . . . which is another way of saying the loss of ESI could negatively impact a party's ability to make its case, or prejudice that party because of the loss of information." *Konica Minolta Bus. Sols., U.S.A. Inc. v. Lowery Corp.*, 2016 WL 4537847, *3 (E.D. Mich. Aug. 31, 2016).

Here, there can be no doubt that Plaintiffs have been prejudiced by Defendants' improper deletion of relevant ESI. The Content and the Communications deleted by Defendants are precisely the kind of proofs necessary for Plaintiffs' case and the loss of such ESI will negatively impact Plaintiffs' ability to make their case. Plaintiffs' primary claim in this case is defamation, ECF No. 13, PageID.402-404, and the first two elements to defamation are "a false and

defamatory statement concerning plaintiff" and "an unprivileged publication to a third party." *Daneshvar v. Kipke*, 266 F. Supp. 3d 1031, 1055 (E.D. Mich. 2017). There could be no evidence more relevant to these claims than the Content, which are the internet posts, videos, and related images Plaintiffs contend to be defamatory, and the Communications, their emails and text messages published to third parties. Likewise, Plaintiffs claim tortious interference with a contract or advantageous business relationship or expectancy. ECF No. 13, PageID.405-406. A key element for such a claim is "intentional and improper interference by the defendant, inducing or causing a breach, disruption, or termination of the contract or the business relationship or expectancy." *Innovation Ventures, LLC v. N2G Distrib., Inc.*, 779 F. Supp. 2d 671, 680 (E.D. Mich. 2011). The deleted Content and Communications would have been directly relevant to the issue of whether Defendants intentionally and improperly interfered with Plaintiffs' union election efforts.

Defendants again argue that the deleted information should already be in Plaintiffs' possession and, in any event, can be replaced through discovery from third parties. ECF No. 91, PageID.3575-76. But those arguments have already been rejected by R&R No.1 and the Order adopting it. *See* ECF No. 61, PageID.2326 and

ECF No. 64, PageID.2354.[4] Defendants also contend that there is no prejudice because Plaintiffs already have sufficient evidence to present their claims to a jury. ECF No. 91, PageID.3577-78. But that begs the question. The deleted ESI could help make Plaintiffs' case stronger as to liability and could significantly affect the amount of damages in the event they prevail on the merits.

I find that Plaintiffs have been prejudiced by the loss of the deleted Content and Communications.

Upon a finding of prejudice, the district court may employ curative measures, but is not authorized to order measures greater than necessary to cure the prejudice. Rule 37(e)(1) and 2015 Advisory Comm. Notes. Here, it is hard to fathom what curative measures short of an adequately tailored adverse inference would completely cure the prejudice caused by the loss of directly relevant evidence. But curative measures under subdivision Rule 37(e)(1) do not include adverse

---

[4] Defendants assert that Mr. Maritas routinely included Plaintiffs as recipients of any email and/or text message containing allegedly defamatory content. ECF No. 30, PageID.840. But Defendants' admitted deletions have deprived Plaintiffs of the ability to test that assertion. Even from the materials that have not been deleted, Plaintiffs point out that they found at least one set of 222 nearly identical text messages with allegedly defamatory content which was not copied to Plaintiffs or any member of their executive team. ECF No. 92, PageID.3798-99 and ECF No. 92-5.

inferences, which are permitted under subdivision Rule 37(e)(2) only on a finding of intent to deprive another party of the lost information's use in the litigation. 2015 Advisory Comm. Notes. Further, authority to order measures no greater than necessary to cure prejudice does not require the court to adopt measures to cure every possible prejudicial effect. *Id.*

Considering the above, I recommend that the Court adopt the following curative measures pursuant to Rule 37(e)(1):

(a) the Court should enter an order permitting the parties to present evidence and argument to the jury regarding the loss of the information that was likely included in the deleted ESI;[5]

(b) the Court should consider, with input from counsel for the parties, giving the jury instructions to assist in its evaluation of such evidence and/or argument; and

(c) the Court should enter an order compelling Defendants to pay Plaintiffs' costs and attorney fees incurred in pursuing their Initial Motion, the forensic review, and the Renewed Motion.

---

[5] As noted in the Initial R&R, "the content of the lost information is fairly evident. The purpose of Defendants' websites, social media accounts, and YouTube pages was to compete with the rival union, SPFPA, and those are the very same publications which SPFPA claims to be defamatory." ECF No. 61, PageID.2326. Plaintiffs should be permitted to present evidence of the deletions and argue to the jury that the deleted information was unfavorable to Defendants even in the event that the Court were to decide not to give an adverse inference instruction under Rule 37(e)(2).

Case 2:19-cv-10743-SJM-RSW ECF No. 98, PageID.4365 Filed 10/28/24 Page 17 of 24

**b. Rule 37(e)(2)**

Based on the findings set forth in Section II.b.i. above and in R&R No.1, Rule 37(e)(2) authorizes the Court to courts to use more severe measures to address or deter failures to preserve electronically stored information, but only on finding that the party that lost the information acted with the intent to deprive another party of the information's use in the litigation. R&R No.1 summarized the relevant standards:

> To obtain sanctions under Rule 37(e)(2), the movant need not show prejudice; however, the court needs to find intent to deprive. *See id.* ("Subdivision (e)(2) does not include a requirement that the court find prejudice to the party deprived of the information. This is because the finding of intent required by the subdivision can support not only an inference that the lost information was unfavorable to the party that intentionally destroyed it, but also an inference that the opposing party was prejudiced by the loss of information that would have favored its position. Subdivision (e)(2) does not require any further finding of prejudice.").
>
> To show intent, the movant must show ESI was lost due to more than negligence or gross negligence. *Id.*; *see also Applebaum v. Target Corp.*, 831 F.3d 740, 745 (6th Cir. 2016) ("A showing of negligence or even gross negligence will not do the trick. . . . [Plaintiff] would not have been able to show any degree of fault for Target's alleged destruction of records, because she cannot show that Target destroyed the records—if they even existed in the first place—after it was put on notice of litigation.") This "intent standard is stringent and does not parallel other discovery standards." *Culhane v. Wal-Mart Supercenter*, 364 F. Supp. 3d 768, 773 (E.D. Mich. 2019) (internal quotation marks and citations omitted). In

> evaluating a party's intent, "[c]ourts should consider the extent to which a party was on notice that litigation was likely and that the information would be relevant." *Id.* (citing to the 2015 Advisory Comm. Notes).

ECF No. 61, PageID.2323-24.

As noted above, to evaluate intent, courts should consider the extent to which a party was on notice that litigation was likely and that the information would be relevant. Here, R&R No.1 found that at least some of the deleted ESI was relevant. ECF No. 61, PageID.2326-27. Plaintiffs argue that Defendants' conduct in deleting the ESI demonstrates clearly that Mr. Maritas acted with the intent to deprive Plaintiffs of the information's use in the litigation. First, Defendants' initial response conceded they "had a duty to preserve the information from the outset of the litigation under Fed. R. Civ. P. 37(E). . . ." ECF No. 30, PageID.836. And at the hearing, counsel for Defendants conceded Maritas was aware of his obligation to preserve evidence. ECF No. 61, PageID.2325.

Defendants contend that deletion was not motivated by an intent to deprive Plaintiffs of information to use in this litigation, but instead he was simply following his previous pattern of practice and procedure. ECF No. 30, PageID.835-36. Specifically, Defendants admitted that, even after the lawsuit was filed and served, Maritas "routinely deleted his inbox as a matter of course and practice" (ECF No.

30, PageID.833), and as for videos, blogposts, and the like, Maritas continued following his "long held practice of post, remove, delete and replace." ECF No. 30, PageID.835.

But Defendants' contention that Mr. Maritas routinely deleted Content, such as videos, blogposts, and the like, is belied by the fact there are *non-deleted* documents, images and/or videos (the .pdf, .jpg, .png, or .mp4 files) referring to Plaintiffs that remain on their hard drive. *See* Avalon's New Excel Report, ECF No. 84-4 and Section II.b.2, above. Further, the only evidence of *deleted* video files found by Avalon shows that they were all deleted on the same date, August 19, 2019, months after Defendants were served with the complaint initiating this action (January 1, 2019). And Defendants' contention that Mr. Maritas routinely deleted Communications is likewise belied by the *non-deleted* ESI. Avalon's analysis of the devices and email accounts revealed that there were over 102,000 *non-deleted* documents with hits using the original 46 search terms (ECF No. 84-9), and over 25,000 *non-deleted* documents with hits using the subsequently narrowed set of three search terms. ECF No. 75, PageID.2637.[6] These facts, along with the timing of the

---

[6] Most of these documents were Communications, such as emails. No doubt, not all these Communications would have been responsive to the two discovery requests at

deletions, suggest that the deletions were selective and limited rather than routine and universal. These facts also suggest the materials were deleted with an intent to deprive Plaintiffs of information to use in this litigation.[7]

I find that Mr. Maritas, individually and as an agent for and on behalf of SPFPA, deleted ESI with the intent to deprive Defendants of the information's use in this litigation. Upon a finding that the party acted with the intent to deprive another party of the information's use in the litigation, the Court has discretion to adopt any

---

issue. Even while conceding there were 25,000 documents matching the search terms, Defendants point out that approximately 15,000 of these documents were communications with the Department of Labor. Nevertheless, the existence of these non-deleted items belies Mr. Maritas' contention that he routinely and regularly deleted emails and other files.

[7] Plaintiffs further contend that Defendants continued to delete emails even after the Court's Order enjoining Defendants from deleting or altering any ESI, which would also support an inference of an intent to deprive Plaintiffs of information to use in this litigation. ECF No. 84, PageID.2744-45. Avalon's final report found there were 97 "Trash/Deleted" emails from Mr. Maritas' leospba email address with date ranges of 10/25/2022 – 10/31/2022. ECF No. 84-3, PageID.2772. Plaintiffs characterize this as a violation of the Court's Order. ECF No. 84, PageID.2745. However, Mr. Maritas contends that he deleted no such emails and this must be an error. Maritas Affidavit, ¶ 5, ECF No. 91-4, PageID.3611. It is possible that these deletions were inadvertently made, for example, by an inadvertent failure to revise automatic deletion or "junk email" settings. Since Avalon was unable to recover this limited set of emails or the email automatic deletion settings, it is difficult to draw any conclusive inference of intent from these deletions. Consequently, I have not drawn any inference from the 97 "Trash/Deleted" emails in making this R&R.

Case 2:19-cv-02074-JMC-RSW ECF No. 98, PageID.4369 Filed 10/26/21 Page 21 of 24

of the measures set forth in Rule 37(e)(2), subsections (A), (B), or (C), to address a failure to preserve ESI.

To find a remedy that best fits the wrong, the Court should consider what inferences can or should be supported by Defendants' intentional deletion of ESI. First, I do not believe Defendants' conduct supports a conclusive inference one way or another on the ultimate question of whether the deleted ESI was in fact defamatory. As noted above, Defendants point out that Mr. Maritas has not shied away from sharing at least some of the allegedly defamatory Content or Communications with Plaintiffs. To be sure, such Content and Communications may not be flattering to Plaintiffs. However, Defendants have always maintained that they are not defamatory, and Mr. Maritas' deletion of the ESI does not necessarily support an inference that he believed it was.

On this point, an order permitting the parties to present evidence and argument to the jury regarding the loss of the information that was likely included in the deleted ESI should suffice. But since Defendants' conduct does not support a conclusive inference one way or another on the ultimate question of whether the deleted ESI was defamatory, I do not believe the appropriate remedy should be entry of a default judgment under Rule 37(e)(2)(C), as requested by Plaintiffs.

Considering Rule 37(e)(2)(A) and (B), the finding of intent to deprive supports an inference that the lost information was unfavorable to the parties that intentionally destroyed it, Defendants. Further, the fact of the deletions supports an inference that the deleted ESI contained *additional* Content and Communications like those alleged in the complaint and identified by Plaintiffs through discovery. Moreover, Plaintiffs contend and Defendants have not disputed that Plaintiffs' pattern of practice was to disseminate the disputed Content to union members (voters) before contested union elections. The discovery requests at issue were intended to fill the gaps in Plaintiffs' information concerning the extent of Plaintiffs' dissemination of the disputed Content. While some of the information gleaned from the relatively few *non-deleted* ESI produced by Defendants after the forensic review may help fill that information gap, Defendants' original discovery responses stated they had no responsive information because it had all been deleted. This context and the fact of the deletions support an inference that Defendants disseminated the identified and/or deleted Content to all union members in contested elections between SPFPA and LEOSU from 2017 (*see* Amended Complaint, ¶ 18, ECF No.13, PageID.402-03) through September 30, 2022, the date of the Court's Order to preserve ESI.

Considering the above, I recommend that the Court adopt the following measures pursuant to Rule 37(e)(2):

(a) the Court should enter an order permitting the parties to present evidence and argument to the jury regarding the loss of the information that was likely included in the deleted ESI;

(b) the Court should consider, with input from counsel for the parties, giving the jury instructions to assist in its evaluation of such evidence and/or argument;

(c) the Court should enter an order instructing the jury that it may presume that the deleted ESI was unfavorable to Defendants;

(d) the Court should enter an order instructing the jury that it may presume the deleted ESI contained *additional* Content and Communications like those alleged in the complaint and identified by Plaintiffs through discovery;

(e) the Court should enter an order instructing the jury that it may presume that Defendants disseminated the identified and/or deleted Content to all union members in contested elections between SPFPA and LEOSU from 2017 through September 30, 2022; and

(f) the Court should enter an order compelling Defendants to pay Plaintiffs' costs and attorney fees incurred in pursuing their Initial Motion, the forensic review, and the Renewed Motion.

## IV. Conclusion

The Discovery Master makes this Report and Recommendations for the reasons set forth above pursuant to the authority provided in the Court's Order Appointing Discovery Master dated June 29, 2022. ECF No. 58, PageID.2310-11.

Pursuant to that Order, unless the court sets a different time, any objection to this Report and Recommendation must be filed no later than fourteen days after a copy is filed on the docket, and responses to any objections must be filed no later than fourteen days after objections are filed on the docket. Failure to timely object to this Report and Recommendation is a permanent waiver of any objection to it such that the report and recommendations are deemed approved, accepted, and ordered by the Court.

Respectfully submitted,

*/s/ Dennis M. Barnes*
Dennis M. Barnes (P39401)
DENNIS M. BARNES, PLLC
8540 Canton Center Road
Canton, Michigan 48187
(248) 736-4828
Dennis@BarnesADR.com

Date: June 17, 2024

# EXHIBIT 13

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

INTERNATIONAL UNIONS, SECURITY POLICE AND FIRE PROFESSIONALS OF AMERICA (SPFPA), an International Union, and DAVID L. HICKEY, the International President of the Security Police and Fire Professionals of America,

Plaintiffs,

v.

STEVE MARITAS, an individual, CALVIN WELLS, an individual, and LAW ENFORCEMENT OFFICERS SECURITY UNION, an unincorporated union,

Defendants.

Case No.: 2:19-cv-10743

Hon. Stephanie Dawkins Davis

Magistrate Judge R. Steven Whalen

---

**REPORT AND RECOMMENDATION OF DISCOVERY MASTER RE: PLAINTIFFS' MOTION FOR DEFAULT JUDGMENT OR ALTERNATIVE SPOLIATION SANCTIONS (ECF No. 29)**

This is a defamation and tortious interference case. Plaintiffs are International Unions, Security Police and Fire Professionals of America, an unincorporated international union which represents security, police, and fire professionals, and its International President, David L. Hickey (together, "SPFPA"). Defendants are a rival union, Law Enforcement Officers Security Union ("LEOSU"), and its founder

and CEO, Steve Maritas. SPFPA claims that LEOSU has engaged in a years-long campaign of publishing defamatory statements on the internet regarding SPFPA.

This Report and Recommendation addresses SPFPA's Motion for Default Judgment or Alternative Spoliation Sanctions. ECF No. 29 (the "Motion").

## I. Background

### a. The Lawsuit

SPFPA originally filed this lawsuit in the Oakland County Circuit Court for the State of Michigan on November 15, 2018. SPFPA served the Defendants with its complaint on January 9, 2019. ECF No. 29-15. On March 12, 1019, Defendants removed the lawsuit to this Court. ECF No. 1.

SPFPA's complaint includes claims for defamation (Counts 1 and 2) and tortious interference with a contract or advantageous business relationship or expectancy (Count 3). ECF No. 13, PageID 402-406. The complaint alleges that "Defendants have published numerous scurrilous, untrue, misleading, and Defamatory Statements against SPFPA and Hickey. Generally, these statements falsely characterize Plaintiffs as, or imply that Plaintiffs are, corrupt, criminal, and otherwise unworthy of support." ECF No. 13, PageID.402-404. SPFPA contends that Defendants disseminate these publications through both multiple

internet websites they operate and control and through individual accounts on websites operated and controlled by a third-party. . ..” ECF No. 13, PageID.401-02. SPFPA further contends that “Defendants also disseminate these publications through emails and text messages sent to SPFPA employees, local SPFPA union members, and members of other security officer, police officer, and fire professional unions.” ECF No. 13, PageID.402.

**b. The Motion**

On September 10, 2020, SPFPA filed the Motion, requesting entry of a default judgment and award of attorney fees against Defendants as a spoliation sanction for the destruction of electronically stored information (“ESI”) relevant to this case during this litigation. ECF No. 29, PageID571-72. Alternatively, SPFPA requests lesser sanctions against Defendants, including an adverse inference jury instruction. *Id*. On October 1, 2020, Defendants filed a response in opposition to the Motion (ECF No. 30), and on October 8, 2020, SPFPA filed a reply in support of the Motion (ECF No. 31).

On June 16, 2022, this case was administratively reassigned from District Judge Stephanie Dawkins Davis to District Judge Stephen J. Murphy, III pursuant to Administrative Order 22-AO-036. On June 29, 2022, the Court entered an order

appointing a Discovery Master to supervise, manage, and make recommendations to the Court regarding the disposition and resolution of discovery-related issues, including the Motion. ECF No.58. Upon consultation with counsel, the Discovery Master scheduled a hearing for the earliest mutually convenient date, September 7, 2022. Having carefully considered the Motion, briefs, and arguments of counsel, the Discovery Master has determined that no further argument of counsel is necessary, and hereby issues this Report and the Recommendations set forth below.

**c. Defendants' deletion of ESI**

In discovery, SPFPA requested various documents, including ESI, pertaining to the allegedly defamatory posts and videos themselves as well as communications to third parties regarding the same. In its First Set of Discovery Requests, for example, SPFPA's Interrogatory No. 2 asked the LEOSU Defendants to, "whether they are still publicly available or not, identify all articles, blogposts, videos, comments, images, photographs, and any other Documents disseminated by any Defendant to any third party relating to, concerning, or referencing Plaintiffs" ("Interrogatory No. 2"). ECF 29-3, PageID.615. SPFPA's Document Request No. 2 asked the LEOSU Defendants to produce "Documents and Correspondence, including, but not limited to blogposts, articles, videos, emails, text messages, and

Case 2:19-cv-10771-JJCG-DRG ECF No. 53, PageID.2318 Filed 10/03/22 Page 5 of 24

letters, created/written/published/disseminated/sent by any Defendant to any third-party which reference Plaintiffs in any way" ("Document Request No. 2"). ECF 29-3, PageID.617.

After receiving what they viewed to be unsatisfactory responses to these requests, SPFPA's counsel followed up with Defendants' counsel seeking further clarity. In or around December 2019, counsel for SPFPA confirmed in an email that counsel for Defendants informed him:

- Interrogatory No. 2 -- Mr. Maritas advised that other than those still publicly available, he has permanently deleted all articles, blogposts, videos, comments, images, photographs, or other documents disseminated to all third parties relating to, concerning, or referencing Plaintiffs. . . .

- Document Request No. 2 -- Mr. Maritas advised that he routinely deletes his emails and text messages, and, as a result, he does not have any responsive documents. You advised that, because of this routine deletion, there are no responsive text messages in your clients' possession, but that you would conduct an email search, including Defendants' deleted emails. . . .

ECF 29-5, PageID.632-33.

At his deposition, Maritas admitted he deleted ESI that would have been responsive to SPFPA's discovery requests while this litigation has been pending. SPFPA's counsel asked Maritas about one of the videos it claims to be defamatory (ECF No. 29-11), which was still online while this litigation was pending but has since been deleted. ECF No. 29-2, Maritas Dep., p. 81:16-18. Maritas previously

represented that he is and always has been the only person with access to add/delete videos to/from the website where it appeared. ECF No. 29-3, Defs.' Resps. to Pls.' 1st Set of Disc. Reqs., Resp. to Interrog. No. 4, p. 6. Yet, Maritas testified that he had "no idea how many posts or videos about SPFPA [he has] deleted." ECF No. 29-2, Maritas Dep., p. 86:9-12.

Maritas also directly confirmed that he had deleted emails and text messages relevant to this lawsuit:

> Q: So ever since [you worked for SPFPA] through today, every day or so, according to what you just said, you go through and delete emails?
>
> A: Absolutely.
>
> . . .
>
> Q: Okay. So you had many more emails and text messages that would have been responsive to our request for production of documents, but you can't produce them, and the reason you can't produce them is because you have deleted them; is that right?
>
> A: Safe to say, yes.

ECF No. 29-2, Maritas Dep., p. 102:6-9, 13-18.

In Defendants' response to the Motion, they admit that Defendants have deleted ESI during the pendency of this lawsuit, but that "the vast majority of the deletion occurred before the instant litigation was filed" (and thus before their

obligation to preserve ESI was triggered). ECF No. 30, PageID.831-33 and 835-37.[1] Defendants argue that "Plaintiffs have not established that Defendants have deleted any information during this relevant period [from January 10, 2019 to present]." ECF No. 30, PageID.835. But this is belied by Defendants' admission that, even after the lawsuit was filed and served, Maritas "routinely deleted his inbox as a matter of course and practice" (ECF No. 30, PageID.833), and as for videos, blogposts, and the like, Maritas continued following his "long held practice of post, remove, delete and replace." ECF No. 30, PageID.835.

Defendants also argue that their online publications are public, and the parties have been following each other's activities, so (a) SPFPA should be in possession of every ESI communication made by the Defendants, (b) "Plaintiffs cannot point to a single communication made by Defendants that was deleted which is relevant [and] are not already in possession of Plaintiffs," and SPFPA "has offered no evidence that additional ESI even exists." ECF No. 30, PageID.836 and 838. These contentions do not explain how SPFPA could possibly have possessed Defendants' email or text

---

[1] SPFPA's Motion is directed to Defendants spoliation during this litigation, after they had notice that the ESI was relevant to the pending litigation. ECF No. 29, PageID.583, ECF No. 31, PageID.983. SPFPA served the Defendants with its complaint on January 9, 2019. ECF No. 29-15.

messages to others. And even if true and supported by evidence, they do not refute Defendants' admission that they have been deleting online publications, emails, and text messages during the course of this litigation. They may or may not relate to the questions of whether Defendants' deletion of ESI was prejudicial, or whether it may be excused or call for a lesser remedy than that requested by SPFPA, as discussed in part below.

## II. Analysis

### a. The Legal Standard

SPFPA seeks sanctions under Federal Rule of Civil Procedure 37(e)(1) and 37(e)(2). Rule 37(e) provides that:

> (E) **Failure to Preserve Electronically Stored Information.** If electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery, the court:
>
> (1) upon finding prejudice to another party from loss of the information, may order measures no greater than necessary to cure the prejudice; or
>
> (2) only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation may:
>
> (A) presume that the lost information was unfavorable to the party;

(B) instruct the jury that it may or must presume the information was unfavorable to the party; or

(C) dismiss the action or enter a default judgment.

Sanctions under Rule 37(e)(1) are only available if the moving party experienced prejudice because of a non-remediable loss. "Prejudice" can be "properly understood as a party's ability to obtain the proofs necessary for its case. . . . which is another way of saying the loss of ESI could negatively impact a party's ability to make its case, or prejudice that party because of the loss of information." *Konica Minolta Bus. Sols., U.S.A. Inc. v. Lowery Corp.*, 2016 WL 4537847, *3 (E.D. Mich. Aug. 31, 2016). Rule 37(e)(1)

> does not place a burden of proving or disproving prejudice on one party or the other. Determining the content of lost information may be a difficult task in some cases, and placing the burden of proving prejudice on the party that did not lose the information may be unfair. In other situations, however, the content of the lost information may be fairly evident, the information may appear to be unimportant, or the abundance of preserved information may appear sufficient to meet the needs of all parties. Requiring the party seeking curative measures to prove prejudice may be reasonable in such situations. The rule leaves judges with discretion to determine how best to assess prejudice in particular cases.

2015 Advisory Comm. Notes. Upon a finding of prejudice, the district court may employ curative measures, but is not authorized to order measures greater than necessary to cure prejudice. *Id.*

To obtain sanctions under Rule 37(e)(2), the movant need not show prejudice; however, the court needs to find intent to deprive. *See id.* ("Subdivision (e)(2) does not include a requirement that the court find prejudice to the party deprived of the information. This is because the finding of intent required by the subdivision can support not only an inference that the lost information was unfavorable to the party that intentionally destroyed it, but also an inference that the opposing party was prejudiced by the loss of information that would have favored its position. Subdivision (e)(2) does not require any further finding of prejudice.").

To show intent, the movant must show ESI was lost due to more than negligence or gross negligence. *Id.*; *see also Applebaum v. Target Corp.*, 831 F.3d 740, 745 (6th Cir. 2016) ("A showing of negligence or even gross negligence will not do the trick. . . . [Plaintiff] would not have been able to show any degree of fault for Target's alleged destruction of records, because she cannot show that Target destroyed the records—if they even existed in the first place—after it was put on notice of litigation.")[2] This "intent standard is stringent and does not

[2] Neither the text of Rule 37(e)(2) nor of the 2015 Advisory Committee Notes place the burden of showing intent on the moving party. They discuss only "findings" by the court.

parallel other discovery standards." *Culhane v. Wal-Mart Supercenter*, 364 F. Supp. 3d 768, 773 (E.D. Mich. 2019) (internal quotation marks and citations omitted). In evaluating a party's intent, "[c]ourts should consider the extent to which a party was on notice that litigation was likely and that the information would be relevant." *Id.* (citing to the 2015 Advisory Comm. Notes).

**b. Discussion**

The threshold question for application of Rule 37(e) is whether: (i) ESI that should have been preserved in the anticipation or conduct of litigation (ii) is lost because a party failed to take reasonable steps to preserve it, and (iii) it cannot be restored or replaced through additional discovery. Upon a finding that these elements exist, the Court should then proceed to an evaluation of prejudice under Rule 37(e)(1), an evaluation of intent to deprive under Rule 37(e)(2), and the appropriateness of a sanction, if any.

**i. Should Defendants' ESI have been preserved in the conduct of litigation?**

"As a general matter, it is beyond question that a party to civil litigation has a duty to preserve relevant information, including ESI, when that party has notice that the evidence is relevant to litigation or . . . should have known that the evidence may be relevant to future litigation." *John B. v. Goetz*, 531 F.3d 448, 459

Case 2:19-cv-10207-JJM-RSW ECF No. 61, PageID.2325 Filed 10/08/22 Page 12 of 24

(6th Cir. 2008) (internal quotation marks and citations omitted) ("It is the responsibility of the parties to ensure that relevant ESI is preserved, and when that duty is breached, a district court may exercise its authority to impose appropriate discovery sanctions."). Here, Defendants' response concedes they "had a duty to preserve the information from the outset of the litigation under Fed. R. Civ. P. 37(E). . . ." ECF No. 30, PageID.836. And at the hearing, counsel for Defendants conceded Maritas was aware of his obligation to preserve evidence.

Defendants argue that SPFPA "cannot point to a single communication made by the Defendants that was deleted which is relevant to the claims of the Plaintiffs that are not already in possession of Plaintiffs." ECF No. 30, PageID.836. But that begs the question as to whether Defendants had a duty to preserve their ESI. It also concedes that at least some of the deleted ESI (that which was already in the possession of Plaintiffs) was relevant to the claims at issue in this case. Parties are entitled to conduct discovery both to confirm what they already know, and also to find out what they do not. The very purpose of a duty to preserve evidence is to have it available for review and use in the pending litigation. To the extent SPFPA may now find it difficult or impossible to prove precisely what was deleted or its relevance, that is only because Defendants have handicapped their ability to do so

by deleting such evidence. Defendants' argument, if accepted to excuse their deletion of ESI, would reward them for the very same conduct the spoliation rules seek to deter (and indeed, sanction).

Defendants' contention that that SPFPA cannot identify any relevant ESI not already in SPFPA's possession is an argument that SPFPA has not been prejudiced. As noted above, however neither the text of Rule 37(e)(2) nor of the 2015 Advisory Committee Notes place the burden of showing prejudice or intent on the moving party. While determining the content of lost information may be difficult, this is a case where placing the burden of proving relevance and/or prejudice on the party that did not lose the information would be unfair. Notably, Defendants have submitted no argument or proof establishing that none of the ESI they deleted during this lawsuit was relevant to SPFPA's claims or their defenses.

In any event, here the content of the lost information is fairly evident. The purpose of Defendants' websites, social media accounts, and YouTube pages was to compete with the rival union, SPFPA, and those are the very same publications which SPFPA claims to be defamatory. Defendants can hardly claim the deleted ESI is unlikely to contain any relevant evidence. Likewise, it strains credulity to say

none of the emails or text messages Defendants deleted during this litigation were relevant.

More importantly, as noted in § II.c. above, Maritas admitted he deleted ESI that would have been responsive to SPFPA's discovery requests while this litigation has been pending. SPFPA has established that at least one of the videos they claim to be defamatory (ECF No. 29-11), which was still online while this litigation was pending, has since been deleted. ECF No. 29-2, Maritas Dep., p. 81:16-18. That alone is sufficient to establish that Defendants deleted relevant ESI during this lawsuit.

I find that Defendants' should have preserved their ESI in the conduct of this litigation.

**ii. Has Defendants' ESI been lost because they failed to take reasonable steps to preserve it?**

Rule 37(e) "calls only for reasonable steps to preserve [and] is inapplicable when the loss of information occurs despite the party's reasonable steps to preserve." 2015 Advisory Comm. Notes (giving as examples party's lack of control, or information destroyed by events outside of party's control, such as flood or software attack). Here, the record is devoid of any argument or evidence that Defendants took any steps to preserve their ESI during this litigation. I find that

Defendants' ESI has been lost because they failed to take reasonable steps to preserve it.

**iii. Can Defendants' ESI be restored or replaced through additional discovery?**

Rule 37(e) applies only when the lost ESI cannot be restored or replaced, and directs that the initial focus should be on whether the lost information can be restored or replaced, for example, through additional discovery. "Because electronically stored information often exists in multiple locations, loss from one source may often be harmless when substitute information can be found elsewhere. . . . If the information is restored or replaced, no further measures should be taken." 2015 Advisory Committee Notes.

Here, Defendants' counsel advised SPFPA's counsel in an email that Maritas "permanently deleted" the ESI in question (ECF 29-5, PageID.632-33), and Defendants' discovery responses stated that "to the extent an item has been deleted Defendants do not recall and cannot provide the information." ECF 29-6, PageID.639.

In their response to the Motion, however, Defendants contend "unequivocally" say that the ESI can be restored or replaced through additional discovery. ECF No. 30, PageID.836. Of course, they say the burden of the

additional discovery should have been on SPFPA, which "could have subpoenaed, deposed or otherwise contacted any person within the network of organizations and election locations that Defendants identified in its answers to other discovery questions for the additional ESI." ECF No. 30, PageID.837.

SPFPA responds that this would have been futile. "Defendants "identified" 16 entire local unions, over 100 individuals, and "any other person that has visited" LEOSU Defendants' various websites and social media pages. ECF NO. 29-11, PageID 754-757. There was no practicable way for SPFPA to subpoena what amounts to thousands of potential third parties in what would have likely been ultimately deemed a disallowed fishing expedition." ECF No. 31, PageID.988. As to this point, I agree with SPFPA. Even if such a massive and disproportionate effort had been made, it is unlikely to have reliably identified or recovered all or even most of the deleted ESI, if any at all. Defendants offered no proof as to how many YouTube viewers or weblog browsers download and save what they have viewed. I suspect the percentage would not be significant.

There is another way to determine whether the lost information can be restored or replaced through additional discovery which neither side addressed in their briefs. At the September 7, 2022 hearing, I asked counsel for SPFPA whether they had

sought or conducted an expert forensic examination of Defendants' computers, servers, cell phones and/or other electronic devices capable of electronically sending and/or receiving communications and/or storing ESI. SPFPA's counsel answered that they had not done so, in reliance on Defendants' representations that Maritas had "permanently deleted" the ESI in question. In turn, I asked Defendants' counsel the same question. Defendants' counsel likewise indicated that he had not subjected his clients' electronic devices to any expert forensic examination.

As noted above, the Court's initial focus under Rule 37(e) should be on whether the lost information can be restored or replaced, for example, through additional discovery, and if the information is restored or replaced, no further measures should be taken. Given the potentially dispositive nature of the relief requested by SPFPA's motion (default judgment, adverse inference jury instruction, other curative measures, including monetary sanctions), the Court's ruling should be based on the best available evidence. An expert computer forensic examination of Defendant's electronic devices is likely to better inform the Court whether the lost information can be restored or replaced, and an expert computer forensic examiner may well be able to restore or replace the deleted ESI. To the extent an expert forensic examination of Defendants' electronic devices reveals that the deleted ESI

cannot be restored or replaced, an expert analysis of the manner and extent of the deletions of ESI is likely to better inform the Court's judgment on the requisite questions of prejudice and intent, and to determine the necessity and extent of appropriate curative measures, if any.

**III. Discovery Master's Recommendations**

The Discovery Master recommends that the Court:

1. Grant SPFPA's request for a determination that Defendants' should have preserved their ESI in the conduct of this lawsuit and that Defendants' ESI has been lost because they failed to take reasonable steps to preserve it;

2. Order Defendants to identify and preserve all computers, servers, cell phones and/or other electronic devices capable of electronically sending, receiving viewing and/or storing communications and/or ESI used by Defendants from January 9, 2019 to date to communicate with others by means of email, text message, telephone, website, weblog, social media, video sharing platforms (such as YouTube) and any similar website or internet based communication platform ("Electronic Devices");

3. Order that Defendants be enjoined from deleting anything from or altering in any way any of their Electronic Devices pending an expert computer forensic examination of Defendants' Electronic Devices;

4. Order an expert computer forensic examination of Defendants' Electronic Devices, on the following terms:

a) Within one week after entry of this Order, counsel for SPFPA and counsel for Defendants will either (a) select a **neutral** electronic discovery vendor (the "Vendor"), responsible to the Court, to search the electronically stored information ("ESI") on Defendant's Electronic Devices using the keyword search terms and parameters to be determined as set forth in ¶ 4.b, below, or (b) if they cannot agree on the selection of an appropriate Vendor, notify the Discovery Master, in which case the Discovery Master will select the Vendor;

b) Within two weeks after entry of this Order, counsel for SPFPA and counsel for Defendants will mutually agree upon a list of keyword search terms and parameters to be used by the Vendor in searching Defendants' Electronic Devices, or (b) if they cannot agree on a list of search terms and parameters, notify the Discovery Master and provide the Discovery Master with their respective proposed search terms and parameters, in which case the Discovery Master will determine a list of search terms and parameters to be provided to the Vendor;

c) Within three weeks after entry of this Order, Defendants shall produce to the Vendor all of Defendant's Electronic Devices for forensic imaging and review, and for all of Defendants' website, weblog, social media, video sharing platforms (such as YouTube) and any similar website or internet based communication platforms, produce to the Vendor all passwords, usernames, and sufficient information, including but not limited to all information requested by the Vendor to access to the administrative accounts for each such account to enable the Vendor to access activity logs, check for archived emails, postings, and the like, checking for eDiscovery tools added on like "vault", reflecting log ins, possible uploads or download activity, and possible deleted activity, and any other information requested by the Vendor so that the Vendor can access any of Defendant's current or historical ESI online.

d) Order the Parties to provide the Vendor with a copy of this Order and the Discovery Master's name and contact information;

e) Order the Parties and Discovery Master to instruct the Vendor that the Vendor shall conduct electronic searches using the keyword search

Case 2:19-cv-10743-SJM-RSW ECF No. 61, PageID.2334 Filed 08/22/22 Page 21 of 24

terms and parameters determined in accordance with ¶ 4.b, above (the "Search Terms"), under the direction of the Discovery Master;

f) Order the Vendor to identify ESI that contains one or more Search Terms (the "Search Hits") and make the results available to counsel for Defendants. This will enable Defendants to identify privileged ESI and assert any privilege claims as may be appropriate. If Defendants withhold any ESI on the basis of privilege, they will advise and work with the Vendor to create a privilege log as discussed in Paragraph 4.h below, which, upon completion, will be shared with counsel for SPFPA. Counsel for Defendants will instruct the Vendor to segregate and quarantine the ESI identified on the privilege log so that SPFPA cannot access or review the privileged ESI. Counsel for Defendants will complete their privilege review within 7 days after receiving the Search Hits from the Vendor. Should SPFPA desire to challenge any of Defendants' privilege claims, they shall submit any such challenges to the Discovery Master for review and decision.

g) After the privileged ESI are quarantined, the Vendor will produce to counsel for Defendants copies of images (in .pdf or similar format) of

Case 2:19-cv-01074-JMC-RSW ECF No. 61, PageID.2335 Filed 10/28/22 Page 22 of 24

the emails and/or documents from the ESI containing the remaining Search Hits.

h) The production of the Defendants' ESI does not waive the protections of the attorney-client privilege, the attorney work product doctrine, the mental impressions of trial counsel or any other such doctrine or rule of law. Any responsive Search Hits withheld by Defendants on the basis of the attorney-client privilege, work product doctrine or any other recognized legal protection will be identified on a privilege log. The production of privileged or work-product protected discovery materials, ESI or those materials not included on the privilege log, whether inadvertent or otherwise, is not a waiver of such protections from discovery in this case. Such materials must be returned to Defendants upon request and/or finding them, with all copies to be destroyed by SPFPA.

5. Order the Vendor to provide the Court with a report, making copies of same available to counsel for all parties and the Discovery Master, evaluating whether Defendants' deleted ESI has been or can be restored or replaced, and

explaining, to the extent possible based on the information made available to the Vendor, the timing, manner, extent, and nature of Defendants' deletions of ESI.

6. Order Defendants, as the parties responsible for deleting ESI notwithstanding their duty to preserve it, to compensate the Vendor for all reasonable charges for the Vendor's time, services, and expenses.

7. Denying the balance of SPFPA's Motion *without prejudice*, preserving SPFPA's right to renew or revise a request for the same or other relief based on the results of the Vendor's examination and report, including a reservation of any claim for redistribution of the Discovery Master's costs and fees (which, under the Court's Order Appointing Discovery Master, are to be split evenly, subject to redistribution by the Court).

**IV. Conclusion**

The Discovery Master makes this Report and Recommendations for the reasons set forth above pursuant to the authority provided in the Court's Order Appointing Discovery Master dated June 29, 2022. ECF No. 58, PageID.2310-11. Pursuant to that Order, unless the court sets a different time, any objection to this Report and Recommendation must be filed no later than fourteen days after a copy is filed on the docket, and responses to any objections must be filed no later than

fourteen days after objections are filed on the docket. Failure to timely object to this Report and Recommendation is a permanent waiver of any objection to it such that the report and recommendations are deemed approved, accepted, and ordered by the Court.

Respectfully submitted,

_/s/ Dennis M. Barnes_
Dennis M. Barnes (P39401)
DENNIS M. BARNES, PLLC
8540 Canton Center Road
Canton, Michigan 48187
(248) 736-4828
Dennis@BarnesADR.com

Date: September 22, 2022

# EXHIBIT 14

Case 2:19-cv-10743-SJM-RSW ECF No. 93, PageID.4304 Filed 08/22/24 Page 1 of 14

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

INTERNATIONAL UNIONS, SECURITY POLICE AND FIRE PROFESSIONALS OF AMERICA and DAVID L HICKEY,

Plaintiffs,

v.

STEVE MARITAS, et al.,

Defendants.
_______________________________/

Case No. 2:19-cv-10743

HONORABLE STEPHEN J. MURPHY, III

**OPINION AND ORDER**
**DENYING MOTION FOR RECUSAL [85]**

Plaintiffs International Unions, Security Police and Fire Professionals of America (SPFPA) and David L. Hickey sued Defendants Law Enforcement Officers Security Unions (LEOSU), Wells Calvin, and Steve Maritas for defamation, false light, tortious interference with a contract or advantageous business relationship or expectancy, knowing misrepresentation of copyright claims under the Digital Millennium Copyright Act (DMCA), and injunctive relief. ECF 13. About a year and a half after Plaintiffs filed the present case, ECF 1, Defendants LEOSU and Maritas filed a separate lawsuit in the Eastern District of Michigan that mirrored the original complaint. *Maritas v. Int'l Unions, Sec. Police & Fire Pros. of Am.* No. 4:20-cv-12544, (E.D. Mich. Sept. 16, 2020) ("*Maritas II*"); *see Maritas II*, ECF 16, PgID 1649 ("Much of the language in the [complaint] mirrors or is identical to the language in the SPFPA amended complaint."). Judge Stephanie Dawkins Davis consolidated the two matters

in December 2021, ECF 41, and in June 2022, the case was reassigned to Judge Stephen Murphy III. Now, after litigating before Judge Murphy for more than a year, Defendants moved for recusal. ECF 85, PgID 3191.

**BACKGROUND**

After the case was reassigned, the Court held a status conference to assess the state of litigation. ECF 58, 65. Statements the Court made at the status conference form the basis, in part, for Defendants' motion. *See* ECF 85, PgID 3193.

At the status conference, Plaintiffs' counsel first explained that discovery closed, but that the parties were awaiting the forensic expert's report to determine whether Defendants deleted relevant electronically stored information (ESI). ECF 67, PgID 2369–70. Plaintiffs also represented that if the forensic expert recovered the files and indicated that Defendants deleted pertinent ESI, Plaintiffs would request to reopen discovery and renew their motion for spoliation sanctions.[1] *Id.* Plaintiffs' counsel also stated that the parties had two unsuccessful mediations and opined that further settlement discussions were not likely to succeed. *Id.* Last, the Court asked Plaintiffs' counsel whether the pending motions for summary judgment reflected the present state of the case. *Id.*

The Court then asked Defendants' counsel to respond. *Id.* at 2373. Defense counsel began, "I will just note for the record that—and counsel is not aware of this. Last week my client authorized me to file yet another lawsuit against SPFPA and

[1] Ultimately, the forensic expert recovered deleted ESI and Plaintiffs renewed their motion for spoliation sanctions. ECF 75, 84.

Mr. Hickey and Mr. Phillips because they continue to defame him." *Id.* at 2373–74. The Court advised, "I would be very, very careful about that . . . they may suffer some severe jeopardy if their case is filed for harassment without merit or to in any way extend [or] delay" this case. *Id.* at 2374. "We don't need jockeying." *Id.* The Court then thanked Defense counsel for the information and asked him to continue. *Id.* at 2375. Defense counsel stated that the lawsuit was already filed and continued, "in terms of the spoilation motion, what I would like to do is update the Court relative to what's been going on that I don't believe Mr. Apel [Plaintiff's counsel] is aware of." *Id.* (cleaned up). The following exchange occurred, which is the subject of the recusal motion:

> "THE COURT: But why isn't he aware? I had you to have a status conference. Why wouldn't you be talking to him in advance of this to discuss what you've been doing and what you're aware of? This is ridiculous. You can't come to a status conference and start disclosing things to Mr. Apel for the first time. Counsels sit down. They meet and confer . . . I'm going to tell you what. You're not doing it the right way if you don't talk to each other. Now, why are you disclosing things to Mr. Apel on the record in a Federal Court proceeding that you should have discussed with him well in advance of this? It doesn't make sense to me. You know what I'm sensing here, Mr. Nunley, and I hate to get upset about this, but I'm sensing some real gamesmanship from the Defendants in this case. That would be the LEOSU, Maritas and Calvin Wells. You don't come to Federal Court and disclose for the first time that a suit has been filed . . . . You sit down and you talk and you try to resolve the case. And, if these clients want to delve in gamesmanship, I'm going to fine them and I'm going to tell you that right now. But go ahead. What's your next point?
>
> MR. NUNLEY: You know, your Honor, I take great umbrage with those statements, because none of them are actually true . . . .
>
> THE COURT: is it not true that you just said on the record I'm going to tell you something that Mr. Apel doesn't know about? . . .
>
> MR. NUNLEY: It's true, your Honor, but you didn't let me finish the –

THE COURT: Okay. That's gamesmanship, pal, okay. If you want to take umbrage with me, that's gamesmanship, all right. You want to play games, you're in the wrong place, I guarant[ee] you that. All right. What's next? . . .

MR. NUNLEY: . . . I'm following the direction of Mr. Barnes relative to the spoliation. So that is why I'm now disclosing it to the court, because Mr. Barnes asked me to do such a thing in the courtroom today. . . We're not playing any games here, your Honor, and I take great umbrage with the fact that you suggest that I'm playing games in any way, shape or fashion with this case when I'm following the directions of your own Special Master. . . .

THE COURT: . . . What else, Mr. Nunley? What else do you have to say?

MR. NUNLEY: The spoliation motion and your order of November 9th—and once again I'll ask the court, if you want to, call Mr. Barnes. It's most likely not going to be met because of the issues that have come up during the course of the specific deadlines set forth in the orders. . . .

THE COURT: Okay. Yeah. All right. There will be court action there. November 8 was suggested, it seemed reasonable, and now you don't want to meet that deadline. . . .

MR. NUNLEY: We want to meet the deadline. The forensic examiner is saying that they most likely will not be able to meet that deadline.

THE COURT: I know what's going on here, Mr. Nunley. I've been this—I've been here 14 years. I've seen it all trust me. They come from Boston and they come from New York, they come from Phoenix, they come from Northville or wherever you're at. I've seen it all. Go ahead.

MR. NUNLEY: You've seen what all, your Honor? I'm a little perplexed right now, because I don't understand what it is that I'm supposedly doing that is disrespectful to this court.

THE COURT: Why don't you get to the issues, Mr. Nunley.

MR. NUNLEY: Well, every time I try to explain the issues I'm told that –

THE COURT: Every time you get to the issues you get mad at me and take umbrage about things. So what's next?

MR. NUNLEY: I mean, that's just unfair, but . . . what I needed to disclose to you was relative to the discussions that Mr. Barnes and I had. And, yes, they were ex parte. And, yes, they were authorized to be ex parte, because Mr. Apel

> and myself and Mr. Barnes all agreed that there would be certain ex parte communications.
>
> THE COURT: Okay. I'm going to set an order in response to this conference . . . So I must say, Mr. Nunley, I came in open-minded today and I had a good discussion about the case, and for whatever reason you wanted to start arguing with me, but that's okay. Your will is to argue aggressively for your clients. You may want to consider the manner in which you do that, but we'll get along. We'll get through this, no problem. But I'm going to tell you we're not going beyond the 15th of November on the report, and we're not extending this case into '24. I've seen this done many, many, many, times. And it's time to play ball here, not quibble about delays and shortcomings and new lawsuits and all these other sorts of things. So with that I thank you both for your timely appearances, your aggressive advocacy on behalf of your clients, your attention to the file and deep-dive into the facts of this case . . . We are adjourned, and I thank you all very much."

*Id.* at 2375−83.

Since the status conference, the Court granted in part and denied in part Plaintiffs' motion for summary judgment and denied Defendants' motion for summary judgment. ECF 70, 71. The Special Master wrote a Report and set deadlines for Defendants to produce the recovered ESI and for Plaintiffs to renew their motion for spoliation sanctions. ECF 75. Both parties objected to the report. ECF 77, 78. In their objections, Defendants requested an extension of time to review the ESI. ECF 78. The Court overruled all the objections from both parties and adopted the Report. ECF 81. Thereafter, because the forensic expert filed a late report, *see* ECF 82, the Special Master recommended that the Court extend the Deadline for Plaintiffs to renew their motion for spoliation sanctions to January 5, 2024. The Court did so, ECF 83, and Plaintiffs renewed the motion. ECF 84. Four days later—before they responded to the spoliation motion—Defendants moved for recusal. ECF 85. For the reasons below, the Court will deny the motion.

Case 2:19-cv-10743-SJM-RSW ECF No. 93, PageID.4329 Filed 08/22/24 Page 6 of 14

**LEGAL STANDARD**

The Court's analysis begins from the premise that "a judge is presumed to be impartial." *Scott v. Metro. Health Corp.*, 234 F.App'x 341, 352 (6th Cir. 2007) (citation omitted). A judge must "disqualify himself in any proceeding in which his impartiality might be reasonably questioned." 28 U.S.C. § 455(a). Additionally, a judge must disqualify himself if "he has a personal bias or prejudice concerning a party[] or personal knowledge of disputed evidentiary facts concerning the proceeding." § 455(b)(1).

> The law with regard to recusal under section 455 is straightforward and well-established in the Sixth Circuit. A district judge is required to recuse himself only if a reasonable person with knowledge of all the facts would conclude that the judge's impartiality might reasonably be questioned. This standard is *objective* and is not based on the subjective view of a party.

*Wheeler v. Southland Corp.*, 875 F.2d 1246, 1251 (6th Cir. 1989) (quotation marks and quotations omitted) (emphasis in original).

The moving party bears the burden of proving "that a reasonable person would find that the bias exists" to justify recusal. *Consol. Rail Corp. v. Yashinsky*, 170 F.3d 591, 597 (6th Cir. 1999). In furtherance of that objective standard, a party cannot justify recusal based on "opinions formed by the judge on the basis of facts introduced or events occurring in the course of current proceedings." *Hewitt v. McCray*, 387 F. Supp. 3d 761, 770 (E.D. Mich. 2019) (quoting *Liteky v. United States*, 510 U.S. 540, 555 (1994)). Rather, a party must show that a judge's opinions "display a deep-seated favoritism or antagonism that would make fair judgment impossible." *Id.* at 771. In support of a request for recusal, a party may "file[] a timely and sufficient affidavit

that the judge before whom the matter is pending has a personal bias or prejudice either against him or in favor of an adverse party." 28 U.S.C. § 144. The affidavit must "be accompanied by a certificate of counsel of record stating that [the affidavit] is made in good faith." *Id.*

"[J]udicial rulings alone almost never constitute a valid basis for a bias or partiality motion. *Liteky v. United States*, 510 U.S. 540, 555 (1994). Rather, judicial rulings "are proper grounds for appeal, not for recusal." *Id.* And "judicial remarks made during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge." *Id.* "A judge's ordinary efforts at courtroom administration—even a stern and short-tempered judge's ordinary efforts at courtroom administration—remain immune." *Id.* at 556.

**DISCUSSION**

Defendant moved for recusal under 28 U.S.C. § 144 and § 455 based on five grounds: (1) Defendant Maritas's section 144 affidavit, (2) Local Administrative Order 08-AO-009, (3) the Court's statements at the October 26, 2022 status conference, (4) the Court's refusal to grant Defendants an extension, and (5) the Court's alleged professional history with Rodger D. Young. ECF 85, PgID 3192–94. Each ground is insufficient support for recusal.

First, Defendant Maritas' affidavit is insufficient to support recusal under § 144. The affidavit includes (1) a general statement that Defendants believe the Court is biased, (2) the same references to the Court's 2022 status conference as the

motion, and (3) instances of adverse rulings. ECF 85-2. Defendants' first contention, that the Court is biased, *id.* at 3213, is insufficient on its own because "more than mere conclusions" are required to support recusal. *United States v. Bell*, 351 F.2d 868, 879 (6th Cir. 1965). Defendant's second contention, that the statements made at the 2022 status conference demonstrated bias, ECF 85-2, PgID 3213, is likewise insufficient for recusal. The facts and reasons set out in the affidavit "must give fair and adequate support" such that they "would convince a reasonable man that a bias exists." *United States v. Story*, 716 F.2d 1088, 1090 (6th Cir. 1983) (quotation marks and quotation omitted). For the reasons below, the statements made at the status conference would not convince a reasonable man that bias exists. Moreover, Defendant's third contention, that the Court's rulings demonstrate bias, ECF 85-2, PgID 3214, is insufficient because "judicial rulings alone almost never constitute a valid basis for a bias or partiality motion." *Liteky*, 510 U.S. at 555. Thus, the affidavit does not support recusal under § 144.

Second, the Court's alleged lack of compliance with Eastern District of Michigan Administrative Order No. 08-AO-009 is not a valid basis for recusal. *See* ECF 85, PgID 3201.The Administrative Order, in part, outlines "civility principles" for judges which include conduct that "should be characterized at all times by courtesy and patience toward all participants." ECF 85-3, PgID 3219. All judges should strive to abide by these principles, but the Supreme Court held that "[a] judge's ordinary efforts at courtroom administration—even a stern and short-tempered judge's ordinary efforts at courtroom administration—[are] immune" from

mandated recusal. *Liteky*, 510 U.S. at 556. Impatient, discourteous, and critical comments do not justify recusal. *Id.* What is more, 28 U.S.C. § 144 and § 455 govern recusal, not the Administrative Order. Because the Court's alleged noncompliance with the local administrative order is immaterial, Defendants' second argument fails.

Third, relief under § 455 is not merited because the Court's statements at the status conference do not demonstrate bias against Defendants. Defendants cited three examples that allegedly demonstrate the Court's bias: (1) the Court's "tone and language" toward defense counsel, (2) the Court's warnings that Defendants should avoid gamesmanship, and (3) alleged "geographically xenophobic" remarks. *See* ECF 85, PgID 3192–93. As to the Court's tone and language toward defense counsel, "[b]ias against an attorney is not enough to require disqualification under § 455 unless petitioners can show that such a controversy would demonstrate a bias against the party itself." *Havard v. Punter*, No. 06-cv-10449, 2009 WL 1585376, *1 (E.D. Mich. June 4, 2009) (holding that "strong, personal criticism of one of the attorneys did not require disqualification"); *see also Liteky*, 510 U.S. at 555 (noting that remarks that are "critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge"). None of the Court's remarks to defense counsel demonstrate a bias against Defendants. And in fact, the Court concluded the conference by affirming "we'll get along" and thanking counsel for aggressively advocating for their clients. ECF 67, PgID 2383.

Next, as to the Court's warnings that Defendants should avoid gamesmanship, "[i]mpressions based on information gained in the proceedings are not grounds for

disqualification in the absence of pervasive bias." *In re M. Ibrahim Khan, P.S.C.*, 751 F.2d 162, 164 (6th Cir. 1984). The Court warned counsel against gamesmanship in response to defense counsel's repeated attempts to introduce new information that it did not disclose to Plaintiffs before the conference. ECF 67, PgID 2375−79. Specifically, defense counsel represented that Defendants filed a new lawsuit and would not meet certain deadlines. *See id.* at 2375, 2379. Those representations created the impression that Defendants were engaging in dilatory litigation strategy. Importantly, the Court did not issue any rulings or findings at the conference, but merely warned counsel to proceed cautiously and avoid bad faith tactics. *See id.* at 2375–77. The Court's response to information at the proceeding did not demonstrate bias. *See In re M. Ibrahim Khan*, 751 F.2d at 164.

The Court did not make "geographically xenophobic" remarks and Defendants' argument to the contrary was made in bad faith. ECF 85-2, PgID 3215. Defendants deliberately misrepresented the Court's statement by redacting words that directly contradict their position. The Court stated, "I know what's going on here, Mr. Nunley. I've been this—I've been here 14 years. I've seen it all trust me. They come from Boston and they come from New York, they come from Phoenix, they come from Northville or wherever you're at. I've seen it all. Go ahead." ECF 67, PgID 2380–81. The Court made this statement in response to defense counsel's assertion that they would not meet the contemplated deadline. *See id.* at 2379. The Court accordingly warned the parties against dilatory tactics. Its references to Boston, New York, Phoenix, and Northville do not demonstrate an ire for the East Coast. Indeed,

Phoenix is in Arizona, which is on the West Coast, and Northville is in Michigan, which is in the Midwest. But Defendants selectively edited the quote in Defendant Maritas' affidavit and in the motion by removing references to "Phoenix" and "Northville" in an ill-conceived attempt at casting the Court as biased against individuals from the East Coast. *See* ECF 85, PgID 3201–02; ECF 85-2, PgID 3213–14. Deliberately misrepresenting the Court's statements demonstrates a lack of good faith.

Fourth, the Court's refusal to grant an extension to Defendants does not demonstrate bias. Defendants complained that the Court was biased because the Court denied Defendants' request for an extension, but sua sponte granted an extension to Plaintiffs. ECF 85, PgID 3193. The comparison is insincere and misguided. Defendants requested a one-hundred-and-twenty-day extension. ECF 78, PgID 2683. The Court only granted Plaintiffs an eight-day extension. ECF 83. Moreover, the Court denied Defendant's excessive extension request based on the Special Master's recommendation to do so.[2] ECF 81, PgID 2720. Similarly, the Court granted Plaintiffs an extension based on the Special Master's recommendation, not sua sponte. And the Court recently afforded Defendants a similar, modest extension at the Special Master's recommendation. ECF 89. The Court's extension decisions do not demonstrate a bias against Defendants.

---

[2] Because of the delay in the Court's adoption of the recommendation, Defendants were afforded significantly more time than was recommended. ECF 81, PgID 2720.

Case 2:19-cv-10743-SJM-RSW ECF No. 93, PageID.4315 Filed 08/20/24 Page 12 of 14

Fifth, the alleged relationship between the Court and the late Rodger D. Young, formerly a principal at Plaintiffs' firm, is not grounds for recusal. And the argument for bias is tenuous at best. Defendants argued that because the Court did not disclose to Defendants that it served on a State Bar of Michigan committee with Rodger D. Young, the Court should recuse. *See* ECF 85, PgID 3193. Defendants provided no legal basis for this argument. *See* ECF 85. Moreover, Mr. Young passed away in 2021, well before the Court was assigned the case. ECF 88, PgID 3273–74. Defendants fourth argument is frivolous.

What is more, the recusal motion is untimely, and Defendants seemingly brought the motion to avoid the Court's adjudication of Plaintiff's motion for default judgment or spoliation sanctions. *Compare* ECF 84 *with* ECF 85 (showing Defendant filed the motion for recusal four days after Plaintiffs moved for spoliation sanctions). Defendants based their motion for recusal on statements made by the Court well over a year ago. *See generally* ECF 85. Defendants attempted to excuse the delay in filing out of "fear of retribution by this Court." ECF 85-2, PgID 3215. But the delay and Defendants' supposed fear of retribution triggers the question: why bring the motion now? "Recusal motions should normally be made at the earliest possible moment after obtaining knowledge of the facts demonstrating the basis for such a claim." *In re Nat'l Prescription Opiate Litig.*, No. 19-3935, 2019 WL 7482137, at *1 (6th Cir. Oct. 10, 2019) (quotation marks and quotation omitted). The timeliness of a recusal motion is important to "avoid[] the risk that a party hold[] back a recusal application as a fall-back position in the event of adverse rulings on pending matters." *Id.* The timing of

Defendants' motion suggests that its filing was motivated by an attempt to avoid an adverse ruling on a pending matter. Indeed, Defendants cited, "[a]s grounds for [the recusal] motion," the belief that "impartiality [is] impossible as to Defendants in this upcoming motion." ECF 85, PgID 3192−93. "Judge-shopping clearly constitutes conduct which abuses the judicial process." *Jones v. Crenshaw*, No. 3:22-cv-00045, 2022 WL 1447597, at *1 (M.D. Tenn. May 6, 2022) (quotation marks and quotations omitted). As such, the Court deems the timing of the motion another example of bad faith.

Given the demonstrable lack of good faith in bringing the instant motion, the Court will direct Defendant's and defense counsel's attention to Federal Rule Of Civil Procedure 11(b), which provides that "[b]y presenting to the court a pleading, written motion, or other paper" an attorney certifies that "(1) it is not being presented for any improper purpose; (2) the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on belief or a lack of information." And the Court will order Defendants and defense counsel to show good cause for why the Court should not impose sanctions for violating Rule 11(b) or for otherwise litigating in bad faith. *See* Fed. R. Civ. P. 11(c); *see also First Bank of Marietta v. Hartford Underwriters Ins.*

Case 2:19-cv-10774-SJM-DRG ECF No. 93, PageID.4317 Filed 02/20/24 Page 14 of 14

*Co.*, 307 F.3d 501, 512 (6th Cir. 2002) ("The district court has the inherent authority to award fees when a party litigates 'in bad faith, vexatiously, wantonly, or for oppressive reasons.") (cleaned up).

**ORDER**

**WHEREFORE**, it is hereby **ORDERED** that the motion for recusal [85] is **DENIED**.

**IT IS FURTHER ORDERED** that Defendants must **SHOW CAUSE no later than February 29, 2024** for why the Court should not impose sanctions on Defendants and defense counsel for litigating in bad faith.

**SO ORDERED.**

s/ Stephen J. Murphy, III
STEPHEN J. MURPHY, III
United States District Judge

Dated: February 20, 2024

# EXHIBIT 15

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

INTERNATIONAL UNIONS, SECURITY POLICE AND FIRE PROFESSIONALS OF AMERICA, et al.,

Plaintiffs,

v.

MARITAS, et al.,

Defendants.
_______________________________/

Case No. 2:19-cv-10743

HONORABLE STEPHEN J. MURPHY, III

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR SUMMARY JUDGMENT BY THE SPFPA PARTIES [49]**

In the interest of judicial economy, the Court will adopt the introduction section from its previous opinion and order, ECF 69, PgID 2387–89. This Order will resolve the summary judgment motion filed by the SPFPA Parties.[1] ECF 49 (motion for summary judgment); ECF 51 (response brief); ECF 55 (reply brief).[2]

## BACKGROUND

SPFPA and LEOSU are competing unions that organize police, security police, special police, protective service officers, security guards, and other security

[1] In this Opinion and Order, the "SPFPA Parties" are International Unions, Security Police and Fire Professionals of America (SPFPA), David L. Hickey, and Dwayne Phillips. *See* ECF 49, PgID 1126. And the "Maritas Parties" are Law Enforcement Officers Security Unions (LEOSU) and Steven Maritas. *Id.*

[2] Based on the parties' briefing, the Court will resolve the motion on the briefs without a hearing. *See* Fed. R. Civ. P. 78(b); E.D. Mich. L.R. 7.1(f)(2).

professionals. *Maritas II*,[3] ECF 8, PgID 541. Each union initiated advertising campaigns against the other; as a result of the campaigns, each union filed suit against the other for defamation, false light, and more besides. *Id.* at 542–44; ECF 13, PgID 401–02.

After the Maritas Parties filed their five-claim complaint, the SPFPA Parties moved to dismiss it in part. *Maritas II*, ECF 12. The Court granted in part and denied in part the motion. *Maritas II*, ECF 16. Now before the Court is the SPFPA Parties' motion for summary judgment. ECF 49. In light of the Court's Order granting in part the partial motion to dismiss, ECF 69, the following claims remain: (1) defamation as to "statements posted [or] published after September [1]6, 2019" and "statements that do not contain a clear date of publication";[4] (2) false light as to "statements posted [or] published after September[1]6, 2019" and "statements that do not contain a clear date of publication"; (3) tortious interference with an advantageous business relationship with union members (but not potential union members); (4) knowing misrepresentation of copyright claims under the Digital Millennium Copyright Act; and (5) permanent injunctive relief. *Maritas II*, ECF 16, PgID 1640, 1653–54; *see Maritas II*, ECF 8, PgID 544–48.

---

[3] As noted in the Court's previous Opinion and Order, *Maritas II* refers to the second, pre-consolidated matter, *Maritas v. Int'l Unions, Sec. Police & Fire Pros. of Am.* No. 4:20-cv-12544 (E.D. Mich. Sept. 16, 2020). All citations not designated as *Maritas II* are citations to the above-captioned matter, 2:19-cv-10743.

[4] The Court specifically noted that the postings identified at ECF 8, PgID 555–58, 586–90, 619–20, 638, 641, 655–56, and 660–63 "are the claims that are not time-barred." *Maritas II*, ECF 16, PgID 1640.

## LEGAL STANDARD

The Court must grant a summary judgment motion "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A moving party must point to specific portions of the record that "it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has met its burden, the non-moving party may not simply rest on the pleadings but must present "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (emphasis omitted) (quoting Fed. R. Civ. P. 56(e)).

A fact is material if proof of that fact would establish or refute an essential element of the cause of action or defense. *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984). A dispute over material facts is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When considering a summary judgment motion, the Court must view the facts and draw all reasonable inferences "in the light most favorable to the non-moving party." *60 Ivy St. Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir. 1987) (citations omitted).

## DISCUSSION

The Court will first discuss the defamation and false light claims. After, the Court will resolve the tortious interference claim. The Court will then resolve the

Digital Millennium Copyright Act claim and will last determine the request for permanent injunctive relief.

I. <u>Defamation and False Light Claims</u>

To establish defamation in Michigan, a plaintiff must show "(1) a false and defamatory statement concerning the plaintiff, (2) an unprivileged communication to a third party, (3) fault amounting to at least negligence on the part of the publisher, and (4) either actionability of the statement irrespective of special harm or the existence of special harm caused by publication." *Thomas M. Cooley L. Sch. v. Doe I*, 300 Mich. App. 245, 262 (2013) (footnote omitted). The "plaintiff must also comply with constitutional requirements that depend on the public- or private-figure status of the plaintiff, the media or nonmedia status of the defendant, and the public or private character of the speech." *Id.* (cleaned up). What is more, "[a] plaintiff claiming defamation must plead a defamation claim with specificity by identifying the exact language that the plaintiff alleges to be defamatory." *Id.* (footnote omitted).

To establish a claim based on false light, "a plaintiff must show that the defendant broadcast[ed] to the public in general, or to a large number of people, information that was unreasonable and highly objectionable by attributing to the plaintiff characteristics, conduct, or beliefs that were false and placed the plaintiff in a false position." *Found. for Behav. Res. v. W. E. Upjohn Unemployment Tr. Corp.*, 332 Mich. App. 406, 410 (2020) (quotation omitted). Importantly, defamation and false light claims both require a plaintiff to establish the existence of a false statement. *Id.* (explaining that falsity is an element of a false light claim); *Hawkins*

*v. Mercy Health Servs., Inc.*, 230 Mich. App. 315, 333 (1998) ("[I]f the gist of an article or the sting of the charge is 'substantially accurate,' the defendant cannot be liable.").

The SPFPA Parties argued that the Court should dismiss the defamation and false light claims for two reasons. First, the "Maritas Parties have not identified any specific language they claim to be defamatory—they merely identified general categories of language." ECF 49, PgID 1144 (cleaned up). Second, "the allegedly defamatory statements are true and[] not defamatory." *Id.* at 1142. The Court will discuss each argument in turn.

*A. Specific Defamatory Statements*

During discovery, the SPFPA Parties "requested that [the] Maritas Plaintiffs identify what specific language . . . [the] Maritas Plaintiffs claimed was untrue." ECF 49, PgID 1144. In response, the Maritas Parties identified fifty allegedly untrue statements. *Id.*; ECF 49-2, PgID 1167–68. But despite the disclosure, the SPFPA Parties argued that "those [fifty] allegedly untrue statements are merely general[] categories of statements, not specific statements identified in the [first amended complaint]. For example, [the] first broad category is '[a]llegations of litigation avoidance.'" ECF 49, PgID 1144 (quoting ECF 49-2, PgID 1167).

The SPFPA Parties submitted a chart that endeavored to connect the statements identified by the Maritas Parties at ECF 49-2, PgID 1167–68 with the postings in the first amended complaint that were not barred by the relevant limitations period. ECF 49, PgID 1145–49. The chart also tried to depict why each of the statements was true "based on [] demonstrable facts." *Id.* at 1145. The Maritas

Parties then submitted their own chart that endeavored to connect the statements identified by the Maritas Parties at ECF 49-2, PgID 1167–68 with the postings in the first amended complaint. ECF 51, PgID 1596–98. The Maritas Parties' chart tried to show why each of the statements was "untruthful and defamatory." *Id.* at 1596.

The Court reviewed the charts offered by both parties, and it independently compared the statements identified by the Maritas Parties with the postings they offered as evidence. *See Maritas II*, ECF 8-2; 8-3; 8-4. Nearly half of the statements identified by the Maritas Parties referred to postings that were barred by the limitations period. For instance, the Maritas Parties contended that "Steve Maritas and criminal friends" was a defamatory statement by the SPFPA Parties. ECF 49-2, PgID 1168. Yet that statement related to a barred exhibit, ECF 8-3, PgID 614. *See* ECF 16, PgID 1640 ("The postings identified at ECF No. 8, PageID.555–58, 586, 587, 588, 589, 590, 619, 620, 638, 641, 655–56, 660, 661, 662, and 663 are the claims that are not time-barred."). And some statements were too general or unspecific such that neither the parties nor the Court could connect the statement to an exhibit that was not time barred.

Accordingly, the Court will *not* consider the following twenty-two statements that either refer to exhibits barred by the relevant limitations period or were too general or unspecific to match with an exhibit, ECF 49-2, PgID 1167–68:

- Statement #1: "Allegations of litigation avoidance"[5]

[5] Too general or unspecific to connect the statement to an exhibit not time barred.

- Statement #16: "The content of videos outlining the above allegations"[6]
- Statement #17: "Steve Maritas attacked a retired Army veteran"[7]
- Statement #21: "Fired by SPFPA"[8]
- Statement #22: "Fired by every union Steve Maritas worked for"[9]
- Statement #23: "Embroiled in a multi-million-dollar lawsuit"[10]
- Statement #25: "Serves only himself"[11]
- Statement #30: "LEOSU is lawless, felon or fraud"[12]
- Statement #34: "That LEOSU is facing multiple federal investigations"[13]
- Statement #35: "That LEOSU has failed its members"[14]
- Statement #36: "Steve Maritas will say anything"[15]
- Statement #37: "Steve Maritas went missing for one year"[16]
- Statement #38: "LEOSU is a fake union"[17]
- Statement #40: "Steve Maritas is familiar with being under arrest"[18]
- Statement #42: "LEOSU or Steve Maritas are scammers"[19]

---

[6] Too general or unspecific to connect the statement to an exhibit not time barred.
[7] Referring to barred exhibit at ECF 8-2, PgID 565.
[8] Referring to barred exhibit at ECF 8-2, PgID 566.
[9] Referring to barred exhibit at ECF 8-2, PgID 566.
[10] Referring to barred exhibits at ECF 8-2, PgID 566; ECF 8-3, PgID 594.
[11] Referring to barred exhibit at ECF 8-2, PgID 566.
[12] Referring to barred exhibits at ECF 8-2, PgID 552, 559, 570, 573, 579; ECF 8-3, PgID 594, 597–98, 601–10, 632, 637.
[13] Referring to barred exhibits at ECF 8-2, PgID 577; ECF 8-3, PgID 628.
[14] Referring to barred exhibit at ECF 8-2, PgID 578.
[15] Referring to barred exhibits at ECF 8-2, PgID 578; ECF 8-3, PgID 613, 616–17.
[16] Referring to barred exhibits at ECF 8-2, PgID 578; ECF 8-3, PgID 617.
[17] Referring to barred exhibits at ECF 8-2, PgID 578; ECF 8-3, PgID 616–17.
[18] Referring to barred exhibit at ECF 8-3, PgID 591.
[19] Referring to barred exhibit at ECF 8-3, PgID 613.

- Statement #43: "Steve Maritas and criminal friends"[20]
- Statement #45: "Steve Maritas is not a friend to security professionals"[21]
- Statement #46: "Steve Maritas filed false copyright claims"[22]
- Statement #47: "LEOSU is a repeat labor law offender"[23]
- Statement #48: "LEOSU spreads fraudulent information"[24]
- Statement #49: "LEOSU has a smear campaign"[25]
- Statement #50: "LEOSU is lawless"[26]

The remaining statements, however, are sufficiently specific when considered alongside the non-barred exhibits from the second amended complaint. Indeed, both parties were able to chart the statements and connect them with the non-barred exhibits. *See* ECF 49, PgID 1145–49; ECF 51, PgID 1596–98. The Court will therefore proceed with the SPFPA Parties' second argument: whether the defamation and false light claims must fail because the remaining statements based on the non-time-barred exhibits were truthful.

*B. Substantially True Statements*

The Court found that nineteen of the exhibits attached to the amended complaint were not time barred. *Maritas II*, ECF 16, PgID 1640 (citing ECF 8-2, PgID

[20] Referring to barred exhibit at ECF 8-3, PgID 614.
[21] Referring to barred exhibit at ECF 8-3, PgID 617.
[22] Referring to barred exhibit at ECF 8-3, PgID 626.
[23] Referring to barred exhibits at ECF 8-2, PgID 577, 579; ECF 8-3, PgID 628.
[24] Referring to barred exhibit at ECF 8-3, PgID 629.
[25] Referring to barred exhibit at ECF 8-3, PgID 629.
[26] Referring to barred exhibits at ECF 8-2, PgID 552, 559, 570, 573, 579; ECF 8-3, PgID 594, 597–98, 601–10, 632, 637.

555–58; ECF 8-3, PgID 586–90, 619–20, 638, 641; ECF 8-4, PgID 655–56, 660–63). The Maritas Parties divided the exhibits into six categories: (1) alleged threats; (2) prison time; (3) child support; (4) tax issues; (5) final judgments; and (6) criminal activity of LEOSU and Mr. Maritas. ECF 51, PgID 1598–1603. The Court will address the exhibits based on those six categories.

*1. Alleged threats*

In two exhibits from the first amended complaint, SPFPA stated that Mr. Maritas "threatened to kill his girlfriend and his baby daughter" and "was arrested for stalking her." ECF 8-2, PgID 555; *see id.* at 558 ("Served time in a California Prison for STALKING and THREATENING to KILL his girlfriend and her infant daughter?"). Mr. Maritas claimed in an affidavit that the allegation was "false and unfounded." ECF 51-8, PgID 1639. And the Maritas Parties argued that because the SPFPA Parties offered "no independent information to support the truthfulness of statements made by the prosecutor" about the charges, and given that "the felony charge was dismissed," the statements about alleged threats by SPFPA could not be "deemed a fair and true report" for the purposes of defamation. ECF 51, PgID 1998 (internal quotation marks omitted).

To show that the statements were truthful, the SPFPA Parties offered a legal brief filed by the People of the State of California, *see* ECF 49-3, in a criminal prosecution in which Mr. Maritas was Defendant. *See id.* The brief opposed a motion to dismiss the criminal information that had been filed against Mr. Maritas. ECF 49-3. In the brief, the government explained that Mr. Maritas allegedly "caused [his

Case 2:24-cv-10774-JJCG-DRG ECF No. 71, PageID.2421 Filed 10/28/25 Page 10 of 33

girlfriend] to be concerned because he called her constantly threatening to take his life, their daughter's life[,] and [his girlfriend's] life." *Id.* at 1183. The government added that Mr. Maritas "threatened to kill her and her daughter and then kill himself." *Id.* Mr. Maritas admitted the truth of the government's brief. ECF 55-3, PgID 2102 ("Mr. Maritas constantly called, stating he was going to take his life as well as her life and the life of their daughter.").

Mr. Maritas later pleaded guilty and admitted that he "stalked Alma Vallarta," his girlfriend. ECF 55-4, PgID 2112–13. He also "stipulate[d] to PE Transcript for factual basis." *Id.* at 2113. The "PE Transcript" appears to be the transcript of the preliminary examination of Mr. Maritas that both he and the government cited in their statements of facts for the motion to dismiss briefing. *See id.*; ECF 49-3, PgID 1183–87; ECF 55-3, PgID 2101–06.

Based on the filings from the California criminal case, the statement that Mr. Maritas threatened to stalk and kill his girlfriend and their daughter was "substantially true." *Nichols v. Moore*, 396 F. Supp. 2d 783, 787 (E.D. Mich. 2005) (quoting *Fisher v. Detroit Free Pres*, 158 Mich. App. 409, 414 (1987)). The Court therefore finds no genuine issue of material fact that the statements about Mr. Maritas stalking and threating to kill his girlfriend and child were true for defamation and false light purposes.[27] And because "[t]ruth is an absolute defense to

---

[27] The Maritas Parties claimed that the SPFPA Parties "failed to mention the felony charge was dismissed." ECF 51, PgID 1598. Because the Maritas Parties included no evidence to support the statement, the Court will assume that they are referring to the Penal Code section 646.9(b) charge, which Mr. Maritas was arraigned on before

an action for defamation," *Nichols*, 396 F. Supp. 2d at 787, and falsity is an essential element of a false light claim, *Found. for Behav. Res.*, 332 Mich. App. at 410, the Court will dismiss the defamation and false light claims that relate to allegations about Mr. Maritas's threats to kill and stalk his girlfriend and daughter.

*2. Prison time*

In two exhibits, SPFPA claimed that Mr. Maritas served time in prison. ECF 8-2, PgID 558; ECF 8-3, PgID 589. Based on the evidence before the Court, there is no genuine dispute of fact that Mr. Maritas has spent time in jail, not prison. *See* ECF 49-4, PgID 1208 (Maritas Deposition); ECF 51, PgID 1599; ECF 55, PgID 2081 (noting that Maritas claimed he "was only ever in jail, not prison"). In the context of criminal procedure, jail and prison carry different meanings. *See* ECF 51, PgID 1599 (citing Black's Law Dictionary). The question then is whether SPFPA's use of the word "prison" was "substantially true" given that Mr. Maritas spent time in jail.

"The [Michigan] common law has never required defendants to prove that a publication is literally and absolutely accurate in every minute detail. For example, the Restatement of Torts provides that "slight inaccuracies of expression are immaterial provided that the defamatory charge is true in substance." *Hawkins*, 230 Mich. App. at 332 (cleaned up). And "if the gist of an article or the sting of the charge is 'substantially accurate,' the defendant cannot be liable." *Id.* at 333 (quotation omitted).

---

he pleaded guilty to stalking under Penal Code section 646.9(a). *See* ECF 49-3, PgID 1182; ECF 55-4, PgID 2112–13. That fact does not change the Court's analysis.

Here, the Court finds that the commonly understood meanings of the words "jail" and "prison" are substantially similar. *Compare Prison*, Merriam-Webster Dictionary (11th ed. 2003) ("a state of confinement or captivity"), *with Jail*, Merriam-Webster Dictionary (11th ed. 2003) ("a place of confinement for persons held in lawful custody"). *Cf. Geary v. C&K Mufflers, Inc.*, No. 267105, 2006 WL 1540805, at *8 (Mich. Ct. App. June 6, 2006) ("It is particularly apt to refer to a dictionary because lawyers and judges may comprehend the word 'trial' differently from its commonly understood meaning."). Plus, the Maritas Parties never argued that their defamation claim concerned defamation by implication. *See* ECF 51, PgID 1599; *see generally Hawkins*, 230 Mich. App. at 329. Thus, even if the term might suggest a conviction, the question here is only whether the fact that Mr. Maritas spent time in prison is "substantially accurate." *Hawkins*, 230 Mich. App. at 332. Mr. Maritas spent time in jail, and he in fact *pleaded guilty* to stalking. *See* ECF 49-2, PgID 1171 ("The length of [jail] time was approximately [three] weeks . . . . The matter was eventually concluded with a plea to a misdemeanor with no jail time."), So, the implication that Mr. Maritas served time in connection with a crime of which he was guilty is true.

All told, while an individual highly familiar with criminal proceedings would understand the difference between a stay in prison versus jail, a layperson would view the terms as interchangeable. Thus, the Maritas Parties cannot show that the statements relating to Mr. Maritas spending time in prison was false for purposes of their defamation and false light claims. The Court will accordingly dismiss the defamation and false light claims that relate to that statement.

*3. Child support*

In five exhibits, SPFPA claimed that Mr. Maritas failed to make child support payments and appended a "WANTED" poster issued by the Oakland County Sheriff's Office that stated Mr. Maritas was wanted for "Non-Payment of Support." ECF 8-2, PgID 556; ECF 8-3, PgID 587, 619–20, 638. The Maritas Parties claimed that the child support obligations owed by Mr. Maritas "were removed as [Mr.] Maritas paid child support directly." ECF 51, PgID 1600. And "the warrant was dismissed once the [c]ourt was made aware of the direct payments." *Id.* Beyond that, the Maritas Parties claimed that the Oakland County Sheriff's Office created the "WANTED" poster at the direction of the SPFPA Parties. *Id.* Mr. Maritas confirmed that he was told by a "detective or police officer" at the Oakland County Sheriff's Office that "the police created the poster," but that "SPFPA [was] behind it." ECF 51-4, PgID 1621.

To support the truthfulness of the child support statements, the SPFPA Parties attached two arrest warrants issued by the Macomb County Circuit Court, ECF 49-5, and the Oakland County Circuit Court, ECF 49-6. Both arrest warrants explained that Mr. Maritas failed to timely make support payments. ECF 49-5, PgID 1242 ("As of October 31, 2014, the respondent owes $13,905.00 in arrears under the support order."); ECF 49-6, PgID 1254 ("As of September 12, 2017, the respondent owes $504.27 in past-due support."). And SPFPA party David Hickey stated that he knew Mr. Maritas owed child support because a sheriff had "com[e] to arrest him at [SPFPA] headquarters . . . multiple times. And the last time he came with a warrant

for [Mr. Maritas's] arrest and a poster. That's how [Hickey] got that information." ECF 49-8, PgID 1268.

The undisputed fact is that the Oakland County Sheriff's Office created the "WANTED" poster. ECF 49, PgID 1136; ECF 51-4, PgID 1621. Accordingly, whether SPFPA helped the Oakland County Sheriff's Office create the poster is of no moment. And the Maritas Parties conceded that the arrest warrants were among the "public records of [Mr.] Maritas'[s] family court matters." ECF 51, PgID 1599. At bottom then, the Court must decide whether SPFPA falsely claimed that Mr. Maritas owed child support.

SPFPA did not claim in any of the five exhibits, ECF 8-2, PgID 556; ECF 8-3, PgID 587, 619–20, 638, that Mr. Maritas was *currently* wanted by law enforcement or that he was *currently* delinquent in making child support payments. Indeed, the "WANTED" posters largely appear without any accompanying text about support payments. *See* ECF 8-2, PgID 556; ECF 8-3, 619–20, 638. And in the one exhibit that contains text about support payments, the text states, "This is the actual wanted poster delivered to the International Office by a Deputy Sheriff looking to arrest Maritas for delinquent child support." ECF 8-3, PgID 587. While the statement does not provide a date for the occurrence, it also does not claim that Mr. Maritas was wanted by law enforcement at that time. *See id.* And the statement that the poster was "delivered to the International Office by a Deputy Sheriff looking to arrest Maritas for delinquent child support" was corroborated by Hickey at his deposition. *Id.*; ECF 49-8, PgID 1268.

What is more, the court records offered by the Maritas Parties which purportedly show that Mr. Maritas had fulfilled his child support obligations, ECF 51-3, PgID 1617–18, do not undercut the other court records offered by the SPFPA Parties. For the Oakland County case, the order explaining that Mr. Maritas had made "direct payments" was submitted on May 16, 2016. ECF 51-3, PgID 1617. Yet on May 18, 2016, the Oakland County Circuit Court issued an arrest warrant based on $641.27 in past-due support payments. ECF 49-6, PgID 1248, 1250. And on September 5, 2017, the court noted that Mr. Maritas owed $504.27 in past-due support. *Id.* at 1254. Thus, even if Mr. Maritas had fulfilled his support obligations in May 2016, he had apparently failed to do so in September 2017. *See id.* The May 16, 2016 document therefore creates no genuine issue of material fact as to whether a warrant had issued to arrest Mr. Maritas for failure to make timely support payments.

All told, the Maritas Parties failed to point to evidence that would create a genuine issue of material fact that Mr. Maritas in fact owed child support payments and that the Oakland County Sheriff's Office created a "WANTED" poster in connection with his support payment obligations. The Court therefore finds that the statements relating to Mr. Maritas's failure to timely fulfill his support obligations was not false for purposes of the defamation and false light claims. The Court will accordingly dismiss the defamation and false light claims that relate to those statements.

*4. Tax issues*

In four exhibits, SPFPA claimed that Mr. Maritas had tax evasion issues or other tax trouble. ECF 8-2, PgID 555; ECF 8-3, PgID 588–89; ECF 8-4, PgID 661. In three exhibits, SPFPA claimed that Mr. Maritas "owes back taxes to the IRS," was having "tax trouble," and had "severe tax, lawsuit[,] and collections problems." ECF 8-2, PgID 555; ECF 8-3, PgID 589; ECF 8-4, PgID 661. In the fourth exhibit, SPFPA claimed that Mr. Maritas had "long standing tax evasion issues and owes over $100,000 dollars in State and federal taxes." ECF 8-3, PgID 588 (alterations omitted).

In an August 2019 deposition, Mr. Maritas confirmed that "[a] tax case commenced by the Internal Revenue Service" (IRS) had been filed against him. ECF 49-4, PgID 1202. He explained that he owed "more than a hundred [thousand]" in "[b]ack taxes" and that the IRS had filed tax liens against him. *Id.* And as of that deposition, Mr. Maritas assumed that the tax liens were still pending and had not "been extinguished or paid." *Id.* Mr. Maritas later stated in an affidavit that he had "never been under investigation, charged[,] or found guilty of any tax related matters" with regard to felony tax evasion under 26 U.S.C. § 7201. ECF 51-8, PgID 1639–40; *see* ECF 51, PgID 1601. He also stated that his "attorney was handling the matter and [he] was not aware of the amount owed." ECF 51-8, PgID 1640. Thus, argued Mr. Maritas, the SPFPA Parties took "a singular line without providing the context" when they referenced his deposition testimony to confirm that he owed over $100,000 in taxes. *Id.*

Simply put, there is no genuine issue of material fact that Mr. Maritas was experiencing tax issues in the amount of $100,000. Mr. Maritas confirmed as much in his deposition and affidavit. ECF 49-4, PgID 1202; ECF 51-8, PgID 1640. Thus, the three exhibits that reference "tax trouble" or "tax . . . problems" relating to "back taxes to the IRS" were not false. ECF 8-2, PgID 555; ECF 8-3, PgID 589; ECF 8-4, PgID 661. The Court will grant summary judgment on the defamation and false claims based on exhibits ECF 8-2, PgID 555; ECF 8-3, PgID 589; and ECF 8-4, PgID 661.

But the statement that Mr. Maritas "has long standing tax evasion issues and owes over $100,000 dollars in State and federal taxes" is at minimum misleading. ECF 8-3, PgID 588 (alterations omitted). For one, 'back taxes' and 'tax evasion' are not interchangeable terms. Indeed, tax evasion is a federal crime under 26 U.S.C. § 7201, but the case against Mr. Maritas was a proceeding "commenced by the [IRS]" and not the Department of Justice. ECF 49-4, PgID 1202.

For another, using the present-tense "owes over $100,000 dollars" rather than the past-tense "owed" suggests that Mr. Maritas owed that amount at the time SPFPA posted the statement. And there is a genuine issue of material fact as to whether that statement is true. Indeed, Mr. Maritas stated in his deposition that he believed the amount he owed "*was* more than a hundred [thousand]" and that his "attorneys *took* care of it." ECF 49-4, PgID 1202 (emphasis on past tense added). Moreover, although he did not believe that the tax liens had been extinguished or paid, he never stated that the full $100,000 amount was still outstanding. *See id.* In

the end, there is no evidence before the Court to confirm the amount of taxes that were outstanding when SPFPA made the statements, but there is a genuine issue of material fact as to whether the amount was "over $100,000." ECF 8-3, PgID 588.

The SPFPA Parties moved for summary judgment on the defamation and false light claims as to the statements about Mr. Maritas having tax issues based on only the fact that the statements were truthful. ECF 49, PgID 1142–50. Because there is a genuine dispute of material fact as to whether the statement "Maritas has long standing tax evasion issues and owes over $100,000 dollars in State and federal taxes" was false, ECF 8-3, PgID 588 (alterations omitted), the Court will deny summary judgment on the defamation and false light claims as to that one statement.

*5. Final judgments*

In two exhibits, SPFPA claimed that Mr. Maritas had "collections problems" and financial judgments against him. ECF 8-3, PgID 589; ECF 8-4, PgID 661. The Maritas Parties claimed that while Mr. Maritas had creditors in 2013, *see* ECF 49-17, PgID 1337, 1346–51, 1372, there was no evidence that he still had creditors in 2019 or 2020, when SPFPA made the allegedly defamatory statements. ECF 51, PgID 1601–02. In reply, the SPFPA Parties stated that an "attached register of actions from another lawsuit shows a May 18, 2006 judgment against [Mr.] Maritas, which was renewed on April 25, 2016 . . . and, to date, has not been satisfied." ECF 55, PgID 2083; ECF 55-5, PgID 2115–17 (order to renew judgment filed April 25, 2016).

Simply put, the Maritas Parties failed to point to "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co.*, 475 U.S. at 587

(emphasis omitted) (quoting Fed. R. Civ. P. 56(e)). The only evidence the Maritas Parties offered to dispute the evidence submitted by the SPFPA Parties was the affidavit by Mr. Maritas that stated, "These sites falsely allege that I have creditors and final judgments against me and asserted these claims at a time when no final judgments were entered against me." ECF 51-8, PgID 1640 (affidavit dated May 19, 2022). "Self-serving affidavits alone, however, are not enough to create an issue of fact sufficient to survive summary judgment." *Ace Am. Ins. Co. v. Gerling & Assocs., Inc.*, ---F. Supp. 3d---, 2022 WL 4468584 (S.D. Ohio 2022) (citation omitted). And when compared with the 2016 judgment renewal, there is no genuine issue of fact that Mr. Maritas had "collections problems" and financial judgments against him. ECF 8-3, PgID 589; ECF 8-4, PgID 661. The Court will accordingly dismiss the defamation and false light claims that relate to judgment and collections statements.

*6. Criminal activity of LEOSU and Mr. Maritas*

Last, the Maritas Parties complained that SPFPA falsely and defamatorily claimed that LEOSU and Mr. Maritas engaged in criminal activity.[28] ECF 8-3, PgID 619, 641; ECF 8-4, PgID 655, 660, 662–63. The Maritas Parties argued that one exhibit suggested that LEOSU had a criminal record. ECF 8-4, PgID 660 ("leosu/Maritas' Criminal Record Exposed!" "Maritas' Criminal History Exposed!"). And six exhibits specifically targeted Mr. Maritas as having a criminal record or being a criminal. ECF 8-3, PgID 619 ("CRIMINAL MARITAS"), 641 ("[M]aritas . . . DOL

[28] To avoid unnecessary repetition, the Court will not include in its analysis here the exhibits that implied criminal activity relating to alleged threats, prison time, child support, or tax issues.

Case 2:24-cv-10740-SJM-DRG ECF No. 70, PageID.2431 Filed 10/28/25 Page 20 of 33

informant to keep from being indicted"); ECF 8-4, PgID 655 ("I'd be more concerned about your criminal run, little association leosu."), 660 ("leosu/Maritas' Criminal Record Exposed!" "Maritas' Criminal History Exposed!"), 662 ("documents exposing Maritas' Criminal Records."), 663 ("Maritas' Criminal History Exposed!").

In light of the previous findings of the Court, there is no genuine issue of material fact that Mr. Maritas has a criminal record. The exhibits that refer to Maritas as a criminal or as having a criminal record were therefore not false for defamation and false light purposes. Moreover, the exhibit about Mr. Maritas being a department of labor informant to avoid indictment is supported by evidence offered by the SPFPA Parties. *See* ECF 49-16. And the Maritas Parties raised no argument relating to SPFPA's statement that Mr. Maritas was a department of labor informant. *See* ECF 51, PgID 1596–1603. By extension, the suggestion that LEOSU was "criminal run" was also not false because there is no dispute that Mr. Maritas ran the organization. ECF 8, PgID 542; ECF 8-4, PgID 655; ECF 55, PgID 2084. The Court will therefore dismiss the defamation and false light claims as to the six exhibits that specifically targeted Mr. Maritas as having a criminal record or being a criminal. ECF 8-3, PgID 619, 641; ECF 8-4, PgID 660, 662–63.

The only remaining argument made by the Maritas Parties is that SPFPA suggested in a mass text message that LEOSU had a criminal record. ECF 8-4, PgID 655, 660. Neither party argued that the LEOSU organization had a criminal record. ECF 51, PgID 1602; ECF 55, PgID 2084. Rather, the parties dispute whether the text message suggested that (a) LEOSU itself has a criminal record, or (b) only Mr.

Case 2:24-cv-10274-JJCG-DRG ECF No. 70, PageID.2432 Filed 10/28/25 Page 21 of 33

Maritas has a criminal record, but because Mr. Maritas is the organizing director of LEOSU, the two are grouped together. The Court finds the latter to be the most reasonable reading of text message. The message reads, "leosu/Maritas' Criminal Record Exposed!" ECF 8-4, PgID 660. The message refers to one criminal record—the record of Mr. Maritas. The same phrase is substantially repeated later in the message, "Maritas' Criminal History Exposed!" *Id.* There again, only one criminal history is mentioned—the history of Mr. Maritas. Plus, "leosu/Maritas[]" could be read as a name-recognition effort by SPFPA to remind the individuals who received the message that Maritas and LEOSU are associated. The message therefore communicates that Mr. Maritas, who is the organizing director of LEOSU, has a criminal record and a history of crime. And as discussed above, that statement is not false for the purposes of the defamation or false light claims. The Court will therefore dismiss the defamation and false light claims as to the exhibit at ECF 8-4, PgID 660.

In sum, the Court will grant summary judgment to the SPFPA Parties on all but one defamation and false light claim: the statement that "Maritas has long standing tax evasion issues and owes over $100,000 dollars in State and federal taxes." ECF 8-3, PgID 588 (alterations omitted).

II. Tortious Interference Claim

As explained earlier, the Court narrowed the Maritas Parties' tortious interference claim to a claim for interference with an advantageous business relationship with union members. *Maritas II*, ECF 16, PgID 1648, 1653–54. The Court excluded any claim for interference with *potential* union members. *See id.* To

establish a claim for tortious interference with a business relationship, the plaintiff must show (1) "the existence of a valid business relationship or expectancy," (2) "knowledge of the relationship or expectancy on the part of the defendant," (3) "an intentional interference by the defendant inducing or causing a breach or termination of the relationship or expectancy," and (4) "resultant damage to the plaintiff." *Cedroni Ass'n, Inc. v. Tomblinson, Harburn Assocs., Architects & Planners, Inc.*, 492 Mich. 40, 45 (2012) (quotation omitted).

The SPFPA Parties argued that the tortious interference claim should be dismissed because the Maritas Parties failed to show the existence of any valid business relationship that LEOSU had at the time of the alleged tort. ECF 49, PgID 1151. The Maritas Parties lodged three arguments in defense. First, they claimed that they had evidence that David Hickey of SPFPA tried to improperly interfere with an entity legally affiliated with LEOSU. ECF 51, PgID 1604–05. That evidence post-dated the filing of the first amended complaint. ECF 51-5, PgID 1624 (dated April 22, 2022). Second, the Maritas Defendants suggested that Dwayne Phillips of SPFPA "admitted" in a deposition that he tortiously interfered with LEOSU's business relationships. ECF 51, PgID 1604 (citing ECF 51-9). And third, the Maritas Defendants lodged several text messages that purportedly showed that SPFPA was circulating defamatory statements to "LEOSU's current membership." *Id.* at 1605. The Court will address each argument in turn.

Case 2:19-cv-10774-JAD-MJRSW ECF No. 70, PageID.2434 Filed 10/28/25 Page 23 of 33

*A. David Hickey Evidence*

First, the evidence related to David Hickey post-dated the filing of the first amended complaint. *Compare Maritas II*, ECF 8 (November 3, 2020), *with* ECF 51-5, PgID 1624 (April 22, 2022). The claim that the SPFPA Parties tortiously interfered with the business relationships of the Maritas Parties could not have been based on an event that occurred more than a year after the allegations were set forth in the complaint. *See also* ECF 51, PgID 1591 ("[A]t the time the discovery was submitted to the [SPFPA Parties], Mr. Hickey had not yet sent the letter to [the Maritas Parties]' affiliated member further tortiously interfering with [the Maritas Parties]' relationships."). Beyond that, the Court previously narrowed the tortious interference claim to involve only the relationships LEOSU had with its *current* union members and not potential members. *Maritas II*, ECF 16, PgID 1648, 1653–54. The letter from Hickey reveals that he was communicating with an organization that had only "*considered* . . . join[ing] with Maritas." ECF 51-5, PgID 1624. And the Maritas Parties never suggested that the letter was also circulated to current union members of LEOSU. *See* ECF 51, PgID 1591–92; 1604–05. Thus, the evidence fails to show that the SPFPA Parties tortiously interfered with an advantageous business relationship with current LEOSU members.

*B. Dwayne Phillips Evidence*

In a conclusory fashion, the Maritas Parties contended that Dwayne Phillips "admitted to" tortious interference with an advantageous business relationship in his deposition. *Id.* at 1604 (citing ECF 51-9). Yet the Maritas never stated which specific

portion of the deposition amounted to an admission. *See id.* And review of the deposition testimony reveals only that Phillips admitted to circulating materials about Mr. Maritas "to potential members or the members [SPFPA] already ha[d]." ECF 51-9, PgID 1644–45. He never mentioned whether he circulated that information to current LEOSU members. *See id.* at 1643–45. The evidence therefore fails to show that the SPFPA parties tortiously interfered with an advantageous business relationship with current LEOSU members.

*C. Text Messages*[29]

The Maritas Parties claimed that SPFPA sent "mass text messages . . . containing defamatory statements . . . to []LEOSU's current membership," which was evidence of SPFPA'a tortious interference with an advantageous business relationship. ECF 51, PgID 1605; *see Maritas II,* ECF 8, PgID 543–44 (citing ECF 8-4). To corroborate the claim, the Maritas Parties attached the following text message at ECF 51-6, PgID 1631:

[29] For the reasons stated in the Court's prior Opinion and Order, ECF 69, PgID 2392–99, the Court will limit its discussion to the text message at ECF 51-6, PgID 1361.

Case 2:24-cv-10274-JJCG-DRG ECF No. 70, PageID.2436 Filed 10/28/25 Page 25 of 33




Although the Maritas Parties claimed that the message was sent by the SPFPA Parties to "LEOSU's current membership," ECF 51, PgID 160, the exhibit does not show who sent or received the message. *See* ECF 51-6, PgID 1631.

In response, the SPFPA Parties pointed to a discovery request response by the Maritas Parties which stated only that the employees at MGM Springfield Casino were "parties with any advantageous business relationship or expectancy with [the] Maritas [Parties] with which [the] SPFPA [Parties] allegedly interfered." ECF 49, PgID 1151; ECF 49-2, PgID 1168–69 ("MGM Springfield Casino . . . Contract Negotiations to represent union members."). Because the employees at MGM Springfield Casino were only "potential union members" of LEOSU, argued the SPFPA Parties, the Maritas parties failed to allege any individual with whom they had a current business relationship. *Id.* And since the Court narrowed the tortious

interference claim to only current union members, the Maritas Parties "cannot sustain their tortious interference claim." *Id.* at 1152.

The SPFPA Parties are correct. In short, the Maritas Parties failed to point to evidence that would convince "a reasonable jury [to] return a verdict for [them]" on the tortious interference claim. *Anderson*, 477 U.S. at 248. In the first amended complaint, the Maritas Parties alleged that the SPFPA Parties "distribute[d] through posters, flyers, emails, direct mail and text messages . . . defamatory statements about" the Maritas Parties "to LEOSU, *its local union members*, members of other security officer, police officer, security police, special police, protective service officer, security professional unions and SPFPA members LEOSU is seeking to organize and other unrelated third parties." *Maritas II*, ECF 8, PgID 543–44 (emphasis added). Accepting those factual allegations as true, the Maritas Parties successfully pleaded that a valid business relationships existed with their union members. *See Maritas II*, ECF 16, PgID 1648. But at summary judgment, the Court need not accept factual allegations as true. Instead, the Court need only view the facts and draw all reasonable *inferences* "in the light most favorable to the non-moving party." *60 Ivy St. Corp.*, 822 F.2d at 1435 (citations omitted).

Here, the single text message is insufficient evidence to support the tortious interference claim. Two reasons support the finding. First, the exhibit shows neither who sent the message nor who received the message. *See* ECF 51-6, PgID 1631. Thus, the Court would need to infer, based on the exhibit and the allegations of the Maritas Parties alone, that the exhibit was sent by the SPFPA Parties to current LEOSU

members. But that inference would be unreasonable in consideration of all the evidence before the Court. For one, the Maritas Parties pointed to no admissible evidence that shows who the members of LEOSU were at the time the mass text message was circulated, or whether any of those members received or viewed the message. For another, even if the Court were to assume that "[c]learly LEOSU had a relationship with all its members," ECF 51, PgID 1605, nothing in the message suggests that it was sent to current LEOSU members. *See* ECF 51-6, PgID 1631. The Court could reasonably infer that the message was sent by SPFPA based on the language of the message. *Id.* ("SPFPA has been successful in gaining Local 3 the right to a re-run election."). But that inference fails to prove that SPFPA intentionally interfered with current LEOSU members.

Second, even if the Court were to make both assumptions—that the message was sent by SPFPA and that it was received by current LEOSU members—the text message fails to show how any interference on the part of the SPFPA Parties was improper. "Improper interference can be shown by proving '(1) the intentional doing of an act wrongful per se, or (2) the intentional doing of a lawful act with malice and unjustified in law for the purpose of invading plaintiffs' contractual rights or business relationship.'" *Maritas II*, ECF 16, PgID 1644 (quoting *Advoc. Org. of Patients & Providers v. Auto Club Ins. Ass'n*, 257 Mich. App. 365, 383 (2003)). The Maritas Parties explained that the text message was evidence of improper interference because the statements contained therein were defamatory. ECF 51, PgID 1605 ("Plaintiffs allege the actions of the Defendants which were intentionally done, were

done with malice and unjustified in law as the claims are defamatory as to both Plaintiffs LEOSU and Steve Maritas."). But the Court has already found, above, that the information contained within the message was not defamatory. Thus, the Maritas Parties failed to show how the message supports a finding that the SPFPA Parties improperly interfered with LEOSU's current membership.

In sum, the three pieces of evidence offered by the Maritas Parties fail to show any genuine issue of material fact as to whether the SPFPA Parties tortiously interfered with an advantageous business relationship with current union members. *Maritas II*, ECF 16, PgID 1648, 1653–54. And because the evidence shows no improper interference by the SPFPA Parties, the Court must grant summary judgment to the SPFPA Parties on the tortious interference claim.

III. <u>Digital Millennium Copyright Act Claim</u>

In their final substantive claim, the Maritas Parties complained that the SPFPA Parties made a knowing misrepresentation of copyright claims under the Digital Millennium Copyright Act (DMCA). *Maritas II*, ECF 8, PgID 546–48. The Court will explain why the DMCA does not apply and will then dismiss the claim.

Under the DMCA, 17 U.S.C. § 512(f), "[a]ny person who knowingly materially misrepresents under this section . . . that material or activity is infringing" is "liable for any damages, including costs and attorneys' fees, incurred by the alleged infringer . . . who is injured by such misrepresentation, as the result of the service provider relying upon such misrepresentation in removing or disabling access to the material or activity claimed to be infringing." To properly notify a service provider of

Case 2:24-cv-… ECF No. … PageID.2440 Filed 10/28/25 Page 29 of 33

a claimed infringement under § 512, a person must make a "written communication . . . to the designated agent of a service provider that includes substantially the following" six elements:

> (i) A physical or electronic signature of a person authorized to act on behalf of the owner of an exclusive right that is allegedly infringed.
>
> (ii) Identification of the copyrighted work claimed to have been infringed, or, if multiple copyrighted works at a single online site are covered by a single notification, a representative list of such works at that site.
>
> (iii) Identification of the material that is claimed to be infringing or to be the subject of infringing activity and that is to be removed or access to which is to be disabled, and information reasonably sufficient to permit the service provider to locate the material.
>
> (iv) Information reasonably sufficient to permit the service provider to contact the complaining party, such as an address, telephone number, and, if available, an electronic mail address at which the complaining party may be contacted.
>
> (v) A statement that the complaining party has a good faith belief that use of the material in the manner complained of is not authorized by the copyright owner, its agent, or the law.
>
> (vi) A statement that the information in the notification is accurate, and under penalty of perjury, that the complaining party is authorized to act on behalf of the owner of an exclusive right that is allegedly infringed.

§ 512(c)(3)(A). A notification is not a DMCA notice under § 512 if the above elements are not "substantially" included. *Id.* And without a DMCA notice, § 512(f) does not apply. Under § 512(f), liability applies to "[a]ny person who knowingly materially misrepresents *under this section.*" *See ISE Ent. Corp. v. Longarzo*, No. 17-9132, 2018 WL 11346736, at *9 (C.D. Cal. Dec. 11, 2018) ("Since [d]efendants have pointed to evidence that not all of the requirements of § 512(c)(3) were met and since [plaintiff]

has not pointed to any evidence to the contrary, the [c]ourt concludes that [plaintiff]'s § 512(f) claim must fail.").

In support of the DMCA claim, the Maritas Parties offered a letter from Wix, the service-provider company that hosted the "loumustgo.org" website run by the Maritas Parties. *Maritas II*, ECF 8-5. In the letter, Wix stated that it had received a "copyright note related to [the Maritas Parties'] Wix site loumustgo.org." *Id.* at 664. The letter also attached a copy of the copyright note. *Id.* The note stated the following:

- Name of the copyright owner: SPFPA
- Your Organization or Client that is the copyright owner: undefined
- First Name: Dwayne
- Last Name: Phillips
- E-Mail: organize@spfpa.com
- Mailing Address: 2551 Kelly Rd. Roseville, MI 48066
- Phone Number: 5867727250
- Additional Phone Number: 5868725634
- Identify and describe your copyrighted work: Several images are posted without SPFPA's permission taken from our website and photo archive.
- Please provide a link to online presentation of copyrighted work (if available): https://www.loumustgo.org
- Please provide a link (URL) leading to your copyright registration (if applicable): [Blank]
- Please provide a link (URL) to the precise location of the allegedly infringing content on a Wix hosted webize: https://www.loumustgo.org . . .
- Dated: Wed Jul 03 2019 . . .
- Electronic Signature: Dwayne Phillips

*Id.* at 664–65.

Missing from the copyright note are the two most critical elements of the proper notice requirements under § 512(c)(3)(A). First, the copyright note identified no "copyrighted work[s] claimed to have been infringed." § 512(c)(3)(A)(ii); *see Maritas*

Case 2:19-cv-10274-JJM-RSW ECF No. 70, PageID.2442 Filed 10/28/25 Page 31 of 33

*II*, ECF 8-5, PgID 664–65. In fact, the question asking for the link to the relevant "copyright registration[s]" was left blank. *Maritas II*, ECF 8-5, PgID 664. The copyright notice therefore failed to "include[] substantially" the requirements under subsection (ii). § 512(c)(3)(A); *Maritas II*, ECF 8-5, PgID 664–65.

Second, the copyright note failed to identify with any specificity whatsoever "the material that is claimed to be infringing or to be the subject of infringing activity and that is to be removed or access to which is to be disabled, and information reasonably sufficient to permit the service provider to locate the material." § 512(c)(3)(A)(iii); *see Maritas II*, ECF 8-5, PgID 664–65. Phillips, the writer of the copyright note, merely stated that "several images" allegedly infringed on SPFPA's copyrighted work, and then listed an entire website as the "precise location of the allegedly infringing content." *Maritas II*, ECF 8-5, PgID 664. Phillips's vague suggestion that there were "several images" on a website that allegedly infringed on an SPFPA copyright thus failed to provide "information reasonably sufficient to permit the service provider to locate the material." § 512(c)(3)(A)(iii). Indeed, based on the information provided, the service provider would have to guess which photos on the website allegedly infringed on an unknown copyright supposedly belonging to SPFPA. *Cf. Schenck v. Orosz*, No. 3:13-CV-0294, 2013 WL 5963557, at *9 (M.D. Tenn. Nov. 7, 2013) ("[W]hen a letter provides notice that can be easily identified by the service provider, the notice substantially complies with the notification requirements.") (quotation omitted). Thus, the copyright notice failed to "include[]

substantially" the requirements under subsection (iii). § 512(c)(3)(A); *Maritas II*, ECF 8-5, PgID 664–65.

In sum, the requirements of two subsections under § 512(c)(3)(A) were not "include[d] substantially" in the Phillips copyright note. The copyright note is not a DMCA notice under § 512. And without a DMCA notice, § 512(f) does not apply. § 512(f); *see ISE Ent. Corp.*, 2018 WL 11346736, at *9. Accordingly, the Court must dismiss the claim.

IV. Permanent Injunctive Relief

Finally, the fifth claim in the Maritas Parties' first amended complaint sought permanent injunctive relief based on their other substantive claims. *Maritas II*, ECF 8, PgID 548 ("Defendants illegally, maliciously, and wrongfully conspired with one another with the intent to and for the illegal purpose of destroying Plaintiffs' goodwill and reputation by use of defamatory statements . . . , placing Plaintiffs in a false light, and interfering with Plaintiffs' contractual or advantageous business relationships or expectancies."). The SPFPA Parties argued that because the substantive claims should be dismissed, the Maritas Parties have "no basis for their final count requesting injunctive relief." ECF 49, PgID 1142.

"[T]he Court must consider four factors when determining whether to grant or deny a permanent injunction." *Laymen Lessons, Inc. v. City of Millersville*, 636 F. Supp. 2d 620, 655 (M.D. Tenn. 2008). The first factor is "the plaintiff's success on the merits." *Id.* Because the Court dismissed all but two claims, the Maritas Parties did not "succe[ed] on the merits" on the dismissed claims. *Id.* The Court will therefore

deny permanent injunctive relief as to the dismissed claims. The Court will not, however, deny permanent injunctive relief as to the claims that it did not dismiss: the defamation and false light claims related to the statement that "Maritas has long standing tax evasion issues and owes over $100,000 dollars in State and federal taxes." ECF 8-3, PgID 588 (alterations omitted).

**CONCLUSION**

The Court will grant summary judgment to the SPFPA Parties on all claims except the following: the defamation and false light claims related to the statement that "Maritas has long standing tax evasion issues and owes over $100,000 dollars in State and federal taxes," ECF 8-3, PgID 588 (alterations omitted); and the claim for permanent injunctive relief as to that allegedly false or defamatory statement.

**ORDER**

**WHEREFORE**, it is hereby **ORDERED** that the SPFPA Parties' motion for summary judgment [49] is **GRANTED IN PART AND DENIED IN PART**.

**SO ORDERED.**

s/ Stephen J. Murphy, III
STEPHEN J. MURPHY, III
United States District Judge

Dated: March 30, 2023

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on March 30, 2023, by electronic and/or ordinary mail.

s/ David P. Parker
Case Manager

# EXHIBIT 16

U.S. Department of Labor
Office of Labor-Management Standards
Washington, DC 20210

Form approved
Office of Management and Budget
No. 1245-0003
Expires 08-31-2016

# FORM LM-1
# LABOR ORGANIZATION INFORMATION REPORT

For Official Use Only

OLMS DRDA RECEIVED MAR 0 6 2018

This report is mandatory under P.L. 86-257, as amended. Failure to comply may result in criminal prosecution, fines, or civil penalties as provided by 29 U.S.C. 439 or 440.

**READ THE INSTRUCTIONS CAREFULLY BEFORE PREPARING THIS REPORT.**

**Identification Items** *(To be completed by all filers)*

1. File Number 545-734

2. What is your organization's fiscal year ending date? 7 / 4 / 2018

3. Is this the first Form LM-1 your organization has filed?

☒ Yes, this is an INITIAL FORM LM-1. *(Complete Items 2 through 21.)*

☐ No, this is an AMENDED FORM LM-1. *(Complete Items 1 through 9, 18, 20, and 21.)*

4. Affiliation or Organization Name
LEOSU

5. Designation *(Local, Lodge, etc.)*
NC - National Council

6. Designation Number
Prefix Number Suffix

7. Unit Name *(if any)*

8. Mailing Address

Name Steve Maritas

Title LEOSU Executive Board Member

P.O. Box, Bldg., and Room No., if any

Street 1155 F St NW #1050,

City Washington DC

State District of Columbia ZIP Code + 4 20004

9. Any other address where records necessary to verify this report are kept

Name Grant Lally

Title Counsel to the Union

Organization Lally & Misir, LLP

P.O. Box, Bldg., and Room No., if any

Street 220 Old Country Rd #2,

City Mineola

State New York ZIP Code + 4 11501

## Signatures

Each of the undersigned, duly authorized officers of the above labor organization, declares, under penalty of perjury and other applicable penalties of law, that all of the information submitted in this report (including the information contained in any accompanying documents) has been examined by the signatory and is, to the best of the undersigned's knowledge and belief, true, correct, and complete. *(See the section on penalties in the instructions.)*

20. Signed [signature] President (if other title, see instructions)
Other (Specify)
Executive Board Member
On 2/19/18 (Date) (202) 595-3510 (Telephone Number)

21. Signed [signature] Secretary (if other title, see instructions)
Other (Specify)
Executive Board Member
On 2/19/18 (Date) (202) 595-3510 (Telephone Number)

Name of Labor Organization LEOSU

File Number 545-734

**Information Items** *(To be completed by initial filers only)*

**10. Where is your organization chartered to operate?**

City Washington DC County District of Columbia State DC

**11. When is your organization's next regular election of officers?**

Month Jun Year 2020

**12. Are any of your organization's members:**

- [X] Private Industry Employees
- [ ] U.S. Postal Service Employees
- [ ] Federal Government Employees

*(Check as many boxes as are applicable)*

**13. Is your organization:**

- [ ] A Local, Lodge, Branch, etc.
- [ ] An Intermediate Body (a conference, general committee, joint board, system board, joint council, district, etc.)
- [X] A National or International

**14. What are your organization's expected annual receipts (dues, fees, etc.):**

- [ ] Less than $10,000
- [X] $10,000 - 199,999
- [ ] $200,000 or more

**15. List the names and titles of all your organization's officers.**

| Name | | Title |
|---|---|---|
| Steve | Maritas | Executive Board Member |
| Brikener | Jean-Gilles | Executive Board Member |
| James | Burke | Executive Board Member |
| Calvin | Wells | Executive Board Member |
| Quentin | Howard | Executive Board Member |

**16. What are your organization's rates of dues and fees?** ***(Enter a minimum and maximum if more than one rate applies for any line.)***

| | $ | per *(month, year, etc.)* | Minimum | Maximum |
|---|---|---|---|---|
| a. Regular Dues/Fees | | Month | 20 | 2& Half XHR |
| b. Working Dues | NA | | | |
| c. Initiation Fees | | | 10 | 125 |
| d. Transfer Fees | NA | | | |
| e. Work Permits | NA | | | |

**17. Two copies of your organization's current constitution and bylaws must be filed with this report. Under certain circumstances, your parent national or international organization may file copies on your behalf** ***(see the instructions for this item)*****. Is your parent national or international submitting copies on your behalf?**

- [X] Yes
- [ ] No

**If your organization is filing any governing documents with this report, list them below.**

LEOSU By-Laws are incorporated into the LEOS-PBA Constitution & By-Laws.

| Name of Labor Organization LEOSU | File Number 545-734 |
|---|---|

**Practices and Procedures** *(To be completed by all filers except Federal employee labor organizations subject solely to Title VII of the Civil Service Reform Act or Chapter 10 of the Foreign Service Act)*

18. Enter in Column (1) the page number and section or paragraph number of your organization's constitution and bylaws where the listed practice or procedure is described. Or, if not described in the constitution and bylaws, check the box in Column (2) and provide a description of the practice or procedure in Item 19 or on an attached page.

| Practice or Procedure | (1) Page, Section, and/or Paragraph Number of Constitution and Bylaws | (2) Described in Item 19 |
|---|---|---|
| a. Qualifications for or restrictions on membership | Article IV Section 1 and Section 2 Pg 6 & 7 | a. ☐ |
| b. Levying assessments | NA | b. ☐ |
| c. Participating in insurance or other benefit plans | Art. VII Sec. 2 I, pg 11, S, pg 12, | c. ☒ |
| d. Authorizing disbursement of labor organization funds | Art. VII Sec.2 pg 10, F,G,H,I,L,S,T pg 11-12 | d. ☒ |
| e. Auditing financial transactions of the labor organization | Art. VII Sec. 7 pg 14 Art XXI Sec 11 pg 72 | e. ☐ |
| f. Calling regular and special meetings | Art. VII Sec. 2 M pg 12 Art. VIII Sec. 2 J | f. ☒ |
| g.1. Selecting officers and stewards and selecting any representatives to other bodies composed of labor organizations' representatives. | Art. VII Sec. 1 pg 9 Sec 2 C. pg 10 pg | g.1. ☒ |
| g.2. Invoking procedures by which a member may protest a defect in the election of officers (including not only all procedures for *initiating* an election protest but also all procedures for subsequently *appealing* an adverse decision, for example, procedures for appeals to superior or parent bodies, if any) | Art. XI Sec. 8 pg 29 Art. XVII Sec. 7 G pg 65 | g.2. ☐ |
| h. Disciplining or removing officers or agents for breaches of their trust | Art. XIV pg Sec. 1 through 8 pg 34 through 43 | h. ☐ |
| i. Imposing fines and suspending or expelling members including the grounds for such action and any provision made for notice, hearing, judgment on the evidence, and appeal procedures | Art. XIV pg Sec. 1 through 8 pg 34 through 43 | i. ☐ |
| j. Authorizing bargaining demands | Art. VII Sec. 2 pg 10 Sec. 2 Q. pg 12 | j. ☒ |
| k. Ratifying contract terms | Art. VIII Sec 2 N pg 15 | k. ☐ |
| l. Authorizing strikes | Art. IX Sec 1-3 pg 21-22 | l. ☐ |
| m. Issuing work permits | Not Applicable | m. ☐ |

**Additional Information** *(To be completed by all filers, as necessary)*

**19. Additional Information**

Item18.c: Art. VIII Sec 2. M,O,pg.15, P,T,U,V,W, pg.16, Sec. 3 pg.17 & 18, H, pg.19 Sec.6 & 7 pg.20 & 21, XXVII pg 80 & 81, A & B pg 81, C pg 82

Item18.d: S,T,V, pg 12, W,Z, pg 13 Art. VII Sec 2.H,I,L,M,O,pg 15, P,T,U,V,W pg 16, Sec.3 pg 17 & 18, Sec 4.A, C,D, pg 18 & 19, E,H, pg 19, Sec 6&7 pg 20 & 21, Art. X Sec.2 B, pg. 22 & 23 Art. XIII Sec 1. A pg 32, Sec 2 pg 32, Art. XV Section 5,7,pg 44 Sec.9, pg.45 Sec 16, pg 46, Art. XVIII Sec. 5 pg 64, Art. XXIV Sec 1,2,3,6, pg 78,Sec 7,pg 79 Art. XXVII pg 80 & 81, A & B pg 81, C pg 82, Art. XXVIII, Bonding, pg 82

Item18.j: XV Sec. 4 pg 43 XXIII Sec 3 & 4 pg 77

Name of Labor Organization LEOSU

File Number 545-734

Item 19 Continuation From Page 3

Item18.f: Art. VII Sec. 2 M pg 12 Art. VIII Sec. 2 J page 15. Art. VIII Sec. 9 pg. 21 Art. XII Convetions Sec. 6 pg. 30

Item18.g1: Art. VII Sec. 1 pg 9 Sec 2 C. pg 10 pg Sec. 2 R pg 12 Sec 4 & 5 pg 13. Art. VIII Sec. 2 Y & Z pg 17 Sec. 6 & 7 pg. 20 Art. XI Elections Sec 1 through 11 pg. 27-28-29. Art XII Conventions Sec. 1 through 11 pg 30-31. Art. XV Sec. 6 pg 44. Sec 11 Sec 12 pg 45-46. Art. XVII Sec 6 pg 51 Sec 11 & 12 pg 56. Art. XVIII Sec 1 through 9 pg 61-66 Art XIX Sec 1 through 5 pg 67

Name of Labor Organization LEOSU

File Number 515-734

**Item 15 Continuation Page**

**Item 15. List the names and titles of all your organization's officers.**

| Name (First, MI, Last) | | Title |
|---|---|---|
| Herbert | Segarra | Executive Board Member |
| Javier | Ortiz | Executive Board Member |
| Jesse | Rager | Executive Board Member |

# EXHIBIT 17

# FORM LM-4 LABOR ORGANIZATION ANNUAL REPORT

U.S. Department of Labor
Office of Labor-Management Standards
Washington, DC 20210

FOR USE ONLY BY LABOR ORGANIZATIONS WITH LESS THAN $10,000 IN TOTAL ANNUAL RECEIPTS

Form Approved
Office of Management and Budget
No. 1245-0003
Expires: 09-30-2021

This report is mandatory under P.L. 86-257, as amended. Failure to comply may result in criminal prosecution, fines, or civil penalties as provided by 29 U.S.C. 439 or 440.

READ THE INSTRUCTIONS CAREFULLY BEFORE PREPARING THIS REPORT.

| For Official Use Only | 1. FILE NUMBER<br>545-734 | 2. PERIOD COVERED<br>From 01/01/2017<br>Through 12/31/2017 | 3. (a) AMENDED - Is this an amended report: No<br>(b) HARDSHIP - Filed under the hardship procedures: No<br>(c) TERMINAL - Is this a terminal report: No |
|---|---|---|---|

4. AFFILIATION OR ORGANIZATION NAME
LAW ENFORCEMENT OFFICERS SECURITY & POLICE

5. DESIGNATION (Local, Lodge, etc.)
NATIONAL COUNCIL

6. DESIGNATION NBR

7. UNIT NAME (if any)
LEOSU

8. MAILING ADDRESS (Type or print in capital letters)

First Name: STEVE
Last Name: MARITAS

P.O Box - Building and Room Number
#1050

Number and Street
1155 F STREET NW

City
WASHINGTON

State: DC
ZIP Code + 4: 20004

Each of the undersigned, duly authorized officers of the above labor organization, declares, under penalty of perjury and other applicable penalties of law, that all of the information submitted in this report (including information contained in any accompanying documents) has been examined by the signatory and is, to the best of the undersigned individual's knowledge and belief, true, correct and complete (See Section V on penalties in the instructions.)

20. SIGNED: Steve Maritas PRESIDENT
Date: Mar 29, 2019 Contact Info: 202-595-3510

21. SIGNED: Brikener Jean-Gilles TREASURER
Date: Mar 29, 2019 Contact Info: 202-595-3510

Form LM-4 (Revised 2016)

**ITEMS 9 THROUGH 18**

| | | | |
|---|---|---|---|
| 9. During the reporting period, did your organization have any changes in its constitution and bylaws (other than rates of dues and fees) or in practices/procedures listed in the instructions? (If the constitution and bylaws have changed, attach two new dated copies. If practices/ procedures have changed, see instructions.) | No | 14. Enter the total value of your organizations assets at the end of the period (cash, bank accounts, equipment, etc.). | $0 |
| | | 15. Enter the total liabilities (debts) of your organization at the end of the period (unpaid bills, loans owed, etc.). | $0 |
| 10. Did your organization change its rates of dues and fees during the reporting period? (If "Yes," report the new rates in Item 19 on page 1.) | No | 16. Enter the total receipts of your organization during the reporting period (dues, fees, interest received, etc.). (If $10,000 or more, your organization must file Form LM-2 or LM-3 instead of this form.) | $0 |
| 11. Did your organization discover any loss or shortage of funds or property during the reporting period? (If "Yes," provide details in Item 19. Answer "Yes" even if there has been repayment or recovery.) | No | 17. Enter the total disbursements made by your organization during the reporting period (per capita tax, loans made, net payment to officers, payments for office supplies, etc.). | $0 |
| 12. Was your organization insured by a fidelity bond during the reporting period? | No | 18. Enter the total payments to officers and employees made by your organization during the reporting period (gross salaries, lost time payments, allowances, expenses, etc.). | $0 |
| If "Yes," enter the maximum amount recoverable under the bond for loss caused by any person. | | | |
| 13. How many members did your organization have at the end of the reporting period? | 217 | | |

## 19. ADDITIONAL INFORMATION SUMMARY



General Information: The Union does not have a President. The Union is governed and managed by an Executive Board, which acts as a committee with each Board member having one vote. The Executive Director is a member of the Executive Board. The National Council does not have any financial transactions or hold any funds. All financial transactions and funds are maintained on the books and records of the International Union.

# EXHIBIT 18

# FORM LM-4 LABOR ORGANIZATION ANNUAL REPORT

U.S. Department of Labor
Office of Labor-Management Standards
Washington, DC 20210

FOR USE ONLY BY LABOR ORGANIZATIONS WITH LESS THAN $10,000 IN TOTAL ANNUAL RECEIPTS

Form Approved
Office of Management and Budget
No. 1245-0003
Expires: 09-30-2021

This report is mandatory under P.L. 86-257, as amended. Failure to comply may result in criminal prosecution, fines, or civil penalties as provided by 29 U.S.C. 439 or 440.

READ THE INSTRUCTIONS CAREFULLY BEFORE PREPARING THIS REPORT.

| For Official Use Only | 1. FILE NUMBER | 2. PERIOD COVERED | 3. |
|---|---|---|---|
| | 545-734 | From 01/01/2018<br>Through 12/31/2018 | (a) AMENDED - Is this an amended report: No<br>(b) HARDSHIP - Filed under the hardship procedures: No<br>(c) TERMINAL - Is this a terminal report: No |

4. AFFILIATION OR ORGANIZATION NAME
LAW ENFORCEMENT OFFICERS SECURITY & POLICE

5. DESIGNATION (Local, Lodge, etc.)
NATIONAL COUNCIL

6. DESIGNATION NBR

7. UNIT NAME (if any)
LEOSU

8. MAILING ADDRESS (Type or print in capital letters)

| | |
|---|---|
| First Name<br>STEVE | Last Name<br>MARITAS |
| P.O Box - Building and Room Number<br>#1050 | |
| Number and Street<br>1155 F STREET NW | |
| City<br>WASHINGTON | |
| State<br>DC | ZIP Code + 4<br>20004 |

Each of the undersigned, duly authorized officers of the above labor organization, declares, under penalty of perjury and other applicable penalties of law, that all of the information submitted in this report (including information contained in any accompanying documents) has been examined by the signatory and is, to the best of the undersigned individual's knowledge and belief, true, correct and complete (See Section V on penalties in the instructions.)

| | | | |
|---|---|---|---|
| 20. SIGNED: Steve Maritas | Executive Director | 21. SIGNED: Brikener Jean-Gilles | TREASURER |
| Date: Mar 31, 2019 | Contact Info: 202-595-3510 | Date: Mar 31, 2019 | Contact Info: 202-595-3510 |

Form LM-4 (Revised 2016)

**ITEMS 9 THROUGH 18**

| | |
|---|---|
| 9. During the reporting period, did your organization have any changes in its constitution and bylaws (other than rates of dues and fees) or in practices/procedures listed in the instructions? (If the constitution and bylaws have changed, attach two new dated copies. If practices/ procedures have changed, see instructions.) | No |
| 10. Did your organization change its rates of dues and fees during the reporting period? (If "Yes," report the new rates in Item 19 on page 1.) | No |
| 11. Did your organization discover any loss or shortage of funds or property during the reporting period? (If "Yes," provide details in Item 19. Answer "Yes" even if there has been repayment or recovery.) | No |
| 12. Was your organization insured by a fidelity bond during the reporting period? | No |
| If "Yes," enter the maximum amount recoverable under the bond for loss caused by any person. | |
| 13. How many members did your organization have at the end of the reporting period? | 557 |

| | |
|---|---|
| 14. Enter the total value of your organizations assets at the end of the period (cash, bank accounts, equipment, etc.). | $0 |
| 15. Enter the total liabilities (debts) of your organization at the end of the period (unpaid bills, loans owed, etc.). | $0 |
| 16. Enter the total receipts of your organization during the reporting period (dues, fees, interest received, etc.). (If $10,000 or more, your organization must file Form LM-2 or LM-3 instead of this form.) | $0 |
| 17. Enter the total disbursements made by your organization during the reporting period (per capita tax, loans made, net payment to officers, payments for office supplies, etc.). | $0 |
| 18. Enter the total payments to officers and employees made by your organization during the reporting period (gross salaries, lost time payments, allowances, expenses, etc.). | $0 |

## 19. ADDITIONAL INFORMATION SUMMARY

FILE NUMBER: 545-734

Item 20 Title:

General Information: The Union does not have a President. The Union is governed and managed by an Executive Board, which acts as a committee with each Board member having one vote. The Executive Director is a member of the Executive Board.

General Information: The Union does not have a President. The Union is governed and managed by an Executive Board, which acts as a committee with each Board member having one vote. The Executive Director is a member of the Executive Board. The National Council does not have any financial transactions or hold any funds. All financial transactions and funds are maintained on the books and records of the International Union.

# EXHIBIT 19

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF MICHIGAN

INTERNATIONAL UNIONS, SECURITY
POLICE AND FIRE PROFESSIONALS OF
AMERICA (SPFPA), et al,
Plaintiffs,

-vs- Case No. 2:19-CV-10743

STEVE MARITAS, et al,
Defendants.
________________________________________/

LAW ENFORCEMENT OFFICERS
SECURITY UNION, et al,
Plaintiffs/Counter-Defendant/
Third-Party Defendant,

-vs- Case No. 2:20-CV-12544

INTERNATIONAL UNIONS, SECURITY POLICE
AND FIRE PROFESSIONALS OF AMERICA,
(SPFPA), et al,
Defendants/Counter-Plaintiff.
_________________________________________/

DEPONENT: STEVEN MARITAS

DATE: Wednesday, March 23, 2022

TIME: 11:17 a.m.

LOCATION: YOUNG, GARCIA & QUADROZZI, PC

27725 Stansbury Boulevard, Suite 125

Farmington Hills, Michigan

REPORTER: Karen Fortna, CRR/RMR/RPR/CSR-5067

JOB NO: 17896

APPEARANCES:

YOUNG, GARCIA & QUADROZZI, PC
By: Mr. J. David Garcia
Mr. Joshua D. Apel
27725 Stansbury Boulevard, Suite 125
Farmington Hills, Michigan 48334
248.353.8620
garcia@youngpc.com
apel@youngpc.com
Appearing on behalf of the Plaintiffs

NUNLEY WHEELOCK, PC
By: Mr. Thomas M. Nunley
4051 Haggerty Road
West Bloomfield, Michigan 48323
248.366.5000
tmnunley@nunleywheelock.com
Appearing on behalf of the Defendants

ALSO PRESENT: Mr. David Hickey
Mr. Scott A. Brooks, Esquire



I N D E X

W I T N E S S


| STEVEN MARITAS | PAGE |
|---|---|
| Examination by Mr. Garcia | 5 |
| Examination by Mr. Nunley | 65 |
| Further examination by Mr. Garcia | 68 |




E X H I B I T S


| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | Deposition notice | 5 |
| Exhibit 2 | Documents | 40 |




Wednesday, March 23, 2022
Farmington Hills, Michigan
11:17 a.m.

* * * *

STEVEN MARITAS,

having first been duly sworn, was examined and testified as follows:

MR. GARCIA: Mr. Maritas, hello again.

**THE WITNESS: Hello. How are you?**

MR. GARCIA: I think you're very familiar with me by now. I'm Dave Garcia, one of the attorneys for SPFPA.

(Marked for identification: Deposition Exhibit No. 1.)

EXAMINATION

BY MR. GARCIA:

Q. I want to start off by handing you an exhibit which we've marked as Exhibit 1. And this is a renotice of your deposition which was set for today. Do you see that?

**A. First page?**

Q. Yep.

**A. Yes, I see it.**

Q. Okay. And attached to that is what we call a duces tecum, which is a fancy phrase for a request for

Page 22

Q. Okay. Is he part of any union relating to the plumbing industry?
**A. I don't recall.**
Q. Okay. Do you know if he has any experience with unions?
**A. I know he has experience with security.**
Q. Okay. What's his experience with security?
**A. He's worked as a bouncer for nightclubs for me.**
Q. Okay. Going back to Mr. Sottilare. Do you know if he has any experience with security?
**A. He has also worked as a bouncer for me, also.**
Q. Okay. Other than Mr. Sottilare and Mr. Ahrens' experiences as being bouncers for you, do you know if they have any other kind of police, security, firefighter, law enforcement background?
**A. Off the top of my head, I cannot tell you.**
Q. Do you know when either Mr. Sottilare or Mr. Ahrens joined the executive board?
**A. Off the top of my head, I don't recall.**
Q. Do you know what year it was?
**A. I don't recall.**
Q. Okay. Do you currently have any position with LEOSU?
**A. I'm an executive board member.**
Q. Okay. Any other position?

Page 23

**A. At the present time?**
Q. Yes.
**A. No.**
Q. And just for the sake of clarity -- and I realize this may have changed over time -- what positions have you had with LEOSU?
**A. I was its organizing director.**
Q. Okay. Organizing director, eventually executive board member. Are there any other positions you've held at any time with LEOSU?
**A. Not with LEOSU.**
Q. When did you cease to be organizing director?
**A. I believe December 31st, 2020, I officially gave up that title.**
Q. Okay. But you remain on the board?
**A. Yes.**
Q. How many board members are there presently?
**A. Presently where? What union?**
Q. Well, let's talk LEOSU.
**A. Okay. So one, two, three, four -- five of us.**
MR. NUNLEY: Just so we're clear, he asked you LEOSU.
**THE WITNESS: LEOSU, five.**
MR. NUNLEY: And this is an LEOS-PBA LM, though.

Page 24

**THE WITNESS: I know, I just looked at the names.**
BY MR. GARCIA:
Q. Which five were you just ticking off as LEOSU board members?
**A. We have myself, Jean-Giles, Calvin Wells, Robert Sottilare, Thomas Ahrens. And we had a few more, but you're asking me presently right now?**
Q. Correct.
**A. Then just the five of us right now.**
Q. Okay. There was some testimony -- you sat in for the video deposition we took this morning, right?
**A. I was here.**
Q. Right. You were in the room. That's all I'm asking. Right?
**A. That's correct.**
Q. Okay. There was some testimony given that as it relates to dues, dues continued to be paid to affiliate members through, I believe, the end of last year, 12-31-21, and then as of the first of the year in '22, that changed. Is that your belief as well?
**A. Has that changed? Could you clarify the question?**
Q. Sure. I'll ask it this way: Through the end of December 2021, were members of LEOSU paying their

Page 25

dues directly to LEOSU?
**A. No.**
Q. Where were those dues being paid?
**A. For who?**
Q. For members of LEOSU.
**A. The dues go to LEOS-PBA.**
Q. So if LEOSU has a member in the latter part of 2021 and that member owes dues, those dues are paid directly to LEOS-PBA; do I have that right?
**A. That's correct.**
Q. Do they flow through LEOSU or is it direct to PBA?
**A. No, I believe that they -- I believe they go right to the LEOS-PBA.**
Q. You believe it's straight to them?
**A. Yeah. Some of them write the checks out to LEOSU and we deposit in the LEOS-PBA account.**
Q. You endorse them over?
**A. Well, we deposit them.**
Q. Okay. As of the first of the year, 2022, has that changed or are the LEOSU union members still paying their dues direct to PBA?
**A. It goes to the -- they write the checks out -- if they write the checks out to LEOSU, we will deposit it in the international account.**
Q. Okay. PBA?

Page 26

**A. LEOS-PBA; that's correct.**
Q. Okay. Does LEOSU continue to hold a bank account with any member funds or was that also transferred over to PBA?
**A. I don't recall LEOSU having a bank account.**
Q. At any time?
**A. At any time.**
Q. Okay. What was done prior to the merger with union dues from LEOSU members? Where would those funds be put?
**A. If dues came in, depending on how they wrote the checks, we deposited them into the international account.**
Q. When you say the international account, I want to make sure I'm following.
**A. LEOS-PBA.**
Q. When did LEOS-PBA come into existence?
**A. In the formation of the union.**
Q. In the formation of the union. Which union?
**A. When we created the union itself.**
Q. Okay. And when was that?
**A. I believe that was on July 6, 2015.**
Q. Okay. So since July 6 or thereabouts, 2015, union members' payments, dues, would be put into the LEOS-PBA account?

Page 27

**A. That's correct.**
Q. Okay. And did that ever change from July of '15 forward?
**A. No.**
Q. Back to the board, the LEOSU board. You identified the five members for me.
**A. That's correct.**
Q. I appreciate that.
Is there a chairman or someone in charge of the board even if he doesn't technically hold the title as chairman?
**A. No.**
Q. When did you decide to retire as the organizing director of LEOSU?
**A. I don't recall, but sometime in 2020.**
Q. And tell me again when that was effective.
**A. I believe it was December 31st.**
Q. Of?
**A. 2020.**
Q. Okay.
**A. '21, I'm sorry. We're in '22 now.**
Q. So to clean that up, when is it you believe you made the decision to resign?
**A. When I made the decision?**
Q. Yes.

Page 28

**A. It could have been a year before. I don't recall when I made the decision.**
Q. What were your reasons for resigning?
**A. Just because I could.**
Q. Because you could. Well, you can do a lot of things. Why did you make this decision?
**A. Just decided to retire.**
Q. From LEOSU?
**A. That's correct.**
Q. Have you retired? Are you doing any work today?
**A. For who?**
Q. Anybody.
**A. Of course I am.**
Q. Okay. What are you doing today?
**A. I run the United Federation LEOS-PBA. I'm the organizing director, executive director.**
Q. That doesn't sound like many people's idea of retirement. You're doing the same job at a different place, right?
**A. I retired from LEOSU.**
Q. Okay. And what were your reasons for wanting to retire from LEOSU, but still be an organizing director of another union?
**A. I don't recall.**
Q. Don't know.

Page 29

Did it have anything to do with the Oakland County litigation that wrapped up in November 2020?
**A. I don't recall.**
Q. You don't know? It might have, it might not have?
**A. I don't recall.**
Q. Okay. Has anyone taken over your position as organizing director, your former position at LEOSU?
**A. Not that I recall.**
Q. How many members did LEOSU have at the time you retired, end of the year 2021?
**A. I don't recall.**
Q. Do you know if it was more than 1,000?
**A. I don't recall.**
Q. Could have been more or less?
**A. Could be less.**
Q. Okay.
**A. If I had to guess, it would be less.**
Q. Less than 1,000?
**A. Yes.**
Q. Okay. Is there anyone today, to your understanding, who is in charge of the day-to-day operation of LEOSU, whatever their formal title?
**A. When you say the day-to-day operation, we have an executive board. The LEOSU still exists.**

Q. Okay. So LEOSU still exists?
**A. That's correct.**
Q. It has a five-person executive board?
**A. That's correct.**
Q. Do those executive board members work full time for LEOSU?
**A. Do they work full time? I work full time.**
Q. You work full time as a board member. Do any of the other four board members work full time?
**A. The other four board members? No.**
Q. Other than the five of you, and I mean the five board members, are there any other employees, consultants, people who perform services for LEOSU?
**A. Well, we run the union and they're an affiliate of the international, so the answer would be that both myself and Charles Strebek run the union and the others will work as needed.**
Q. All right. Let me make sure I understand. I think we were using the phrase with Mr. Strebek the international, being the union that was created as part of the merger in roughly March of '21.
**A. That's correct.**
Q. Can we use that phrase with you, the international?
**A. The international.**
Q. We'll call it that.



So since the formation of the international, if I understood what you just said, you and Mr. Strebek are running the day-to-day operations of LEOSU; is that right?
**A. We run the operations of several affiliate -- we run the operations of several affiliated unions.**
Q. I understand. I'm not trying to limit your role to only that, but I'm asking you as part of -- strike that.
I'm focusing on LEOSU as it exists post creation of the international. Am I correct that you and Mr. Strebek are the ones responsible for the day-to-day operations of that entity?
**A. We're responsible for all the affiliate unions, including LEOSU.**
Q. Okay. Is there anyone else, particularly as it relates to LEOSU, that affiliate union, who was responsible for day-to-day operations other than you and Mr. Strebek?
**A. No.**
Q. Okay. With regard to the other affiliated entities, how many are there?
**A. Several.**
MR. GARCIA: Okay. Do you have that list, Josh?



While he's pulling them up, one of them was, I think what we were calling for shorthand the national, the one out of DC.
**THE WITNESS: Okay.**
MR. NUNLEY: National? I don't remember the national one. There's NUSPO --
MR. GARCIA: If I can read my handwriting, the National Union of Police and Security. Do I have that close?
**THE WITNESS: That's not the right name.**
MR. GARCIA: I think that's the name I gave but I'll -- okay. I was close.
BY MR. GARCIA:
Q. There's the National Union of Special Police Officers, NUSPO?
**A. That's correct.**
Q. Okay. That's the one out of DC?
**A. That's correct.**
Q. Okay. So that is one of the affiliated entities that you and Mr. Strebek run the day-to-day operations for, right?
**A. That's correct.**
Q. Okay. And to make this simple, sir, I'm looking at a list of nine affiliated entities. Does that sound about the right number today?



**A. Somewhere around there, yes.**
Q. I can go through these one by one, but I'll take a shot and see if we can save some time.
For all of the affiliated entities of the international, would your answer be the same, that you and Mr. Strebek are responsible for the day-to-day operations?
**A. As executive officers, we are responsible, yes, for the day-to-day operations of these facilities.**
Q. Okay. Is there anybody else other than the two of you that you would say is responsible for day-to-day operations of those nine affiliated entities?
**A. Well, if you're asking me whether or not we have other people that are responsible for some of the job duties, then the answer would be there are more than one person other than me and Mr. Strebek.**
Q. Okay. Let's clarify that then. You and Mr. Strebek are, would you agree, ultimately responsible for the operations of those nine affiliates?
**A. That's correct, because we're on the international.**
Q. Okay. But you have other people who work for you, report to you, et cetera?
**A. That's correct.**

Page 70

A. **I would have to see the poster again.**
Q. Well, you've seen the poster many times over the years, haven't you?
A. **I'd still have to see the poster.**
Q. You can look at page 2 of Exhibit 2.
A. **I can't read it.**
Q. Okay. Do you recall from the many times you've seen that poster anything being inaccurate about it?
A. **Without looking at the actual poster -- I can't read this.**
MR. NUNLEY: It says, "Non-payment of support."
**THE WITNESS: Oh, non-payment of support. That's not true.**
BY MR. GARCIA:
Q. Okay. So you believe the sheriff's office got that one wrong, it has nothing to do with non-payment of support?
A. **No, my child support was always paid up. If there was a medical bill for some reason that SPFPA did not send in the money, which had happened on a couple of occasions, then that's different than child support.**
Q. Okay. What money did SPFPA not send to whoever

Page 71

they were supposed to send on your behalf?
A. **Well, I remember there was a time that -- you know, my payments went directly to the state and came out of my check.**
Q. Okay.
A. **So SPFPA was responsible for paying all child support payments through my check and then I believe there was a time where I had received a notice during that time where the bookkeeper, for whatever reason, wasn't making the payments.**
Q. Okay. Specifics. When and how much?
A. **I don't know the specifics, but it was when I worked for them, so it was prior to 2013. I know that, you know, I did receive notice and the reason I got notice was because my ex-wife was saying she wasn't getting her money, so when I inquired about it, we determined for whatever reason that they weren't sending in money to the state.**
Q. Okay. Who did you talk to at SPFPA, if anyone, about this claim that SPFPA was somehow not sending money to the state?
A. **The bookkeeper and Dave Hickey knew about it.**
Q. Who is the bookkeeper?
A. **Carrie Cabell (ph).**
Q. Okay. So you believe you spoke to Carrie and to

Page 72

Mr. Hickey about SPFPA needing to send money to either the state or the federal government for some kind of obligation of yours?
A. **Absolutely.**
MR. GARCIA: Okay. That's all I have.
MR. NUNLEY: I'm good.

(Deposition concluded at 12:55 p.m.)

Page 73

STATE OF MICHIGAN)
COUNTY OF OAKLAND)

Certificate of Notary Public

I do hereby certify the witness, whose attached testimony was taken in the above matter, was first duly sworn to tell the truth; the testimony contained herein was reduced to writing in the presence of the witness, by means of stenography; afterwards transcribed; and is a true and complete transcript of the testimony given. I further certify that I am not connected by blood or marriage with any of the parties, their attorneys or agents, and that I am not interested directly, indirectly or financially in the matter of controversy.

In witness whereof, I have hereunto set my hand this day at Clarkston, Michigan, State of Michigan.

I hereby set my hand this day, March 27, 2022.

Karen Fortna

Karen Fortna, CRR/RMR/RPR/CSR-5067
Notary Public, Oakland County, Michigan
My Commission expires 4/30/2025

# EXHIBIT 20

# FORM LM-4 LABOR ORGANIZATION ANNUAL REPORT

U.S. Department of Labor
Office of Labor-Management Standards
Washington, DC 20210

FOR USE ONLY BY LABOR ORGANIZATIONS WITH LESS THAN $10,000 IN TOTAL ANNUAL RECEIPTS

Form Approved
Office of Management and Budget
No. 1245-0003
Expires: 09-30-2021

This report is mandatory under P.L. 86-257, as amended. Failure to comply may result in criminal prosecution, fines, or civil penalties as provided by 29 U.S.C. 439 or 440.

READ THE INSTRUCTIONS CAREFULLY BEFORE PREPARING THIS REPORT.

| For Official Use Only | 1. FILE NUMBER 545-734 | 2. PERIOD COVERED From 01/01/2020 Through 12/31/2020 | 3. (a) AMENDED - Is this an amended report: No<br>(b) HARDSHIP - Filed under the hardship procedures: No<br>(c) TERMINAL - Is this a terminal report: No |
|---|---|---|---|

4. AFFILIATION OR ORGANIZATION NAME
LAW ENFORCEMENT OFFICERS SECURITY & POLICE

5. DESIGNATION (Local, Lodge, etc.)
NATIONAL COUNCIL

6. DESIGNATION NBR

7. UNIT NAME (if any)
LEOSU

8. MAILING ADDRESS (Type or print in capital letters)

| | |
|---|---|
| First Name<br>STEVE | Last Name<br>MARITAS |
| P.O Box - Building and Room Number<br>#1050 | |
| Number and Street<br>1155 F STREET NW | |
| City<br>WASHINGTON | |
| State<br>DC | ZIP Code + 4<br>20004 |

Each of the undersigned, duly authorized officers of the above labor organization, declares, under penalty of perjury and other applicable penalties of law, that all of the information submitted in this report (including information contained in any accompanying documents) has been examined by the signatory and is, to the best of the undersigned individual's knowledge and belief, true, correct and complete (See Section V on penalties in the instructions.)

20. SIGNED: Steve Maritas — Executive Director
Date: Jun 16, 2021 — Contact Info: 202-486-8558

21. SIGNED: Brikener Jean Gilles — TREASURER
Date: Jun 26, 2021 — Contact Info: 631-494-8318

Form LM-4 (Revised 2016)

**ITEMS 9 THROUGH 18**

| | |
|---|---|
| 9. During the reporting period, did your organization have any changes in its constitution and bylaws (other than rates of dues and fees) or in practices/procedures listed in the instructions? (If the constitution and bylaws have changed, attach two new dated copies. If practices/ procedures have changed, see instructions.) | No |
| 10. Did your organization change its rates of dues and fees during the reporting period? (If "Yes," report the new rates in Item 19 on page 1.) | No |
| 11. Did your organization discover any loss or shortage of funds or property during the reporting period? (If "Yes," provide details in Item 19. Answer "Yes" even if there has been repayment or recovery.) | No |
| 12. Was your organization insured by a fidelity bond during the reporting period? | No |
| If "Yes," enter the maximum amount recoverable under the bond for loss caused by any person. | |
| 13. How many members did your organization have at the end of the reporting period? | 1,724 |

| | |
|---|---|
| 14. Enter the total value of your organizations assets at the end of the period (cash, bank accounts, equipment, etc.). | $0 |
| 15. Enter the total liabilities (debts) of your organization at the end of the period (unpaid bills, loans owed, etc.). | $0 |
| 16. Enter the total receipts of your organization during the reporting period (dues, fees, interest received, etc.). (If $10,000 or more, your organization must file Form LM-2 or LM-3 instead of this form.) | $0 |
| 17. Enter the total disbursements made by your organization during the reporting period (per capita tax, loans made, net payment to officers, payments for office supplies, etc.). | $0 |
| 18. Enter the total payments to officers and employees made by your organization during the reporting period (gross salaries, lost time payments, allowances, expenses, etc.). | $0 |

## 19. ADDITIONAL INFORMATION SUMMARY

FILE NUMBER: 545-734

Item 20 Title: The Union does not have a President. The Union is governed and managed by an Executive Board, which acts as a committee with each Board member having one vote. The Executive Director is a member of the Executive Board.The Union does not have a President. The Union is governed and managed by an Executive Board, which acts as a committee with each Board member having one vote. The Executive Director is a member of the Executive Board. The National Council does not have any financial transactions or hold any funds. All financial transactions and funds are maintained on the books and records of the International Union.

# EXHIBIT 21

# FORM LM-4 LABOR ORGANIZATION ANNUAL REPORT

U.S. Department of Labor
Office of Labor-Management Standards
Washington, DC 20210

FOR USE ONLY BY LABOR ORGANIZATIONS WITH LESS THAN $10,000 IN TOTAL ANNUAL RECEIPTS

Form Approved
Office of Management and Budget
No. 1245-0003
Expires: 01-31-2025

This report is mandatory under P.L. 86-257, as amended. Failure to comply may result in criminal prosecution, fines, or civil penalties as provided by 29 U.S.C. 439 or 440.

READ THE INSTRUCTIONS CAREFULLY BEFORE PREPARING THIS REPORT.

| For Official Use Only | 1. FILE NUMBER<br>545-734 | 2. PERIOD COVERED<br>From 01/01/2021<br>Through 12/31/2021 | 3. (a) AMENDED - Is this an amended report: No<br>(b) HARDSHIP - Filed under the hardship procedures: No<br>(c) TERMINAL - Is this a terminal report: No |
|---|---|---|---|

4. AFFILIATION OR ORGANIZATION NAME
LAW ENFORCEMENT OFFICERS SECURITY & POLICE

5. DESIGNATION (Local, Lodge, etc.)
NATIONAL COUNCIL

6. DESIGNATION NBR

7. UNIT NAME (if any)
LEOSU

8. MAILING ADDRESS (Type or print in capital letters)

First Name: STEVE
Last Name: MARITAS
P.O Box - Building and Room Number: #1050
Number and Street: 1155 F STREET NW
City: WASHINGTON
State: DC
ZIP Code + 4: 20004

Each of the undersigned, duly authorized officers of the above labor organization, declares, under penalty of perjury and other applicable penalties of law, that all of the information submitted in this report (including information contained in any accompanying documents) has been examined by the signatory and is, to the best of the undersigned individual's knowledge and belief, true, correct and complete (See Section V on penalties in the instructions.)

20. SIGNED: Steve Maritas EXXECUTIVE DIRECTOR
Date: Jul 25, 2022 Contact Info: 202-486-8558

21. SIGNED: Brikener Jean Gilles TREASURER
Date: Jul 25, 2022 Contact Info: 631-494-8318

Form LM-4 (Revised 2016)

**ITEMS 9 THROUGH 18**

| | | | |
|---|---|---|---|
| 9. During the reporting period, did your organization have any changes in its constitution and bylaws (other than rates of dues and fees) or in practices/procedures listed in the instructions? (If the constitution and bylaws have changed, attach two new dated copies. If practices/ procedures have changed, see instructions.) | No | 14. Enter the total value of your organizations assets at the end of the period (cash, bank accounts, equipment, etc.). | $0 |
| | | 15. Enter the total liabilities (debts) of your organization at the end of the period (unpaid bills, loans owed, etc.). | $0 |
| 10. Did your organization change its rates of dues and fees during the reporting period? (If "Yes," report the new rates in Item 19 on page 1.) | No | 16. Enter the total receipts of your organization during the reporting period (dues, fees, interest received, etc.). (If $10,000 or more, your organization must file Form LM-2 or LM-3 instead of this form.) | $0 |
| 11. Did your organization discover any loss or shortage of funds or property during the reporting period? (If "Yes," provide details in Item 19. Answer "Yes" even if there has been repayment or recovery.) | No | 17. Enter the total disbursements made by your organization during the reporting period (per capita tax, loans made, net payment to officers, payments for office supplies, etc.). | $0 |
| 12. Was your organization insured by a fidelity bond during the reporting period? | No | 18. Enter the total payments to officers and employees made by your organization during the reporting period (gross salaries, lost time payments, allowances, expenses, etc.). | $0 |
| If "Yes," enter the maximum amount recoverable under the bond for loss caused by any person. | | | |
| 13. How many members did your organization have at the end of the reporting period? | 1,724 | | |

## 19. ADDITIONAL INFORMATION SUMMARY



Item 20 Title: There is NO President. The Executive Director is signing in place of the PresidentThe Union does not have a President. The Union is governed and managed by an Executive Board, which acts as a committee with each Board member having one vote. The Executive Director is a member of the Executive Board. The National Council does not have any financial transactions or hold any funds. All financial transactions and funds are maintained on the books and records of the International Union.

# EXHIBIT 22

# FORM LM-4 LABOR ORGANIZATION ANNUAL REPORT

U.S. Department of Labor
Office of Labor-Management Standards
Washington, DC 20210

FOR USE ONLY BY LABOR ORGANIZATIONS WITH LESS THAN $10,000 IN TOTAL ANNUAL RECEIPTS

Form Approved
Office of Management and Budget
No. 1245-0003
Expires: 01-31-2025

This report is mandatory under P.L. 86-257, as amended. Failure to comply may result in criminal prosecution, fines, or civil penalties as provided by 29 U.S.C. 439 or 440.

READ THE INSTRUCTIONS CAREFULLY BEFORE PREPARING THIS REPORT.

| For Official Use Only | 1. FILE NUMBER | 2. PERIOD COVERED | 3. |
|---|---|---|---|
| | 545-734 | From 01/01/2022<br>Through 12/31/2022 | (a) AMENDED - Is this an amended report: No<br>(b) HARDSHIP - Filed under the hardship procedures: No<br>(c) TERMINAL - Is this a terminal report: No |

4. AFFILIATION OR ORGANIZATION NAME
LAW ENFORCEMENT OFFICERS SECURITY & POLICE

5. DESIGNATION (Local, Lodge, etc.)
NATIONAL COUNCIL

6. DESIGNATION NBR

7. UNIT NAME (if any)
LEOSU

8. MAILING ADDRESS (Type or print in capital letters)

| First Name | Last Name |
|---|---|
| STEVE | MARITAS |

P.O Box - Building and Room Number
10th Floor

Number and Street
1717 Pennsylvania avenue NW

City
WASHINGTON

| State | ZIP Code + 4 |
|---|---|
| DC | 20006 |

Each of the undersigned, duly authorized officers of the above labor organization, declares, under penalty of perjury and other applicable penalties of law, that all of the information submitted in this report (including information contained in any accompanying documents) has been examined by the signatory and is, to the best of the undersigned individual's knowledge and belief, true, correct and complete (See Section V on penalties in the instructions.)

20. SIGNED: Steve Maritas — Executive Director
Date: Aug 13, 2023 — Contact Info: 202-486-8558

21. SIGNED: Brikener Jean Gilles — TREASURER
Date: Aug 14, 2023 — Contact Info: 631-494-8318

**ITEMS 9 THROUGH 18**

| | | | |
|---|---|---|---|
| 9. During the reporting period, did your organization have any changes in its constitution and bylaws (other than rates of dues and fees) or in practices/procedures listed in the instructions? (If the constitution and bylaws have changed, attach two new dated copies. If practices/ procedures have changed, see instructions.) | No | 14. Enter the total value of your organizations assets at the end of the period (cash, bank accounts, equipment, etc.). | $0 |
| | | 15. Enter the total liabilities (debts) of your organization at the end of the period (unpaid bills, loans owed, etc.). | $0 |
| 10. Did your organization change its rates of dues and fees during the reporting period? (If "Yes," report the new rates in Item 19 on page 1.) | No | 16. Enter the total receipts of your organization during the reporting period (dues, fees, interest received, etc.). (If $10,000 or more, your organization must file Form LM-2 or LM-3 instead of this form.) | $0 |
| 11. Did your organization discover any loss or shortage of funds or property during the reporting period? (If "Yes," provide details in Item 19. Answer "Yes" even if there has been repayment or recovery.) | No | 17. Enter the total disbursements made by your organization during the reporting period (per capita tax, loans made, net payment to officers, payments for office supplies, etc.). | $0 |
| 12. Was your organization insured by a fidelity bond during the reporting period? | No | 18. Enter the total payments to officers and employees made by your organization during the reporting period (gross salaries, lost time payments, allowances, expenses, etc.). | $0 |
| If "Yes," enter the maximum amount recoverable under the bond for loss caused by any person. | | | |
| 13. How many members did your organization have at the end of the reporting period? | 1,724 | | |

## 19. ADDITIONAL INFORMATION SUMMARY

FILE NUMBER: 545-734

Item 20 Title: The Union does Not have a President only an Executive Director who is signing this LM Report.The Union does not have a President. The Union is governed and managed by an Executive Board, which acts as a committee with each Board member having one vote. The Executive Director is a member of the Executive Board. The National Council does not have any financial transactions or hold any funds. All financial transactions and funds are maintained on the books and records of the International Union.

# EXHIBIT 23

Union Reporting History

000-420

LAW ENFORCEMENT OFFICERS SECURITY & POLICE NATIONAL HEADQUARTERS

1717 PENNSYLVANIA AVE NW, 1

WASHINGTON, DC 20006

Below lists all the reports filed for this union from 2001 to the latest report filed on record.
Note: The filing status reflects the FY filing status of the first full report received for the fiscal year.

| Date Received | FY Filing Status | Filing Type | Fiscal Year | Total Assets | Total Liabilities | Total Receipts | Total Disbursements | Total Membership |
|---|---|---|---|---|---|---|---|---|
| | Report Not Received | | 2023 | $0 | $0 | $0 | $0 | 0 |
| 03-31-2023 | Received On Time | LM-2 | 2022 | $147,088 | $0 | $916,062 | $1,310,379 | 1,724 |
| 08-25-2022 | Received After Due Date | LM-2 | 2021 | $541,405 | $0 | $841,299 | $509,059 | 1,724 |
| 10-11-2021 | Received After Due Date | LM-2 | 2020 | $227,832 | $1,159 | $366,592 | $253,172 | 1,724 |
| 08-10-2020 | Received After Due Date | LM-2 | 2019 | $119,745 | $12,000 | $311,583 | $256,998 | 655 |
| 04-01-2019 | | LM-3 | 2018 | $50,160 | $1,302 | $161,343 | $124,268 | 557 |
| 08-10-2020 | Received After Due Date | LM-3 | 2017 | $7,930 | $2,622 | $48,897 | $44,812 | 217 |
| 03-14-2019 | | LM-3 | 2017 | $7,930 | $2,622 | $48,897 | $44,812 | 217 |
| 08-10-2020 | Received After Due Date | LM-4 | 2016 | $0 | $0 | $0 | $0 | 0 |

# EXHIBIT 24

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF MICHIGAN

INTERNATIONAL UNIONS, SECURITY POLICE AND FIRE PROFESSIONALS OF AMERICA (SPFPA), et al,
Plaintiffs,

-vs- Case No. 2:19-CV-10743

STEVE MARITAS, et al,
Defendants.
_______________________________________/

LAW ENFORCEMENT OFFICERS SECURITY UNION, et al,
Plaintiffs/Counter-Defendant/
Third-Party Defendant,

-vs- Case No. 2:20-CV-12544

INTERNATIONAL UNIONS, SECURITY POLICE AND FIRE PROFESSIONALS OF AMERICA, (SPFPA), et al,
Defendants/Counter-Plaintiff.
_______________________________________/

DEPONENT: CHARLES STREBEK (VIA ZOOM)

DATE: Wednesday, March 23, 2022

TIME: 9:20 a.m.

LOCATION: YOUNG, GARCIA & QUADROZZI, PC
27725 Stansbury Boulevard, Suite 125
Farmington Hills, Michigan

REPORTER: Karen Fortna, CRR/RMR/RPR/CSR-5067

JOB NO: 18045

Page 2

APPEARANCES:

YOUNG, GARCIA & QUADROZZI, PC
By: Mr. J. David Garcia
Mr. Joshua D. Apel
27725 Stansbury Boulevard, Suite 125
Farmington Hills, Michigan 48334
248.353.8620
garcia@youngpc.com
apel@youngpc.com
Appearing on behalf of the Plaintiffs

NUNLEY WHEELOCK, PC
By: Mr. Thomas M. Nunley
4051 Haggerty Road
West Bloomfield, Michigan 48323
248.366.5000
tmnunley@nunleywheelock.com
Appearing on behalf of the Defendants

ALSO PRESENT: Mr. Steve Maritas
Mr. David Hickey
Mr. Scott A. Brooks, Esquire

Page 3

I N D E X

W I T N E S S


| CHARLES STREBEK | PAGE |
| --- | --- |
| Examination by Mr. Apel | 5 |
| Examination by Mr. Nunley | 64 |
| Further examination by Mr. Apel | 66 |


Page 4

E X H I B I T S


| EXHIBIT | DESCRIPTION | PAGE |
| --- | --- | --- |
| Exhibit 2 | Deposition notice . . . . . . . . . | 8 |


Page 5

Wednesday, March 23, 2022
Farmington Hills, Michigan
9:20 a.m.
* * * *

CHARLES STREBEK,
having first been duly sworn, was examined and testified as follows:
(Witness appearing via Zoom videoconference.)

MR. APEL: Hi, Mr. Strebek. I introduced myself earlier. My name is Josh Apel. I'm an attorney at Young, Garcia & Quadrozzi and we're representing SPFPA, Dave Hickey and Dwayne Phillips in the litigation that we're here about today.

EXAMINATION

BY MR. APEL:
Q. Have you ever been deposed before?
**A. Yes.**
Q. How recently?
**A. It's been years. It's been awhile.**

MR. APEL: If it's been awhile, I want to give you a couple ground rules to make sure things go smoothly today -- here's Mr. Maritas.

MR. MARITAS: Good morning, everybody. Sorry I'm late.

(Discussion off the record.)

Page 34

**A. SPFPA, yes. Sorry.**
Q. Okay. Did you ask to review the details of what these defamation allegations were?
**A. No.**
Q. Did you have any other independent knowledge of what the allegations of defamation were?
**A. No.**
Q. So did have any reason to believe whether or not the allegations were true or not?
**A. No.**
Q. But that didn't bother you in deciding to go into this merger?
**A. That's correct.**
Q. Why not?
**A. I still thought it was a good business decision for my union and for the future of the Federation.**
Q. Even if one of the unions you were going to become affiliated with has a lawsuit against it and you have no basis to know whether it's a valid or invalid lawsuit; is that right?
**A. That's correct.**
Q. Okay. Since that time, have you ever taken any time to get more familiar with the details of the lawsuit?
**A. No.**

Page 35

Q. Have you ever -- before your conversation with Steve in June or July of 2020, had you ever heard of LEOSU before?
**A. As a competing union, yes.**
Q. Okay. And what was -- if you were the executive director and then the president of the Federation, in your view, you're familiar with unions, what was LEOSU's reputation?
**A. I really don't know.**
Q. Okay. Had you ever been in any election or organizing campaigns against LEOSU as the Federation?
**A. No.**
Q. No?
**A. No.**
Q. Did Mr. Maritas ever talk to you about sort of his strategy in organizing campaigns?
**A. No.**
Q. Before the merger, did you have any understanding of Mr. Maritas' organizing campaign strategies?
**A. No.**
Q. I understand that you're saying that with the merger the union would be -- that the new union would be a larger union. Was the goal to form this larger union and then expand even further?

Page 36

**A. Yes.**
Q. Okay. What's the goal? How many union members is your goal to expand to?
**A. We haven't really decided that yet.**
Q. Okay. So after this August 2020 meeting with Steve, it sounds like there was kind of -- you guys didn't have the details worked out, but you kind of had a handshake agreement that you guys would move forward with the merger; is that fair?
**A. Yes.**
Q. Okay. And we already said that the merger didn't actually happen until March 2021. What were the steps that you guys had to take between August 2020 and March 2021 to effectuate the merger?
**A. The LEOS-PBA's attorney, John Axlerod, created the merger agreement and we spent some time going over that merger agreement to make sure it accurately reflected what we were going to do.**
Q. And what were you going to do?
**A. We were going to merge the three unions together and create a new international union of the United Federation LEOS-PBA.**
Q. Okay. Did any -- so as part of this merger, did one union acquire another union?
**A. No.**

Page 37

Q. Let's -- what was the name of the new union?
**A. United Federation LEOS-PBA.**
Q. Okay. And I normally would call that the Federation, but we're already calling the previous existing union the Federation, so to avoid any confusion, I'm going to still call the original Federation the Federation as I have been and I'm going to call the new merged union Federation LEOS.
**A. Okay.**
Q. Is that fair?
**A. Sure.**
Q. Okay. So for the -- I'm trying to understand what the details of this merger were.
Did Federation LEOS acquire the other smaller unions?
**A. The smaller unions became affiliated with the new Federation LEOS.**
Q. What does that mean to be affiliated?
**A. That it still operates independently, but it's supported by the international.**
Q. Okay. So does the -- so because you called it the international, that's what I'll call it. Instead of Federation LEOS, I'm going to call it the international. I like your term better.
Does the international have any members of

international, correct?
**A. Correct.**
Q. And do you expect that after the first quarter, the treasurer will provide you financials of the first quarter of dues collecting for the international?
**A. In the normal the course of business, I would expect that to happen.**
Q. Great. And finally, do you expect to sign off on the LM after it's provided to you by the accountant when it's due sometime after the end of the first fiscal year?
**A. Yes.**
MR. NUNLEY: Very good. No further questions.
MR. APEL: I just have one quick followup there, I guess something I wasn't clear on.

FURTHER EXAMINATION

BY MR. APEL:
Q. Just now to Mr. Nunley you testified that the affiliates only started paying dues to the international in January 2022, right?
**A. Yes.**
Q. So from March 2021, when the merger, through December 31, 2021, am I to understand that all the affiliates kept their dues just as they would have



before the merger?
**A. Yes.**
MR. APEL: Okay. I just wasn't clear on that. I just wanted to make sure I understood. Thanks.
MR. NUNLEY: We're good, Charles. Thank you.

(Deposition concluded at 10:49 a.m.)



STATE OF MICHIGAN)
COUNTY OF OAKLAND)

Certificate of Notary Public

I do hereby certify the witness, whose attached testimony was taken in the above matter, was first duly sworn to tell the truth; the testimony contained herein was reduced to writing in the presence of the witness, by means of stenography; afterwards transcribed; and is a true and complete transcript of the testimony given. I further certify that I am not connected by blood or marriage with any of the parties, their attorneys or agents, and that I am not interested directly, indirectly or financially in the matter of controversy.

In witness whereof, I have hereunto set my hand this day at Clarkston, Michigan, State of Michigan.

I hereby set my hand this day, March 23, 2022.

*Karen Fortna*

Karen Fortna, CRR/RMR/RPR/CSR-5067
Notary Public, Oakland County, Michigan
My Commission expires 4/30/2025

# EXHIBIT 25

# FORM LM-2 LABOR ORGANIZATION ANNUAL REPORT

U.S. Department of Labor
Office of Labor-Management Standards
Washington, DC 20210

MUST BE USED BY LABOR ORGANIZATIONS WITH $250,000 OR MORE IN TOTAL ANNUAL RECEIPTS AND LABOR ORGANIZATIONS IN TRUSTEESHIP

Form Approved
Office of Management and Budget
No. 1245-0003
Expires: 01-31-2025

This report is mandatory under P.L. 86-257, as amended. Failure to comply may result in criminal prosecution, fines, or civil penalties as provided by 29 U.S.C. 439 or 440.

READ THE INSTRUCTIONS CAREFULLY BEFORE PREPARING THIS REPORT.

| For Official Use Only | 1. FILE NUMBER 000-420 | 2. PERIOD COVERED From 01/01/2021 Through 12/31/2021 | 3. (a) AMENDED - Is this an amended report: No<br>(b) HARDSHIP - Filed under the hardship procedures: No<br>(c) TERMINAL - This is a terminal report: No |
|---|---|---|---|

4. AFFILIATION OR ORGANIZATION NAME
LAW ENFORCEMENT OFFICERS SECURITY & POLICE

5. DESIGNATION (Local, Lodge, etc.)
NATIONAL HEADQUARTERS

6. DESIGNATION NBR

7. UNIT NAME (if any)
LEOS-PBA

9. Are your organization's records kept at its mailing address? Yes

8. MAILING ADDRESS (Type or print in capital letters)

| First Name | Last Name |
|---|---|
| STEVE | MARITAS |

P.O Box - Building and Room Number
10th Floor

Number and Street
1717 Pennsylvania Ave NW, 1

City
WASHINGTON

| State | ZIP Code + 4 |
|---|---|
| DC | 20006 |

Each of the undersigned, duly authorized officers of the above labor organization, declares, under penalty of perjury and other applicable penalties of law, that all of the information submitted in this report (including information contained in any accompanying documents) has been examined by the signatory and is, to the best of the undersigned individual's knowledge and belief, true, correct and complete (See Section V on penalties in the instructions.)

0. SIGNED: Steve Maritas EXECUTIVE DIRECTOR
Date: Jul 11, 2022 Telephone Number: 202-486-8558

71. SIGNED: Brikener Jean Gilles TREASURER
Date: Aug 25, 2022 Telephone Number: 631-494-8318

**ITEMS 10 THROUGH 21**

FILE NUMBER: 000-420

| | |
|---|---|
| 10. During the reporting period did the labor organization create or participate in the administration of a trust or a fund or organization, as defined in the instructions, which provides benefits for members or beneficiaries? | No |
| 11(a). During the reporting period did the labor organization have a political action committee (PAC) fund? | No |
| 11(b). During the reporting period did the labor organization have a subsidiary organization as defined in Section X of these Instructions? | No |
| 12. During the reporting period did the labor organization have an audit or review of its books and records by an outside accountant or by a parent body auditor/representative? | No |
| 13. During the reporting period did the labor organization discover any loss or shortage of funds or other assets? (Answer "Yes" even if there has been repayment or recovery.) | No |
| 14. What is the maximum amount recoverable under the labor organization's fidelity bond for a loss caused by any officer, employee or agent of the labor organization who handled union funds? | $25,000 |
| 15. During the reporting period did the labor organization acquire or dispose of any assets in a manner other than purchase or sale? | No |
| 16. Were any of the labor organization's assets pledged as security or encumbered in any way at the end of the reporting period? | No |
| 17. Did the labor organization have any contingent liabilities at the end of the reporting period? | No |
| 18. During the reporting period did the labor organization have any changes in its constitution or bylaws, other than rates of dues and fees, or in practices/procedures listed in the instructions? | No |
| 19. What is the date of the labor organization's next regular election of officers? | 12/2022 |

20. I-low many members did the labor organization have at the end of the reporting period? 1,724

21. What are the labor organization's rates of dues and fees?

| Rates of Dues and Fees | | | | | |
|---|---|---|---|---|---|
| Dues/Fees | Amount | | Unit | Minimum | Maximum |
| (a) Regular Dues/Fees | 0 | per | month | 20 | 22.5 X hourly rate |
| (b) Working Dues/Fees | n/a | per | n/a | n/a | n/a |
| (c) Initiation Fees | n/a | per | n/a | n/a | n/a |
| (d) Transfer Fees | n/a | per | n/a | n/a | n/a |
| (e) Work Permits | n/a | per | n/a | n/a | n/a |

**STATEMENT A - ASSETS AND LIABILITIES**

FILE NUMBER: 000-420

ASSETS

| ASSETS | Schedule Number | Start of Reporting Period (A) | End of Reporting Period (B) |
|---|---|---|---|
| 22. Cash | | $209,165 | $541,405 |
| 23. Accounts Receivable | 1 | $17,563 | $0 |
| 24. Loans Receivable | 2 | $1,104 | $0 |
| 25. U.S. Treasury Securities | | $0 | $0 |
| 26. Investments | | | |
| 27. Fixed Assets | 6 | | |
| 28. Other Assets | | | |
| 29. TOTAL ASSETS | | $227,832 | $541,405 |

LIABILITIES

| LIABILITIES | Schedule Number | Start of Reporting Period (A) | End of Reporting Period (B) |
|---|---|---|---|
| 30. Accounts Payable | 8 | $1,159 | |
| 31. Loans Payable | 9 | | |
| 32. Mortgages Payable | | $0 | $0 |
| 33. Other Liabilities | 10 | | |
| 34. TOTAL LIABILITIES | | $1,159 | $0 |

| | | |
|---|---|---|
| 35. NET ASSETS | $226,673 | $541,405 |

**STATEMENT B - RECEIPTS AND DISBURSEMENTS**

FILE NUMBER: 000-420

| CASH RECEIPTS | SCH | AMOUNT |
|---|---|---|
| 36. Dues and Agency Fees | | $840,195 |
| 37. Per Capita Tax | | $0 |
| 38. Fees, Fines, Assessments, Work Permits | | $0 |
| 39. Sale of Supplies | | $0 |
| 40. Interest | | $0 |
| 41. Dividends | | $0 |
| 42. Rents | | $0 |
| 43. Sale of Investments and Fixed Assets | 3 | |
| 44. Loans Obtained | 9 | |
| 45. Repayments of Loans Made | 2 | $1,104 |
| 46. On Behalf of Affiliates for Transmittal to Them | | $0 |
| 47. From Members for Disbursement on Their Behalf | | $0 |
| 48. Other Receipts | 14 | $0 |
| 49. TOTAL RECEIPTS | | $841,299 |

| CASH DISBURSEMENTS | | SCH | AMOUNT |
|---|---|---|---|
| 50. Representational Activities | | 15 | $379,268 |
| 51. Political Activities and Lobbying | | 16 | $0 |
| 52. Contributions, Gifts, and Grants | | 17 | $3,000 |
| 53. General Overhead | | 18 | $63,397 |
| 54. Union Administration | | 19 | $39,596 |
| 55. Benefits | | 20 | $11,208 |
| 56. Per Capita Tax | | | $0 |
| 57. Strike Benefits | | | $0 |
| 58. Fees, Fines, Assessments, etc. | | | $0 |
| 59. Supplies for Resale | | | $0 |
| 60. Purchase of Investments and Fixed Assets | | 4 | |
| 61. Loans Made | | 2 | $0 |
| 62. Repayment of Loans Obtained | | 9 | |
| 63. To Affiliates of Funds Collected on Their Behalf | | | $0 |
| 64. On Behalf of Individual Members | | | $0 |
| 65. Direct Taxes | | | $12,590 |
| | | | |
| 66. Subtotal | | | $509,059 |
| 67. Withholding Taxes and Payroll Deductions | | | |
| 67a. Total Withheld | $0 | | |
| 67b. Less Total Disbursed | $0 | | |
| 67c. Total Withheld But Not Disbursed | | | |
| 68. TOTAL DISBURSEMENTS | | | $509,059 |

**SCHEDULE 1 - ACCOUNTS RECEIVABLE AGING SCHEDULE**

FILE NUMBER: 000-420

| Entity or Individual Name (A) | Total Account Receivable (B) | 90-180 Days Past Due (C) | 180+ Days Past Due (D) | Liquidated Account Receivable (E) |
|---|---|---|---|---|
| Total of all itemized accounts receivable | $0 | $0 | $0 | $0 |
| Totals from all other accounts receivable | $0 | $0 | $0 | $0 |
| **Totals** (Total of Column (B) will be automatically entered in Item 23, Column(B)) | $0 | $0 | $0 | $0 |

**SCHEDULE 2 - LOANS RECEIVABLE**

FILE NUMBER: 000-420

| List below loans to officers, employees, or members which at any time during the reporting period exceeded $250 and list all loans to business enterprises regardless of amount. (A) | Loans Outstanding at Start of Period (B) | Loans Made During Period (C) | Repayments Received During Period: Cash (D)(1) | Repayments Received During Period: Other Than Cash (D)(2) | Loans Outstanding at End of Period (E) |
|---|---|---|---|---|---|
| Name: Steve Maritas<br>Purpose: Travel Costs<br>Security: None<br>Terms of Repayment: Repayment in Full January 2021 | $1,104 | $0 | $1,104 | $0 | $0 |
| Total of loans not listed above | | | | | |
| Total of all lines above | $1,104 | | $1,104 | $0 | |
| Totals will be automatically entered in... | Item 24 Column (A) | Item 61 | Item 45 | Item 69 with Explanation | Item 24 Column (B) |

Form LM-2 (Revised 2010); (Tech. Rev. 2/2013)

**SCHEDULE 3 - SALE OF INVESTMENTS AND FIXED ASSETS**

FILE NUMBER: 000-420

| Description (if land or buildings, give location) (A) | Cost (B) | Book Value (C) | Gross Sales Price (D) | Amount Received (E) |
|---|---|---|---|---|
| Total of all lines above | $0 | $0 | $0 | $0 |
| | | | Less Reinvestments | |
| (The total from Net Sales Line will be automatically entered in Item 43) | | | Net Sales | |

**SCHEDULE 4 - PURCHASE OF INVESTMENTS AND FIXED ASSETS**



| Description (if land or buildings, give location) (A) | Cost (B) | Book Value (C) | Cash Paid (D) |
|---|---|---|---|
| Total of all lines above | $0 | | |
| | | Less Reinvestments | |
| (The total from Net Purchases Line will be automatically entered in Item 60.) | | Net Purchases | |

**SCHEDULE 5 - INVESTMENTS**

FILE NUMBER: 000-420

| Description (A) | Amount (B) |
|---|---|
| Marketable Securities | |
| A. Total Cost | |
| B. Total Book Value | |
| C. List each marketable security which has a book value over $5,000 and exceeds 5% of Line B. | |
| Other Investments | |
| D. Total Cost | |
| E. Total Book Value | |
| F. List each other investment which has a book value over $5,000 and exceeds 5% of Line E. Also, list each subsidiary for which separate reports are attached. | |
| **G. Total of Lines B and E** (Total will be automatically entered in Item 26, Column(B)) | $0 |

**SCHEDULE 6 - FIXED ASSETS**

FILE NUMBER: 000-420

| Description (A) | Cost or Other Basis (B) | Total Depreciation or Amount Expensed (C) | Book Value (D) | Value (E) |
|---|---|---|---|---|
| A. Land (give location) | $0 | | $0 | $0 |
| B. Buildings (give location) | $0 | $0 | $0 | $0 |
| C. Automobiles and Other Vehicles | | | | |
| D. Office Furniture and Equipment | | | | |
| E. Other Fixed Assets | | | | |
| **F. Totals of Lines A through E** (Column(D) Total will be automatically entered in Item 27, Column(B)) | $0 | $0 | $0 | $0 |

Form LM-2 (Revised 2010); (Tech. Rev. 2/2013)

**SCHEDULE 7 - OTHER ASSETS**

FILE NUMBER: 000-420

| Description (A) | Book Value (B) |
|---|---|
| **Total** (Total will be automatically entered in Item 28, Column(B)) | $0 |

Form LM-2 (Revised 2010); (Tech. Rev. 2/2013)

**SCHEDULE 8 - ACCOUNTS PAYABLE AGING SCHEDULE**

FILE NUMBER: 000-420

| Entity or Individual Name (A) | Total Account Payable (B) | 90-180 Days Past Due (C) | 180+ Days Past Due (D) | Liquidated Account Payable (E) |
|---|---|---|---|---|
| Total for all itemized accounts payable | $0 | $0 | $0 | $0 |
| Total from all other accounts payable | $0 | $0 | $0 | $0 |
| **Totals** (Total for Column(B) will be automatically entered in Item 30, Column(D)) | $0 | $0 | $0 | $0 |

Form LM-2 (Revised 2010); (Tech. Rev. 2/2013)

**SCHEDULE 9 - LOANS PAYABLE**

FILE NUMBER: 000-420

| Source of Loans Payable at Any Time During the Reporting Period (A) | Loans Owed at Start of Period (B) | Loans Obtained During Period (C) | Repayment During Period Cash (D)(1) | Repayment During Period Other Than Cash (D)(2) | Loans Owed at End of Period (E) |
|---|---|---|---|---|---|
| Total Loans Payable | $0 | $0 | $0 | $0 | $0 |
| Totals will be automatically entered in... | Item 31 Column (C) | Item 44 | Item 62 | Item 69 with Explanation | Item 31 Column (D) |

**SCHEDULE 10 - OTHER LIABILITIES**

FILE NUMBER: 000-420

| Description (A) | Amount at End of Period (B) |
|---|---|
| **Total Other Liabilities** (Total will be automatically entered in Item 33, Column(D)) | $0 |

Form LM-2 (Revised 2010); (Tech. Rev. 2/2013)

**SCHEDULE 11 - ALL OFFICERS AND DISBURSEMENTS TO OFFICERS**

FILE NUMBER: 000-420

| | (A) Name | (B) Title | (C) Status | (D) Gross Salary Disbursements (before any deductions) | (E) Allowances Disbursed | (F) Disbursements for Official Business | (G) Other Disbursements not reported in (D) through (F) | (H) TOTAL | | |
|---|---|---|---|---|---|---|---|---|---|---|
| A B C | Burke , James | Executive Board Members | C | $0 | $0 | $1,000 | $0 | $1,000 | | |
| I | Schedule 15 Representational Activities | 85 % | Schedule 16 Political Activities and Lobbying | 0 % | Schedule 17 Contributions | 0 % | Schedule 18 General Overhead | 0 % | Schedule 19 Administration | 15 % |
| A B C | Jean-Giles , Brikener | Executive Board Member | C | $0 | $0 | $2,507 | $0 | $2,507 | | |
| I | Schedule 15 Representational Activities | 85 % | Schedule 16 Political Activities and Lobbying | 0 % | Schedule 17 Contributions | 0 % | Schedule 18 General Overhead | 0 % | Schedule 19 Administration | 15 % |
| A B C | Maritas , Steve | Executive Director | C | $158,500 | $9,000 | $3,307 | $0 | $170,807 | | |
| I | Schedule 15 Representational Activities | 85 % | Schedule 16 Political Activities and Lobbying | 0 % | Schedule 17 Contnbutions | 0 % | Schedule 18 General Overhead | 0 % | Schedule 19 Administration | 15 % |
| ot B C | IVells , Calvin | Executive Board Member | C | $0 | $0 | $2,000 | $0 | $2,000 | | |
| I | Schedule 15 Representational Activities | 85 % | Schedule 16 Political Activities and Lobbying | 0 % | chedule 17 ontributions | 0 % | Schedule 18 General Overhead | 0 % | Schedule 19 Administration | 15 % |
| A B C | Sottilare , Robert | Executive Board Member | C | $0 | $0 | $1,500 | $0 | $1,500 | | |
| I | Schedule 15 Representational Activities | 85 % | Schedule 16 Political Activities and Lobbying | 0 % | chedule 17 ontributions | 0 % | Schedule 18 General Overhead | 0 % | Schedule 19 Administration | 15 % |
| A B C | Ahrens , Thomas | Executive Board Member | C | $0 | $0 | $1,500 | $0 | $1,500 | | |
| I | Schedule 15 Representational Activities | 85 % | Schedule 16 Political Activities and Lobbying | 0 % | Schedule 17 Contributions | 0 % | Schedule 18 General Overhead | 0 % | Schedule 19 Administration | 15 % |
| Total Officer Disbursements | | | | $158,500 | $9,000 | $11,814 | $0 | $179,314 | | |
| Less Deductions | | | | | | | | | | |
| Net Disbursements | | | | | | | | $179,314 | | |

**SCHEDULE 12 - DISBURSEMENTS TO EMPLOYEES**

FILE NUMBER: 000-420

| I Schedule 15 Representational Activities | | Schedule 16 Political Activities and Lobbying | Schedule 17 Contributions | Schedule 18 General Overhead | Schedule 19 Administration |
|---|---|---|---|---|---|
| Total Employee Disbursements | | $0 | $0 | $0 | |
| Less Deductions | | | | | |
| Net Disbursements | | | | | |

Form LM-2 (Revised 2010); (Tech. Rev. 2/2013)

**SCHEDULE 13 - MEMBERSHIP STATUS**

FILE NUMBER: 000-420

| Category of Membership (A) | Number (B) | Voting Eligibility (C) |
|---|---|---|
| Regular Members | 1,724 | Yes |
| Associate Member | 0 | No |
| **Members** (Total of all lines above) | 1,724 | |
| Agency Fee Payers* | 0 | |
| Total Members/Fee Payers | 1,724 | |
| *Agency Fee Payers are not considered members of the labor organization. | | |

**DETAILED SUMMARY PAGE - SCHEDULES 14 THROUGH 19**

FILE NUMBER: 000-420

| SCHEDULE 14 OTHER RECEIPTS | |
|---|---|
| 1. Named Payer Itemized Receipts | $0 |
| 2. Named Payer Non-itemized Receipts | $0 |
| 3. All Other Receipts | |
| 4. Total Receipts | $ |

| SCHEDULE 15 REPRESENTATIONAL ACTIVITIES | |
|---|---|
| 1. Named Payee Itemized Disbursements | $165,000 |
| 2. Named Payee Non-itemized Disbursements | $11,000 |
| 3. To Officers | $152,417 |
| 4. To Employees | $0 |
| 5. All Other Disbursements | $50,851 |
| 6. Total Disbursements | $379,268 |

| SCHEDULE 16 POLITICAL ACTIVITIES AND LOBBYING | |
|---|---|
| 1. Named Payee Itemized Disbursements | $0 |
| 2. Named Payee Non-itemized Disbursements | $0 |
| 3. To Officers | $0 |
| 4. To Employees | $0 |
| 5. All Other Disbursements | $0 |
| 6. Total Disbursements | $0 |

| SCHEDULE 17 CONTRIBUTIONS, GIFTS & GRANTS | |
|---|---|
| 1. Named Payee Itemized Disbursements | $0 |
| 2. Named Payee Non-itemized Disbursements | $0 |
| 3. To Officers | $0 |
| 4. To Employees | $0 |
| 5. All Other Disbursements | $3,000 |
| 6. Total Disbursements | $3,000 |

| SCHEDULE 18 GENERAL OVERHEAD | |
|---|---|
| 1. Named Payee Itemized Disbursements | $27,418 |
| 2. Named Payee Non-itemized Disbursements | $33,436 |
| 3. To Officers | $0 |
| 4. To Employees | $0 |
| 5. All Other Disbursements | $2,543 |
| 6. Total Disbursements | $63,397 |

| SCHEDULE 19 UNION ADMINISTRATION | |
|---|---|
| 1. Named Payee Itemized Disbursements | $10,000 |
| 2. Named Payee Non-itemized Disbursements | $1,763 |
| 3. To Officers | $26,897 |
| 4. To Employees | $0 |
| 5. All Other Disbursements | $936 |
| 6. Total Disbursements | $39,596 |

**SCHEDULE 14 - OTHER RECEIPTS** FILE NUMBER: 000-420

There was no data found for this schedule.

**SCHEDULE 15 - REPRESENTATIONAL ACTIVITIES** FILE NUMBER: 000-420

| Name and Address (A) | Purpose (C) | Date (D) | Amount (E) |
|---|---|---|---|
| Beins Axlerod, PC<br><br>1717 K St NW Suite 1120<br>Washington<br>DC<br>20006 | Legal fees for representational activities | 02/02/2021 | $5,000 |
| | Legal fees for representational activities | 03/16/2021 | $5,000 |
| | Legal fees for representational activities | 04/13/2021 | $5,000 |
| | Legal fees for representational activities | 05/25/2021 | $7,500 |
| | Legal fees for representational activities | 06/22/2021 | 515,000 |
| | Legal fees for representational activities | 07/20/2021 | 515,000 |
| Type or Classification (B) | Legal fees for representational activities | 09/08/2021 | $15,000 |
| | Legal fees for representational activities | 10/15/2021 | $15,000 |
| Law Firm | Legal fees for representational activities | 11/17/2021 | $15,000 |
| | Legal fees for representational activities | 12/09/2021 | $15,000 |
| | Total Itemized Transactions with this Payee/Payer | | $112,500 |
| | Total Non-Itemized Transactions with this Payee/Payer | | 50 |
| | Total of All Transactions with this Payee/Payer for This Schedule | | $112,500 |

| Name and Address (A) | Purpose (C) | Date (D) | Amount (E) |
|---|---|---|---|
| JAMS<br><br>1155 F St NW Ste 1150<br>Washington<br>DC<br>20004 | Total Itemized Transactions with this Payee/Payer | | |
| | Total Non-Itemized Transactions with this Payee/Payer | | $7,500 |
| | Total of All Transactions with this Payee/Payer for This Schedule | | $7,500 |
| Type or Classification (B) | | | |
| Mediation Services | | | |

| Name and Address (A) | Purpose (C) | Date (D) | Amount (E) |
|---|---|---|---|
| Nunley Wheelock<br><br>4051 Haggerty Road<br>West Bloomfield<br>MI | Legal fees for representational activities | 01/19/2021 | 5,000 |
| | Legal fees for representational activities | 02/12/2021 | $5,000 |
| | Legal fees for representational activities | 02/17/2021 | s5,000 |
| | Legal fees for representational activities | 03/17/2021 | $5,000 |
| | Legal fees for representational activities | 07/07/2021 | $5,000 |
| Type or Classification (B) | Legal fees for representational activities | 09/09/2021 | $5,000 |
| | Legal fees for representational activities | 10/07/2021 | 5,000 |
| Law Firm | Legal fees for representational activities | 11/08/2021 | $5,000 |
| | Legal fees for representational activities | 12/07/2021 | $7,500 |
| | Legal fees for representational activities | 08/05/2021 | $5,000 |
| | Total Itemized Transactions with this Payee/Payer | | $52,500 |
| | Total Non-Itemized Transactions with this Payee/Payer | | $3,500 |
| | Total of All Transactions with this Payee/Payer for This Schedule | | $56,000 |

**SCHEDULE 16 - POLITICAL ACTIVITIES AND LOBBYING** FILE NUMBER 000-420

There was no data found for this schedule.

**SCHEDULE 17 - CONTRIBUTIONS, GIFTS & GRANTS** FILE NUMBER: 000-420

There was no data found for this schedule.

**SCHEDULE 18 - GENERAL OVERHEAD** FILE NUMBER: 000-420

| Name and Address (A) | Purpose (C) | Date (D) | Amount (E) |
|---|---|---|---|
| Servcorp US<br><br>1330 Avenue of the Americas<br>New York<br>NY<br>10019 | Total Itemized Transactions with this Payee/Payer | | |
| | Total Non-Itemized Transactions with this Payee/Payer | | $6,603 |
| | Total of All Transactions with this Payee/Payer for This Schedule | | $6,603 |
| Type or Classification (B): Office SPace | | | |

| Name and Address (A) | Purpose (C) | Date (D) | Amount (E) |
|---|---|---|---|
| Support HQ<br><br>734 Walt Whitman Road<br>Melville<br>NY<br>11747 | Total Itemized Transactions with this Payee/Payer | | |
| | Total Non-Itemized Transactions with this Payee/Payer | | $21,244 |
| | Total of All Transactions with this Payee/Payer for This Schedule | | $21,244 |
| Type or Classification (B): Bookkeeping Service | | | |

| Name and Address (A) | Purpose (C) | Date (D) | Amount (E) |
|---|---|---|---|
| WithumSmith+Brown, PC<br><br>4600 East-West Highway, Sui<br>Bethesda<br>MD<br>20814 | Accounting and Compliance Services | 02/05/2021 | $5,000 |
| | Accounting and Compliance Services | 04/12/2021 | $5,000 |
| | Accounting and Compliance Services | 05/19/2021 | $5,000 |
| | Accounting and Compliance Services | 05/26/2021 | $5,000 |
| | Accounting and Compliance Services | 09/19/2021 | $7,418 |
| | Total Itemized Transactions with this Payee/Payer | | $27,418 |
| Type or Classification (B): Public Accounting Firm | Total Non-Itemized Transactions with this Payee/Payer | | |
| | Total of All Transactions with this Payee/Payer for This Schedule | | $27,418 |

| Name and Address (A) | Purpose (C) | Date (D) | Amount (E) |
|---|---|---|---|
| WIX<br><br>154 W 14th St Ste 703<br>New York<br>NY<br>10011 | Total Itemized Transactions with this Payee/Payer | | |
| | Total Non-Itemized Transactions with this Payee/Payer | | $5,589 |
| | Total of All Transactions with this Payee/Payer for This Schedule | | $5,589 |
| Type or Classification (B): Web Services | | | |

**SCHEDULE 19 - UNION ADMINISTRATION**

FILE NUMBER: 000-420

| Name and Address (A) | Purpose (C) | Date (D) | Amount (E) |
|---|---|---|---|
| Lally & Misir LLP<br><br>220 Old Country Road<br>Mineola<br>NY<br>11501 | Legal fees for Union Administration | 06/14/2021 | $5,000 |
| | Legal fees for Union Administration | 07/30/2021 | $5,000 |
| | Total Itemized Transactions with this Payee/Payer | | $10,000 |
| | Total Non-Itemized Transactions with this Payee/Payer | | $1,763 |
| Type or Classification (B) | Total of All Transactions with this Payee/Payer for This Schedule | | $11,763 |
| Law Firm | | | |

**SCHEDULE 20 - BENEFITS**

FILE NUMBER: 000-420

| Description (A) | To Whom Paid (B) | Amount (C) |
| --- | --- | --- |
| Health Insurance | Fidelis | $11,208 |
| Total of all lines above (Total will be automatically entered in Item 55.) | | $11,208 |

**69. ADDITIONAL INFORMATION SUMMARY** **FILE NUMBER: 000-420**

**Item 70 Title: There is no President of the union only an Executive Board. The Executive Director is signing in place of the President which does not exist.**

**Schedule 2, Row1:**

**Schedule 2, Row1:**

**Schedule 13, Row1:**

**Schedule 13, Row1:**

**Schedule 13, Row1:Membership shall be open to those individuals who provide protective services/security services.**

**Schedule 13, Row1:**

**Schedule 13, Row1:**

**Schedule 13, Row1:**

**Schedule 13, Row2:**

**Schedule 13, Row2:Any law enforcement and/or security professional who wish to join our International Union may do so as an Associate Member. Such Associate Member shall not have any voting rights in this organization. Such Associate Members are not required to pay monthly dues. Nothing shall prohibit this International Union from setting a yearly membership fee and/or from providing limited benefits to such Associate member or members.**

**Schedule 13, Row2:**

**Schedule 13, Row2:**

**Schedule 13, Row2:Associate Members do not have voting rights**

# EXHIBIT 26

# FORM LM-2 LABOR ORGANIZATION ANNUAL REPORT

U.S. Department of Labor
Office of Labor-Management Standards
Washington, DC 20210

MUST BE USED BY LABOR ORGANIZATIONS WITH $250,000 OR MORE IN TOTALANNUAL RECEIPTS AND LABOR ORGANIZATIONS IN TRUSTEESHIP

Form Approved
Office of Management and Budget
No. 1245-0003
Expires: 01-31-2025

This report is mandatory under P.L. 86-257, as amended. Failure to comply may result in criminal prosecution, fines, or civil penalties as provided by 29 U.S.C. 439 or 440.

READ THE INSTRUCTIONS CAREFULLY BEFORE PREPARING THIS REPORT.

| For Official Use Only | 1. FILE NUMBER<br>000-420 | 2. PERIOD COVERED<br>From 01/01/2022<br>Through 12/31/2022 | 3. (a) AMENDED - Is this an amended report: No<br>(b) HARDSHIP - Filed under the hardship procedures: No<br>(c) TERMINAL - This is a terminal report: No |
|---|---|---|---|

. AFFILIATION OR ORGANIZATION NAME
LAW ENFORCEMENT OFFICERS SECURITY & POLICE

. DESIGNATION (Local, Lodge, etc.)
NATIONAL HEADQUARTERS

6. DESIGNATION NBR

. UNIT NAME (if any)
LEOS-PBA

9. Are your organization's records kept at its mailing address? Yes

8. MAILING ADDRESS (Type or print in capital letters)

First Name
STEVE

Last Name
MARITAS

P.O Box - Building and Room Number
10th Floor

Number and Street
1717 Pennsylvania Ave NW, 1

City
WASHINGTON

State
DC

ZIP Code + 4
20006

Each of the undersigned, duly authorized officers of the above labor organization, declares, under penalty of perjury and other applicable penalties of law, that all of the information submitted in this report (including information contained in any accompanying documents) has been examined by the signatory and is, to the best of the undersigned individual's knowledge and belief, true, correct and complete (See Section V on penalties in the instructions.)

70. SIGNED: Steve Maritas Executive Director
Date: Mar 31, 2023 Telephone Number: 202-486-8558

71. SIGNED: Brikener Jean Gilles TREASURER
Date: Mar 31, 2023 Telephone Number: 631-494-8318

Form LM-2 (Revised 2010); (Tech. Rev. 2/2013)

**ITEMS 10 THROUGH 21**

FILE NUMBER: 000-420

| | |
|---|---|
| 10. During the reporting period did the labor organization create or participate in the administration of a trust or a fund or organization, as defined in the instructions, which provides benefits for members or beneficiaries? | No |
| 11(a). During the reporting period did the labor organization have a political action committee (PAC) fund? | No |
| 11(b). During the reporting period did the labor organization have a subsidiary organization as defined in Section X of these Instructions? | No |
| 12. During the reporting period did the labor organization have an audit or review of its books and records by an outside accountant or by a parent body auditor/representative? | No |
| 13. During the reporting period did the labor organization discover any loss or shortage of funds or other assets? (Answer "Yes" even if there has been repayment or recovery.) | No |
| 14. What is the maximum amount recoverable under the labor organization's fidelity bond for a loss caused by any officer, employee or agent of the labor organization who handled union funds? | $25,000 |
| 15. During the reporting period did the labor organization acquire or dispose of any assets in a manner other than purchase or sale? | No |
| 16. Were any of the labor organization's assets pledged as security or encumbered in any way at the end of the reporting period? | No |
| 17. Did the labor organization have any contingent liabilities at the end of the reporting period? | No |
| 18. During the reporting period did the labor organization have any changes in its constitution or bylaws, other than rates of dues and fees, or in practices/procedures listed in the instructions? | No |
| 19. What is the date of the labor organization's next regular election of officers? | 08/2024 |

i20. How many members did the labor organization have at the end of the reporting period? 1,724

1. What are the labor organization's rates of dues and fees?

| Rates of Dues and Fees | | | | | |
|---|---|---|---|---|---|
| Dues/Fees | Amount | | Unit | Minimum | Maximum |
| (a) Regular Dues/Fees | 0 | per | month | 20 | 22.5 X hourly rate |
| (b) Working Dues/Fees | n/a | per | n/a | n/a | n/a |
| (c) Initiation Fees | n/a | per | n/a | n/a | n/a |
| (d) Transfer Fees | n/a | per | n/a | n/a | n/a |
| (e) Work Permits | n/a | per | n/a | n/a | n/a |

**STATEMENT A - ASSETS AND LIABILITIES**

FILE NUMBER: 000-420

ASSETS

| ASSETS | Schedule Number | Start of Reporting Period (A) | End of Reporting Period (B) |
|---|---|---|---|
| 22. Cash | | $541,405 | $147,088 |
| 23. Accounts Receivable | 1 | $0 | $0 |
| 24. Loans Receivable | 2 | $0 | $0 |
| 25. U.S. Treasury Securities | | $0 | $0 |
| 26. Investments | 5 | | $0 |
| 27. Fixed Assets | 6 | | $0 |
| 28. Other Assets | 7 | | $0 |
| 29. TOTAL ASSETS | | $541,405 | $147,088 |

LIABILITIES

| LIABILITIES | Schedule Number | Start of Reporting Period (A) | End of Reporting Period (B) |
|---|---|---|---|
| 30. Accounts Payable | 8 | | $0 |
| 31. Loans Payable | 9 | | $0 |
| 32. Mortgages Payable | | $0 | $0 |
| 33. Other Liabilities | 10 | | $0 |
| 34. TOTAL LIABILITIES | | $0 | $0 |

| | | |
|---|---|---|
| 35. NET ASSETS | $541,405 | $147,088 |

**STATEMENT B - RECEIPTS AND DISBURSEMENTS**

FILE NUMBER: 000-420

| CASH RECEIPTS | SCH | AMOUNT | CASH DISBURSEMENTS | SCH | AMOUNT |
|---|---|---|---|---|---|
| 36. Dues and Agency Fees | | $916,062 | 50. Representational Activities | 15 | $297,963 |
| 37. Per Capita Tax | | $0 | 51. Political Activities and Lobbying | 16 | $0 |
| 38. Fees, Fines, Assessments, Work Permits | | $0 | 52. Contributions, Gifts, and Grants | 17 | $0 |
| 39. Sale of Supplies | | $0 | 53. General Overhead | 18 | $58,838 |
| 40. Interest | | $0 | 54. Union Administration | 19 | $43,548 |
| 41. Dividends | | $0 | 55. Benefits | 20 | $7,937 |
| 42. Rents | | $0 | 56. Per Capita Tax | | $900,000 |
| 43. Sale of Investments and Fixed Assets | 3 | $0 | 57. Strike Benefits | | $0 |
| 44. Loans Obtained | 9 | $0 | 58. Fees, Fines, Assessments, etc. | | $0 |
| 45. Repayments of Loans Made | 2 | $0 | 59. Supplies for Resale | | $0 |
| 46. On Behalf of Affiliates for Transmittal to Them | | $0 | 60. Purchase of Investments and Fixed Assets | 4 | $0 |
| 47. From Members for Disbursement on Their Behalf | | $0 | 61. Loans Made | 2 | $0 |
| 48. Other Receipts | 14 | $0 | 62. Repayment of Loans Obtained | 9 | $0 |
| 49. TOTAL RECEIPTS | | $916,062 | 63. To Affiliates of Funds Collected on Their Behalf | | $0 |
| | | | 64. On Behalf of Individual Members | | $0 |
| | | | 65. Direct Taxes | | $2,093 |
| | | | | | |
| | | | 66. Subtotal | | $1,310,379 |
| | | | 67. Withholding Taxes and Payroll Deductions | | |
| | | | 67a. Total Withheld $0 | | |
| | | | 67b. Less Total Disbursed $0 | | |
| | | | 67c. Total Withheld But Not Disbursed | | |
| | | | 68. TOTAL DISBURSEMENTS | | $1,310,379 |

Form LM-2 (Revised 2010); (Tech. Rev. 2/2013)

**SCHEDULE 1 - ACCOUNTS RECEIVABLE AGING SCHEDULE**

FILE NUMBER: 000-420

| Entity or Individual Name (A) | Total Account Receivable (B) | 90-180 Days Past Due (C) | 180+ Days Past Due (D) | Liquidated Account Receivable (E) |
|---|---|---|---|---|
| Total of all itemized accounts receivable | $0 | $0 | $ | $0 |
| Totals from all other accounts receivable | $0 | $0 | $0 | $0 |
| **Totals** (Total of Column (B) will be automatically entered in Item 23, Column(B)) | $0 | $0 | $0 | $0 |

**SCHEDULE 2 - LOANS RECEIVABLE**

FILE NUMBER: 000-420

| List below loans to officers, employees, or members which at any time during the reporting period exceeded $250 and list all loans to business enterprises regardless of amount. (A) | Loans Outstanding at Start of Period (B) | Loans Made During Period (C) | Repayments Received During Period | | Loans Outstanding at End of Period (E) |
|---|---|---|---|---|---|
| | | | Cash (D)(1) | Other Than Cash (D)(2) | |
| Total of loans not listed above | $0 | $0 | $0 | $0 | $0 |
| Total of all lines above | $0 | $0 | $0 | $0 | $0 |
| Totals will be automatically entered in... | Item 24 Column (A) | Item 61 | Item 45 | Item 69 with Explanation | Item 24 Column (B) |

Form LM-2 (Revised 2010); (Tech. Rev. 2/2013)

**SCHEDULE 3 - SALE OF INVESTMENTS AND FIXED ASSETS**

FILE NUMBER: 000-420

| Description (if land or buildings, give location) (A) | Cost (B) | Book Value (C) | Gross Sales Price (D) | Amount Received (E) |
|---|---|---|---|---|
| Total of all lines above | $0 | $0 | $0 | $0 |
| | | | Less Reinvestments | $0 |
| (The total from Net Sales Line will be automatically entered in Item 43) | | | Net Sales | $0 |

**SCHEDULE 4 - PURCHASE OF INVESTMENTS AND FIXED ASSETS**

**FILE NUMBER: 000-420**

| Description (if land or buildings, give location)<br>(A) | Cost<br>(B) | Book Value<br>(C) | Cash Paid<br>(D) |
|---|---|---|---|
| Total of all lines above | $0 | $0 | $0 |
| | | Less Reinvestments | $0 |
| (The total from Net Purchases Line will be automatically entered in Item 60.) | | Net Purchases | $0 |

**SCHEDULE 5 - INVESTMENTS**

FILE NUMBER: 000-420

| Description (A) | Amount (B) |
|---|---|
| Marketable Securities | |
| A. Total Cost | $0 |
| B. Total Book Value | $0 |
| C. List each marketable security which has a book value over $5,000 and exceeds 5% of Line B. | |
| Other Investments | |
| D. Total Cost | $0 |
| E. Total Book Value | $0 |
| F. List each other investment which has a book value over $5,000 and exceeds 5% of Line E. Also, list each subsidiary for which separate reports are attached. | |
| **G. Total of Lines B and E** (Total will be automatically entered in Item 26, Column(B)) | $0 |

**SCHEDULE 6 - FIXED ASSETS**

FILE NUMBER: 000-420

| Description (A) | Cost or Other Basis (B) | Total Depreciation or Amount Expensed (C) | Book Value (D) | Value (E) |
|---|---|---|---|---|
| A. Land (give location) | $0 | | $0 | $0 |
| B. Buildings (give location) | $0 | $0 | $0 | $0 |
| C. Automobiles and Other Vehicles | $0 | $0 | $0 | $0 |
| D. Office Furniture and Equipment | $0 | $0 | $0 | $0 |
| E. Other Fixed Assets | $0 | $0 | $0 | $0 |
| **F. Totals of Lines A through E** (Column(D) Total will be automatically entered in Item 27, Column(B)) | $0 | $0 | $0 | $0 |

**SCHEDULE 7 - OTHER ASSETS**

FILE NUMBER: 000-420

| Description (A) | Book Value (B) |
|---|---|
| **Total** (Total will be automatically entered in Item 28, Column(B)) | $0 |

**SCHEDULE 8 -ACCOUNTS PAYABLE AGING SCHEDULE**

FILE NUMBER: 000-420

| Entity or Individual Name (A) | Total Account Payable (B) | 90-180 Days Past Due (C) | 180+ Days Past Due (D) | Liquidated Account Payable (E) |
|---|---|---|---|---|
| Total for all itemized accounts payable | $0 | $0 | $0 | $0 |
| Total from all other accounts payable | $0 | $0 | $0 | $0 |
| **Totals** (Total for Column(B) will be automatically entered in Item 30, Column(D)) | $0 | $0 | $0 | $0 |

**SCHEDULE 9 - LOANS PAYABLE**

**FILE NUMBER: 000-420**

| Source of Loans Payable at Any Time During the Reporting Period (A) | Loans Owed at Start of Period (B) | Loans Obtained During Period (C) | Repayment During Period Cash (D)(1) | Repayment During Period Other Than Cash (D)(2) | Loans Owed at End of Period (E) |
|---|---|---|---|---|---|
| Total Loans Payable | $0 | $0 | $0 | $0 | $0 |
| Totals will be automatically entered in... | Item 31 Column (C) | Item 44 | Item 62 | Item 69 with Explanation | Item 31 Column (D) |

**SCHEDULE 10 - OTHER LIABILITIES**

**FILE NUMBER:** 000-420

| Description (A) | Amount at End of Period (B) |
|---|---|
| **Total Other Liabilities** (Total will be automatically entered in Item 33, Column(D)) | $0 |

**SCHEDULE 11 - ALL OFFICERS AND DISBURSEMENTS TO OFFICERS**

FILE NUMBER: 000-420

| | (A) Name | (B) Title | (C) Status | (D) Gross Salary Disbursements (before any deductions) | (E) Allowances Disbursed | (F) Disbursements for Official Business | (G) Other Disbursements not reported in (D) through (F) | (H) TOTAL | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 00<br>B<br>C | burke , james<br>Executive Board Member<br>P | | | $0 | $0 | $0 | $0 | $0 | | |
| I | Schedule 15 Representational Activities | 85 % | Schedule 16 Political Activities and Lobbying | 0 % | Schedule 17 Contributions | 0 % | Schedule 18 General Overhead | 0 % | Schedule 19 Administration | 15 % |
| A<br>B<br>C | Jean-Giles , Brikener<br>Executive Board Member<br>C | | | $12,000 | $0 | $0 | $0 | $12,000 | | |
| I | Schedule 15 Representational Activities | 85 % | Schedule 16 Political Activities and Lobbying | 0 % | Schedule 17 Contributions | 0 % | Schedule 18 General Overhead | 0 % | Schedule 19 Administration | 15 % |
| A<br>B<br>C | Maritas , Steve<br>Executive Director<br>C | | | $0 | $0 | $10,634 | $0 | $10,634 | | |
| I | Schedule 15 Representational Activities | 85 % | Schedule 16 Political Activities and Lobbying | 0 % | Schedule 17 Contributions | 0 % | Schedule 18 General Overhead | 0 0 | Schedule 19 Administration | 15 % |
| A<br>B<br>C | Wells , Calvin<br>Executive Board Member<br>C | | | $13,350 | $0 | $0 | $0 | $13,350 | | |
| I | Schedule 15 Representational Activities | 85 % | Schedule 16 Political Activities and Lobbying | 0 % | Schedule 17 Contributions | 0 % | Schedule 18 General Overhead | 0 % | Schedule 19 Administration | 15 |
| ot<br>B<br>C | ottilare , Robert<br>Executive Board Member<br>C | | | $12,000 | $0 | $0 | ;: | $12,000 | | |
| I | Schedule 15 Representational Activities | 85 % | Schedule 16 Political Activities and Lobbying | 0 % | Schedule 17 Contributions | 0 % | Schedule 18 General Overhead | 0 % | Schedule 19 Administration | 15 % |
| A<br>B<br>C | Ahrens , Thomas<br>Executive Board Member<br>C | | | $12,000 | $0 | $0 | $0 | $12,000 | | |
| I | Schedule 15 Representational Activities | 85 % | Schedule 16 Political Activities and Lobbying | 0 % | Schedule 17 Contributions | 0 % | Schedule 18 General Overhead | 0 % | Schedule 19 Administration | 15 % |
| Total Officer Disbursements | | | | $49,350 | $0 | $10,634 | $0 | $59,984 | | |
| Less Deductions | | | | | | | | $0 | | |
| Net Disbursements | | | | | | | | $59,984 | | |

Form LM-2 (Revised 2010); (Tech. Rev. 2/2013)

**SCHEDULE 12 - DISBURSEMENTS TO EMPLOYEES**

FILE NUMBER: 000-420

| | (A) Name | (B) Title | (C) Other Payer | (D) Gross Salary Disbursements (before any deductions) | (E) Allowances Disbursed | (F) Disbursements for Official Business | (G) Other Disbursements not reported in (D) through (F) | (H) TOTAL |
|---|---|---|---|---|---|---|---|---|
| TOTALS RECEIVED BY EMPLOYEES MAKING $10,000 OR LESS | | | | $22,67 | $0 | $0 | $ | $22,673 |
| I | Schedule 15 Representational Activities | 100 °A | Schedule 16 Political Activities and Lobbying | | Schedule 17 Contributions | Schedule 18 iGeneral Overhead | Schedule 19 Administration | |
| Tota Employee Disbursements | | | | $22,673 | $0 | $0 | $0 | $22,673 |
| Less Deductions | | | | | | | | $0 |
| Net Disbursements | | | | | | | | $22,673 |

Form LM-2 (Revised 2010); (Tech. Rev. 2/2013)

**SCHEDULE 13 - MEMBERSHIP STATUS**

FILE NUMBER: 000-420

| Category of Membership (A) | Number (B) | Voting Eligibility (C) |
|---|---|---|
| Regular Members | 1,724 | Yes |
| Associate Member | 0 | No |
| **Members** (Total of all lines above) | 1,724 | |
| Agency Fee Payers* | 0 | |
| Total Members/Fee Payers | 1,724 | |
| *Agency Fee Payers are not considered members of the labor organization. | | |

**DETAILED SUMMARY PAGE - SCHEDULES 14 THROUGH 19**

FILE NUMBER: 000-420

| SCHEDULE 14 OTHER RECEIPTS | |
|---|---|
| 1. Named Payer Itemized Receipts | $0 |
| 2. Named Payer Non-itemized Receipts | $0 |
| 3. All Other Receipts | $0 |
| 4. Total Receipts | $0 |

| SCHEDULE 15 REPRESENTATIONAL ACTIVITIES | |
|---|---|
| 1. Named Payee Itemized Disbursements | $183,995 |
| 2. Named Payee Non-itemized Disbursements | $0 |
| 3. To Officers | $50,987 |
| 4. To Employees | $22,673 |
| 5. All Other Disbursements | $40,308 |
| 6. Total Disbursements | $297,963 |

| SCHEDULE 16 POLITICAL ACTIVITIES AND LOBBYING | |
|---|---|
| 1. Named Payee Itemized Disbursements | $0 |
| 2. Named Payee Non-itemized Disbursements | $0 |
| 3. To Officers | $0 |
| 4. To Employees | $0 |
| 5. All Other Disbursements | $0 |
| 6. Total Disbursements | $0 |

| SCHEDULE 17 CONTRIBUTIONS, GIFTS & GRANTS | |
|---|---|
| 1. Named Payee Itemized Disbursements | $0 |
| 2. Named Payee Non-itemized Disbursements | $0 |
| 3. To Officers | $0 |
| 4. To Employees | $0 |
| 5. All Other Disbursements | $0 |
| 6. Total Disbursements | $0 |

| SCHEDULE 18 GENERAL OVERHEAD | |
|---|---|
| 1. Named Payee Itemized Disbursements | $0 |
| 2. Named Payee Non-itemized Disbursements | $30,869 |
| 3. To Officers | $0 |
| 4. To Employees | $0 |
| 5. All Other Disbursements | $27,969 |
| 6. Total Disbursements | $58,838 |

| SCHEDULE 19 UNION ADMINISTRATION | |
|---|---|
| 1. Named Payee Itemized Disbursements | $25,000 |
| 2. Named Payee Non-itemized Disbursements | $0 |
| 3. To Officers | $8,998 |
| 4. To Employees | $0 |
| 5. All Other Disbursements | $9,550 |
| 6. Total Disbursements | $43,548 |

**SCHEDULE 14 - OTHER RECEIPTS** FILE NUMBER: 000-420

There was no data found for this schedule.

**SCHEDULE 15 - REPRESENTATIONAL ACTIVITIES** FILE NUMBER: 000-420

| Name and Address (A) | Purpose (C) | Date (D) | Amount (E) |
|---|---|---|---|
| Dennis M Barnes P LLC<br><br>8540 N Canton Center Rd<br>Canton<br>MI<br>48187 | Legal fees for representational activities | 12/21/2022 | $8,196 |
| | Total Itemized Transactions with this Payee/Payer | | $8,196 |
| | Total Non-Itemized Transactions with this Payee/Payer | | $0 |
| Type or Classification (B) | Total of All Transactions with this Payee/Payer for This Schedule | | $8,196 |
| Law Firm | | | |

| Name and Address (A) | Purpose (C) | Date (D) | Amount (E) |
|---|---|---|---|
| Lally & Misir, LLP<br><br>220 Old Country Road<br>Mineola<br>NY<br>11501 | Legal fees for representational activities | 11/16/2022 | $50,000 |
| | Total Itemized Transactions with this Payee/Payer | | $50,000 |
| | Total Non-Itemized Transactions with this Payee/Payer | | $0 |
| Type or Classification (B) | Total of All Transactions with this Payee/Payer for This Schedule | | $50,000 |
| Law Firm | | | |

| Name and Address (A) | Purpose (C) | Date (D) | Amount (E) |
|---|---|---|---|
| Nunley Wheelock | Legal fees for representational activities | 03/11/2022 | 510,000 |
| | Legal fees for representational activities | 03/25/2022 | $10,000 |
| 4051 Haggerty Road | Legal fees for representational activities | 05/06/2022 | $10,000 |
| West Bloomfield Townshi | Legal fees for representational activities | 08/09/2022 | $10,000 |
| MI 8323 | Legal fees for representational activities | 09/13/2022 | $20,000 |
| **Type or Classification (B)** | Legal fees for representational activities | 10/06/2022 | s28,299 |
| | Legal fees for representational activities | 11/08/2022 | $20,000 |
| Law Firm | Legal fees for representational activities | 06/10/2022 | $10,000 |
| | Legal fees for representational activities | 07/14/2022 | $7,500 |
| | Total Itemized Transactions with this Payee/Payer | | $125,799 |
| | Total Non-Itemized Transactions with this Payee/Payer | | $0 |
| | Total of All Transactions with this Payee/Payer for This Schedule | | 5125,799 |

**SCHEDULE 16 - POLITICAL ACTIVITIES AND LOBBYING** FILE NUMBER 000-420

There was no data found for this schedule.

**SCHEDULE 17 - CONTRIBUTIONS, GIFTS & GRANTS** FILE NUMBER: 000-420

There was no data found for this schedule.

**SCHEDULE 18 - GENERAL OVERHEAD** FILE NUMBER: 000-420

| Name and Address (A) | Purpose (C) | Date (D) | Amount (E) |
|---|---|---|---|
| Servcorp US<br><br>1330 Avenue of the Americas<br>New York<br>NY<br>10019 | Total Itemized Transactions with this Payee/Payer | | |
| | Total Non-Itemized Transactions with this Payee/Payer | | $7,135 |
| | Total of All Transactions with this Payee/Payer for This Schedule | | $7,135 |
| Type or Classification (B) | | | |
| Office Space | | | |

| Name and Address (A) | Purpose (C) | Date (D) | Amount (E) |
|---|---|---|---|
| WithumSmith+Brown, PC<br><br>4600 East-West Highway<br>Bethesda<br>MD<br>20814 | Total Itemized Transactions with this Payee/Payer | | |
| | Total Non-Itemized Transactions with this Payee/Payer | | $12,009 |
| | Total of All Transactions with this Payee/Payer for This Schedule | | $12,009 |
| Type or Classification (B) | | | |
| Accounting Firm | | | |

| Name and Address (A) | Purpose (C) | Date (D) | Amount (E) |
|---|---|---|---|
| WIX<br><br>154 W 14th St Ste 703<br>New York<br>NY<br>10011 | Total Itemized Transactions with this Payee/Payer | | |
| | Total Non-Itemized Transactions with this Payee/Payer | | $11,725 |
| | Total of All Transactions with this Payee/Payer for This Schedule | | $11,725 |
| Type or Classification (B) | | | |
| Web Services | | | |

**SCHEDULE 19 - UNION ADMINISTRATION**

FILE NUMBER: 000-420

| Name and Address (A) | Purpose (C) | Date (D) | Amount (E) |
|---|---|---|---|
| Lally & Misir LLP<br><br>220 Old Country Road<br>Mineola<br>NY<br>11501 | Legal fees for Union Administration | 07/07/2022 | $5,000 |
| | Legal fees for Union Administration | 09/14/2022 | $10,000 |
| | Legal fees for Union Administration | 11/02/2022 | $10,000 |
| | Total Itemized Transactions with this Payee/Payer | | $25,000 |
| Type or Classification (B) | Total Non-Itemized Transactions with this Payee/Payer | | $0 |
| Law Firm | Total of All Transactions with this Payee/Payer for This Schedule | | $25,000 |

**SCHEDULE 20 - BENEFITS**

**FILE NUMBER: 000-420**

| Description (A) | To Whom Paid (B) | Amount (C) |
|---|---|---|
| Health Insurance | Fidelis | $7,937 |
| Total of all lines above (Total will be automatically entered in Item 55.) | | $7,937 |

**69. ADDITIONAL INFORMATION SUMMARY**



**Item 70 Title: There is No President. The Executive Director who is also a Board member is signing on its behalf.**

**Schedule 13, Row1:**

**Schedule 13, Row1::Membership shall be open to those individuals who provide protective services/security services.**

**Schedule 13, Row1:**

**Schedule 13, Row1::**

**Schedule 13, Row2:**

**Schedule 13, Row2::Any law enforcement and/or security professional who wish to join our International Union may do so as an Associate Member. Such Associate Member shall not have any voting rights in this organization. Such Associate Members are not required to pay monthly dues. Nothing shall prohibit this International Union from setting a yearly membership fee and/or from providing limited benefits to such Associate member or members.**

**Schedule 13, Row2:**

**Schedule 13, Row2:: Associate members do not have voting rights.**

**General Information:**

**Schedule 11 - James Burke is listed as a past officer. Mr. Burke resigned effective January 1, 2021, however, he was inadvertently included as a continuing officer on the 2021 Form LM-2.**